## UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

| | |
|---|---|
| RICHARD STANTON, Individually and on behalf of all others similarly situated, | Case No: |
| Plaintiff, | JURY TRIAL DEMANDED |
| v. | |
| WALMART INC., C. DOUGLAS MCMILLON, and M. BRETT BIGGS, | |
| Defendants. | |

## CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
## FEDERAL SECURITIES LAWS

Plaintiff Richard Stanton ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Walmart Inc. ("Walmart" or the "Company"), and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a class action on behalf of persons or entities who purchased or otherwise acquired publicly traded Walmart securities between March 30, 2016 and December 22, 2020,

1

inclusive (the "Class Period"). Plaintiff seeks to recover compensable damages caused by Defendants' violations of the federal securities laws under the Securities Exchange Act of 1934 (the "Exchange Act").

## JURISDICTION AND VENUE

2.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

3.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 27 of the Exchange Act (15 U.S.C. §78aa).

4.      Venue is proper in this judicial district pursuant to 28 U.S.C. §1391(b) and Section 27 of the Exchange Act (15 U.S.C. §78aa(c)) as the alleged misstatements entered and the subsequent damages took place in this judicial district.

5.      In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

6.      Plaintiff, as set forth in the accompanying certification, incorporated by reference herein, purchased Walmart securities during the Class Period and was economically damaged thereby.

7.      Defendant Walmart engages in the retail and wholesale operations in various formats worldwide. The Company operates in three segments: Walmart U.S., Walmart International, and Sam's Club. It operates supercenters, supermarkets, hypermarkets, warehouse clubs, cash and carry stores, discount stores, drugstores, and convenience stores; membership-only warehouse

clubs; ecommerce websites, such as walmart.com, walmart.com.mx, asda.com, walmart.ca, flipkart.com, and samsclub.com; and mobile commerce applications. It operates approximately 11,500 stores and various e-commerce Websites under the 56 banners in 27 countries. Wal-mart Stores Inc. changed its name to Walmart Inc. in February 2018. Walmart is incorporated in the Delaware with headquarters at 702 SW 8th Street, Bentonville, AR 72716. Walmart's securities trade on New York Stock Exchange ("NYSE") under the ticker symbol "WMT."

8.      Defendant C. Douglas McMillon ("McMillon") has served as the Company's Chief Executive Officer ("CEO") and President since 2014.

9.      Defendant M. Brett Biggs ("Biggs") has served as the Company's Chief Financial Officer ("CFO") and Executive Vice President since December 2015.

10.     Defendants McMillon and Biggs are collectively referred to herein as the "Individual Defendants."

11.     Each of the Individual Defendants:

        (a)     directly participated in the management of the Company;

        (b)     was directly involved in the day-to-day operations of the Company at the highest levels;

        (c)     was privy to confidential proprietary information concerning the Company and its business and operations;

        (d)     was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

        (e)     was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(f)     was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

(g)     approved or ratified these statements in violation of the federal securities laws.

12.     Walmart is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

13.     The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to Walmart under *respondeat superior* and agency principles.

14.     Defendants Walmart and the Individual Defendants are collectively referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS
### Materially False and Misleading
### Statements Issued During the Class Period

15.     On March 30, 2016, the Company filed its annual report on Form 10-K for the year ended January 31, 2016 with the SEC (the "2015 10-K"). The 2015 10-K was signed by Defendants McMillon and Biggs. The 2015 10-K contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants McMillon and Biggs attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud. The Company reported that 11% of its total merchandise sales from Walmart U.S. were from the "Health and Wellness" category, which included revenues from its pharmacy business.

16.     On March 31, 2017, the Company filed its annual report on Form 10-K for the year ended

January 31, 2017 with the SEC (the "2016 10-K"). The 2016 10-K was signed by Defendants McMillon and Biggs. The 2016 10-K contained signed SOX certifications by Defendants McMillon and Biggs attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud. The Company reported that 11% of its total merchandise sales from Walmart U.S. were from the "Health and Wellness" category, which included revenues from its pharmacy business.

17.     The 2016 10-K stated the generic risk concerning the Company's pharmacy business:

> The retail pharmacy operations in our Walmart U.S. and Sam's Club segments generate substantial net sales, a large majority of which are generated by filling prescriptions for which we receive payment established through contractual relationship with third-party payers and payment administrators, such as private insurers, governmental agencies and pharmacy benefit managers ("PBMs").
>
> Our retail pharmacy operations are subject to numerous risks, including: reductions in the third-party reimbursement rates for drugs; changes in our payer mix (i.e., shifts in the relative distribution of our pharmacy customers across drug insurance plans and programs toward plans and programs with less favorable reimbursement terms); changes in third party payer drug formularies (i.e., the schedule of prescription drugs approved for reimbursement or which otherwise receive preferential coverage treatment); growth in, and our participation in or exclusion from, exclusive and preferred pharmacy network arrangements operated by PBMs and/or any insurance plan or program; increases in the prices we pay for brand name and generic prescription drugs we sell; increases in the administrative burden associated with seeking third-party reimbursement; changes in the frequency with which new brand name pharmaceuticals become available to consumers; introduction of lower cost generic drugs as substitutes for existing brand name drugs for which there was no prior generic drug competition; changes in drug mix (i.e., the relative distribution of drugs customers purchase at our pharmacies between brands and generics); changes in the health insurance market generally; changes in the scope of or the elimination of Medicare Part D or Medicaid drug programs; increased competition from other retail pharmacy operations; further consolidation among third party payers, PBMs or purchasers of drugs; overall economic conditions and the ability of our pharmacy customers to pay for drugs prescribed for them to the extent the costs are not reimbursed by a third party; failure to meet any performance or incentive thresholds to which our level of third party reimbursement may be subject; and changes in the regulatory

environment for the retail pharmacy industry and the pharmaceutical industry, including as a result of restrictions on the further implementation of or the repeal of the Patient Protection and Affordable Care Act or the enactment and implementation of a law replacing such act, and other changes in laws, rules and regulations that affect our retail pharmacy business.

If the supply of certain pharmaceuticals provided by one or more of vendors were to be disrupted for any reason, our pharmacy operations could be severely affected until at least such time as we could obtain a new supplier for such pharmaceuticals. Any such disruption could cause reputational damage and result in a significant number of our pharmacy customers transferring their prescriptions to other pharmacies.

One or a combination of such factors may adversely affect the volumes of brand name and generic pharmaceuticals we sell, our cost of sales associated with our retail pharmacy operations, and the net sales and gross margin of those operations, result in the loss of cross-store or -club selling opportunities and, in turn, adversely affect our overall net sales, other results of operations, cash flows and liquidity.

18.     On March 30, 2018, the Company filed its annual report on Form 10-K for the year ended

January 31, 2018 with the SEC (the "2017 10-K"). The 2017 10-K was signed by Defendants

McMillon and Biggs. The 2017 10-K contained signed SOX certifications by Defendants

McMillon and Biggs attesting to the accuracy of financial reporting, the disclosure of any

material changes to the Company's internal controls over financial reporting, and the disclosure

of all fraud. The Company reported that 11% of its total merchandise sales from Walmart U.S.

were from the "Health and Wellness" category, which included revenues from its pharmacy

business.

19.     The 2017 10-K stated the generic risk concerning the Company's pharmacy business:

Walmart has retail pharmacy operations in our Walmart U.S. and Sam's Club segments and a large majority of the retail pharmacy net sales are generated by filling prescriptions for which we receive payment through established contractual relationships with third-party payers and payment administrators, such as private insurers, governmental agencies and pharmacy benefit managers ("PBMs").

Our retail pharmacy operations are subject to numerous risks, including: reductions in the third-party reimbursement rates for drugs; changes in our payer mix (i.e., shifts in the relative distribution of our pharmacy customers across drug insurance plans and programs toward plans and programs with less favorable reimbursement terms); changes in third party payer drug formularies (i.e., the schedule of prescription drugs approved for reimbursement or which otherwise receive preferential coverage treatment); growth in, and our participation in or exclusion from, exclusive and preferred pharmacy network arrangements operated by PBMs and/or any insurance plan or program; increases in the prices we pay for brand name and generic prescription drugs we sell; increases in the administrative burdens associated with seeking third-party reimbursement; changes in the frequency with which new brand name pharmaceuticals become available to consumers; introduction of lower cost generic drugs as substitutes for existing brand name drugs for which there was no prior generic drug competition; changes in drug mix (i.e., the relative distribution of drugs customers purchase at our pharmacies between brands and generics); changes

in the health insurance market generally; changes in the scope of or the elimination of Medicare Part D or Medicaid drug programs; increased competition from other retail pharmacy operations; further consolidation among third party payers, PBMs or purchasers of drugs; overall economic conditions and the ability of our pharmacy customers to pay for drugs prescribed for them to the extent the costs are not reimbursed by a third party; failure to meet any performance or incentive thresholds to which our level of third party reimbursement may be subject; and changes in the regulatory environment for the retail pharmacy industry and the pharmaceutical industry, including as a result of restrictions on the further implementation of or the repeal of the Patient Protection and Affordable Care Act or the enactment and implementation of a law replacing such act, and other changes in laws, rules and regulations that affect our retail pharmacy business.

If the supply of certain pharmaceuticals provided by one or more of our vendors were to be disrupted for any reason, our pharmacy operations could be severely affected until at least such time as we could obtain a new supplier for such pharmaceuticals. Any such disruption could cause reputational damage and result in a significant number of our pharmacy customers transferring their prescriptions to other pharmacies.

One or a combination of such factors may adversely affect the volumes of brand name and generic pharmaceuticals we sell, our cost of sales associated with our retail pharmacy operations, and the net sales and gross margin of those operations, result in the loss of cross-store or cross-club selling opportunities and, in turn, adversely affect our overall net sales, other results of operations, cash flows and liquidity.

20.     The 2017 10-K stated the following concerning the pharmacy's business's regulatory

requirements:

> We operate in complex regulated environments in the United States and in the other countries in which we operate and could be adversely affected by changes to existing legal requirements including the related interpretations and enforcement practices, new legal requirements and/or any failure to comply with applicable regulations. Our pharmacy operations in the United States are subject to numerous federal, state and local regulations including licensing and other requirements for pharmacies and reimbursement arrangements. ***The regulations to which we are subject include, but are not limited to: federal and state registration and regulation of pharmacies; dispensing and sale of controlled substances and products containing pseudoephedrine;*** applicable governmental payer regulations including Medicare and Medicaid; data privacy and security laws and regulations including the Health Insurance Portability and Accountability Act, the Affordable Care Act or any successor thereto; laws and regulations relating to the protection of the environment and health and safety matters, including those governing exposure to, and the management and disposal of, hazardous substances; regulations regarding food and drug safety including those of the U.S. Food and Drug Administration (the "FDA") and the Drug Enforcement Administration (the "DEA"), trade regulations including those of the U.S. Federal Trade Commission, and consumer protection and safety regulations including those of the Consumer Product Safety Commission, as well as state regulatory authorities, governing the availability, sale, advertisement and promotion of products we sell and the financial services we offer; anti-kickback laws; false claims laws; and federal and state laws governing health care fraud and abuse and the practice of the professions of pharmacy, optical care and nurse practitioner services.

21.     On March 28, 2019, the Company filed its annual report on Form 10-K for the year ended January 31, 2019 with the SEC (the "2018 10-K"). The 2018 10-K was signed by Defendants McMillon and Biggs. The 2018 10-K contained signed SOX certifications by Defendants McMillon and Biggs attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud. The Company reported $35,788 million of merchandise sales from the "Health and Wellness" category, which included revenues from its pharmacy business.

22.     The 2018 10-K stated the generic risk concerning the Company's pharmacy business:

Walmart has retail pharmacy operations in our Walmart U.S. and Sam's Club segments. A large majority of our retail pharmacy net sales are generated by filling prescriptions for which we receive payment through established contractual relationships with third-party payers and payment administrators, such as private insurers, governmental agencies and pharmacy benefit managers ("PBMs").

Our retail pharmacy operations are subject to numerous risks, including: reductions in the third-party reimbursement rates for drugs; changes in our payer mix (i.e., shifts in the relative distribution of our pharmacy customers across drug insurance plans and programs toward plans and programs with less favorable reimbursement terms); changes in third party payer drug formularies (i.e., the schedule of prescription drugs approved for reimbursement or which otherwise receive preferential coverage treatment); growth in, and our participation in or exclusion from, exclusive and preferred pharmacy network arrangements operated by PBMs and/or any insurance plan or program; increases in the prices we pay for brand name and generic prescription drugs we sell; increases in the administrative burdens associated with seeking third-party reimbursement; changes in the frequency with which new brand name pharmaceuticals become available to consumers; introduction of lower cost generic drugs as substitutes for existing brand name drugs for which there was no prior generic drug competition; changes in drug mix (i.e., the relative distribution of drugs customers purchase at our pharmacies between brands and generics); changes in the health insurance market generally; changes in the scope of or the elimination of Medicare Part D or Medicaid drug programs; increased competition from other retail pharmacy operations; further consolidation among third party payers, PBMs or purchasers of drugs; overall economic conditions and the ability of our pharmacy customers to pay for drugs prescribed for them to the extent the costs are not reimbursed by a third party; failure to meet any performance or incentive thresholds to which our level of third party reimbursement may be subject; and changes in the regulatory environment for the retail pharmacy industry and the pharmaceutical industry, including as a result of restrictions on the further implementation of or the repeal of the Patient Protection and Affordable Care Act or the enactment and implementation of a law replacing such act, and other changes in laws, rules and regulations that affect our retail pharmacy business.

If the supply of certain pharmaceuticals provided by one or more of our vendors were to be disrupted for any reason, our pharmacy operations could be severely affected until at least such time as we could obtain a new supplier for such pharmaceuticals. Any such disruption could cause reputational damage and result in a significant number of our pharmacy customers transferring their prescriptions to other pharmacies.

One or a combination of such factors may adversely affect the volumes of brand name and generic pharmaceuticals we sell, our cost of sales associated with our retail pharmacy operations, and the net sales and gross margin of those operations or result in the loss of cross-store or cross-club selling opportunities and, in turn,

adversely affect our overall net sales, other results of operations, cash flows and liquidity.

23.     The 2018 10-K stated the following concerning the pharmacy's business's regulatory requirements:

> We operate in complex regulated environments in the United States and in the other countries in which we operate and could be adversely affected by changes to existing legal requirements including the related interpretations and enforcement practices, new legal requirements and/or any failure to comply with applicable regulations.
>
> Our pharmacy operations in the United States are subject to numerous federal, state and local regulations including licensing and other requirements for pharmacies and reimbursement arrangements. ***The regulations to which we are subject include, but are not limited to: federal and state registration and regulation of pharmacies; dispensing and sale of controlled substances and products containing pseudoephedrine***; applicable governmental payer regulations including Medicare and Medicaid; data privacy and security laws and regulations including the Health Insurance Portability and Accountability Act, the Affordable Care Act, laws and regulations relating to the protection of the environment and health and safety matters, including those governing exposure to, and the management and disposal of, hazardous substances; regulations regarding food and drug safety including those of the U.S. Food and Drug Administration (the "FDA") and the Drug Enforcement Administration (the "DEA"), trade regulations including those of the U.S. Federal Trade Commission, and consumer protection and safety regulations including those of the Consumer Product Safety Commission, as well as state regulatory authorities, governing the availability, sale, advertisement and promotion of products we sell and the financial services we offer; anti-kickback laws; false claims laws; and federal and state laws governing health care fraud and abuse and the practice of the professions of pharmacy, optical care and nurse practitioner services.

24.     On March 20, 2020, the Company filed its annual report on Form 10-K for the year ended January 31, 2020 with the SEC (the "2019 10-K"). The 2019 10-K was signed by Defendants McMillon and Biggs. The 2019 10-K contained signed SOX certifications by Defendants McMillon and Biggs attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud. The Company reported $37,507 million of merchandise sales from the "Health and

Wellness" category, which included revenues from its pharmacy business.

25.     The 2019 10-K stated the generic risk concerning the Company's pharmacy business:

> Walmart has retail pharmacy operations in our Walmart U.S. and Sam's Club segments, as well as the recent addition of Walmart Health Centers to some of our U.S. stores. A large majority of our retail pharmacy net sales are generated by filling prescriptions for which we receive payment through established contractual relationships with third-party payers and payment administrators, such as private insurers, governmental agencies and pharmacy benefit managers ("PBMs").

> Our retail pharmacy operations are subject to numerous risks, including: reductions in the third-party reimbursement rates for drugs; changes in our payer mix (i.e., shifts in the relative distribution of our pharmacy customers across drug insurance plans and programs toward plans and programs with less favorable reimbursement terms); changes in third-party payer drug formularies (i.e., the schedule of prescription drugs approved for reimbursement or which otherwise receive preferential coverage treatment); growth in, and our participation in or exclusion from, exclusive and preferred pharmacy network arrangements operated by PBMs and/or any insurance plan or program; increases in the prices we pay for brand name and generic prescription drugs we sell; increases in the administrative burdens associated with seeking third-party reimbursement; changes in the frequency with which new brand name pharmaceuticals become available to consumers; introduction of lower cost generic drugs as substitutes for existing brand name drugs for which there was no prior generic drug competition; changes in drug mix (i.e., the relative distribution of drugs customers purchase at our pharmacies between brands and generics); changes in the health insurance market generally; changes in the scope of or the elimination of Medicare Part D or Medicaid drug programs; increased competition from other retail pharmacy operations; further consolidation and strategic alliances among third-party payers, PBMs or purchasers of drugs; overall economic conditions and the ability of our pharmacy customers to pay for drugs prescribed for them to the extent the costs are not reimbursed by a third-party; failure to meet any performance or incentive thresholds to which our level of third-party reimbursement may be subject; and changes in the regulatory environment for the retail pharmacy industry and the pharmaceutical industry, including as a result of restrictions on the further implementation of or the repeal of the Patient Protection and Affordable Care Act or the enactment and implementation of a law replacing such act, and other changes in laws, rules and regulations that affect our retail pharmacy business.

> If the supply of certain pharmaceuticals provided by one or more of our vendors were to be disrupted for any reason, our pharmacy operations could be severely affected until at least such time as we could obtain a new supplier for such pharmaceuticals. Any such disruption could cause reputational damage and result

in a significant number of our pharmacy customers transferring their prescriptions to other pharmacies.

One or a combination of such factors may adversely affect the volumes of brand name and generic pharmaceuticals we sell, our cost of sales associated with our retail pharmacy operations, and the net sales and gross margin of those operations or result in the loss of cross-store or cross-club selling opportunities and, in turn, adversely affect our overall net sales, other results of operations, cash flows and liquidity.

26.     The 2019 10-K stated the following concerning the pharmacy's business's regulatory requirements:

We operate in complex regulated environments in the U.S. and in the other countries in which we operate and could be adversely affected by changes to existing legal requirements including the related interpretations and enforcement practices, new legal requirements and/or any failure to comply with applicable regulations.

Our pharmacy and other healthcare operations in the U.S. are subject to numerous federal, state and local regulations including licensing and other requirements and reimbursement arrangements. ***The regulations to which we are subject include, but are not limited to: federal and state registration and regulation of pharmacies; dispensing and sale of controlled substances and products containing pseudoephedrine***; applicable governmental payer regulations including Medicare and Medicaid; data privacy and security laws and regulations including the Health Insurance Portability and Accountability Act, the Affordable Care Act, laws and regulations relating to the protection of the environment and health and safety matters, including those governing exposure to, and the management and disposal of, hazardous substances; regulations regarding food and drug safety including those of the U.S. Food and Drug Administration (the "FDA") and the Drug Enforcement Administration (the "DEA"), trade regulations including those of the U.S. Federal Trade Commission, and consumer protection and safety regulations including those of the Consumer Product Safety Commission, as well as state regulatory authorities, governing the availability, sale, advertisement and promotion of products we sell and the financial services we offer; anti-kickback laws; false claims laws; and federal and state laws governing health care fraud and abuse and the practice of the professions of pharmacy, optical care and nurse practitioner services.

27.     The statements contained in ¶15-26 were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's

business, operations and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) the Company knowingly filled prescriptions that were issued by so-called "pill-mill" prescribers; (2) the Company filled thousands of prescriptions that showed obvious red flags, including highly-dangerous cocktails of drugs, (3) the Company's managers made it difficult for Walmart pharmacists to comply with their legal obligations by pressuring them to fulfill as many orders as possible; (4) hence, the Company's pharmacy revenues were inflated because the Company filled thousands of invalid prescriptions in violation of the Controlled Substance Act dispensing requirements; (5) the aforementioned conduct would subject the Company to regulatory scrutiny; and (6) as a result, Defendants' statements about its business, operations, and prospects, were materially false and misleading and/or lacked a reasonable basis at all relevant times.

## THE TRUTH BEGINS TO EMERGE

28.    On December 22, 2020, while the market was open, the Department of Justice announced in a press release that it has filed a lawsuit against Walmart for alleged violations of the Controlled Substances Act and the Company's role in the opioid epidemic.  The DOJ press release stated, in pertinent part:

> In a civil complaint filed today, the Department of Justice has alleged that Walmart Inc. unlawfully dispensed controlled substances from pharmacies it operated across the country and unlawfully distributed controlled substances to those pharmacies throughout the height of the prescription opioid crisis.

> The complaint alleges that this unlawful conduct resulted in hundreds of thousands of violations of the Controlled Substances Act (CSA).  The Justice Department seeks civil penalties, which could total in the billions of dollars, and injunctive relief.

> "It has been a priority of this administration to hold accountable those responsible for the prescription opioid crisis.  As one of the largest pharmacy chains and wholesale drug distributors in the country, Walmart had the responsibility and the

means to help prevent the diversion of prescription opioids," said Jeffrey Bossert Clark, Acting Assistant Attorney General of the Civil Division. ***"Instead, for years, it did the opposite — filling thousands of invalid prescriptions at its pharmacies and failing to report suspicious orders of opioids and other drugs placed by those pharmacies. This unlawful conduct contributed to the epidemic of opioid abuse throughout the United States. Today's filing represents an important step in the effort to hold Walmart accountable for such conduct."***

"We entrust distributors and dispensers with the responsibility to ensure controlled substances do not fall into the wrong hands," said Drug Enforcement Administration (DEA) Acting Administrator Timothy Shea. "When processes to safeguard against drug diversion are violated or ignored, or when pharmacies routinely fill illegitimate prescriptions, we will hold accountable anyone responsible, including Walmart. Too many lives have been lost because of oversight failures and those entrusted with responsibility turning a blind eye."

The result of a multi-year investigation by the department's Prescription Interdiction & Litigation (PIL) Task Force, the complaint filed in the U.S. District Court for the District of Delaware alleges that Walmart violated the CSA in multiple ways as the operator of its pharmacies and wholesale drug distribution centers. ***The complaint alleges that, as the operator of its pharmacies, Walmart knowingly filled thousands of controlled substance prescriptions that were not issued for legitimate medical purposes or in the usual course of medical practice, and that it filled prescriptions outside the ordinary course of pharmacy practice. The complaint also alleges that, as the operator of its distribution centers, which ceased distributing controlled substances in 2018, Walmart received hundreds of thousands of suspicious orders that it failed to report as required to by the DEA. Together, the complaint alleges, these actions helped to fuel the prescription opioid crisis.***

If Walmart is found liable for violating the CSA, it could face civil penalties of up to $67,627 for each unlawful prescription filled and $15,691 for each suspicious order not reported. The court also may award injunctive relief to prevent Walmart from committing further CSA violations.

"For years, Walmart failed to meet its obligations in distributing and dispensing dangerous opioids and other drugs," said Deputy Assistant Attorney General Daniel J. Feith of the Civil Division's Consumer Protection Branch. "We look forward to advancing this case with our DOJ partners."

"The opioid crisis has exacted a catastrophic human toll upon the residents of our district and upon our country," said U.S. Attorney for the Middle District of Florida Maria Chapa Lopez. "National pharmacy chains must meet their legal obligations when dispensing and distributing these powerful medications. The filing of this complaint in collaboration with the Department of Justice and other United States Attorneys' Offices demonstrates our firm commitment to enforcing these critical legal requirements."

***"As a pharmacy that fills prescriptions for controlled substances, Walmart has an obligation to fill only those prescriptions that are legitimate***," said Acting

14

U.S. Attorney for the Eastern District of New York Seth D. DuCharme.  "As a wholesale drug distributor, Walmart also had an obligation to notify DEA of suspicious orders of controlled substances.  Walmart failed to comply with both of its obligations, and thereby failed in its responsibility to prevent the diversion of controlled substances."

***"Today's complaint is the culmination of a painstaking investigation by my office and our Department of Justice colleagues that uncovered years of unlawful conduct that did untold damage to communities around the country, including here in Colorado," said U.S. Attorney for the District of Colorado Jason R. Dunn.  "We look forward to pursuing justice and holding the company accountable for its conduct."***

(Emphasis added.)

29.     On this news, Walmart's stock price fell $2.75 per share, or 1.88%, over the next two trading days to close at $144.20 per share on December 23, 2020.

30.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common shares, Plaintiff and other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

31.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons other than defendants who acquired Walmart securities publicly traded on NYSE during the Class Period, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of Walmart, members of the Individual Defendants' immediate families and their legal representatives, heirs, successors or assigns and any entity in which Officer or Director Defendants have or had a controlling interest.

32.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Walmart securities were actively traded on NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only

through appropriate discovery, Plaintiff believes that there are hundreds, if not thousands of members in the proposed Class.

33.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

34.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

35.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the Exchange Act was violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the financial condition and business Walmart;

- whether Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

- whether the Defendants caused Walmart to issue false and misleading SEC filings during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false SEC filings;

- whether the prices of Walmart securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

36.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

37.   Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Walmart shares met the requirements for listing, and were listed and actively traded on NYSE, a highly efficient and automated market;

- As a public issuer, Walmart filed periodic public reports with the SEC and NYSE;

- Walmart regularly communicated with public investors via established market communication mechanisms, including through the regular dissemination of press releases via major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

- Walmart was followed by a number of securities analysts employed by major brokerage firms who wrote reports that were widely distributed and publicly available.

38.     Based on the foregoing, the market for Walmart securities promptly digested current information regarding Walmart from all publicly available sources and reflected such information in the prices of the shares, and Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

39.     Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information as detailed above.

## COUNT I
### For Violations of Section 10(b) And Rule 10b-5 Promulgated Thereunder
### Against All Defendants

40.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

41.     This Count is asserted against Defendants is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

42.     During the Class Period, Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

43.     Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

- employed devices, schemes and artifices to defraud;

- made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

- engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Walmart securities during the Class Period.

44.     Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of Walmart were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of Walmart, their control over, and/or receipt and/or modification of Walmart's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning Walmart, participated in the fraudulent scheme alleged herein.

45.      Individual Defendants, who are the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other Walmart personnel to members of the investing public, including Plaintiff and the Class.

46.     As a result of the foregoing, the market price of Walmart securities was artificially inflated during the Class Period. In ignorance of the falsity of Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of Walmart securities during the Class Period in purchasing Walmart

securities at prices that were artificially inflated as a result of Defendants' false and misleading statements.

47.    Had Plaintiff and the other members of the Class been aware that the market price of Walmart securities had been artificially and falsely inflated by Defendants' misleading statements and by the material adverse information which Defendants did not disclose, they would not have purchased Walmart securities at the artificially inflated prices that they did, or at all.

48.    As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

49.    By reason of the foregoing, Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchase of Walmart securities during the Class Period.

## COUNT II
### Violations of Section 20(a) of the Exchange Act
### Against the Individual Defendants

50.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

51.    During the Class Period, the Individual Defendants participated in the operation and management of Walmart, and conducted and participated, directly and indirectly, in the conduct of Walmart's business affairs. Because of their senior positions, they knew the adverse non-public information about Walmart's misstatement of revenue and profit and false financial statements.

52.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Walmart's financial

condition and results of operations, and to correct promptly any public statements issued by Walmart which had become materially false or misleading.

53.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Walmart disseminated in the marketplace during the Class Period concerning Walmart's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Walmart to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of Walmart within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Walmart securities.

54.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Walmart.

### PRAYER FOR RELIEF

**WHEREFORE**, plaintiff, on behalf of himself and the Class, prays for judgment and relief as follows:

(a)     declaring this action to be a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and designating plaintiff's counsel as Lead Counsel;

(b)     awarding damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, together with interest thereon;

(c)     awarding plaintiff and the Class reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

      (d)     awarding plaintiff and other members of the Class such other and further relief as the Court may deem just and proper.

**JURY TRIAL DEMANDED**

      Plaintiff hereby demands a trial by jury.

Dated: January 20, 2021              Respectfully submitted,

Of Counsel:                     **FARNAN LLP**

**THE ROSEN LAW FIRM, P.A.**      /s/ Michael J. Farnan

Laurence Rosen                  Brian E. Farnan (Bar No. 4089)

Phillip Kim                     Michael J. Farnan (Bar No. 5165)

275 Madison Avenue, 40th Floor    919 N. Market St., 12th Floor

New York, NY 10016             Wilmington, DE 19801

Telephone: (212) 686-1060        Telephone: (302) 777-0300

Facsimile: (212) 202-3827         Facsimile: (302) 777-0301

Email: lrosen@rosenlegal.com       Email: bfarnan@farnanlaw.com

pkim@rosenlegal.com                  mfarnan@farnanlaw.com

                                      *Counsel for Plaintiff*