# EXHIBIT D

EFiled: Oct 19 2020 12:00PM EDT
Transaction ID 66032202
Case No. Multi-Case

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

POLICE & FIRE RETIREMENT SYSTEM OF       :
THE CITY OF DETROIT,                      :
                                          :
                 Plaintiff,               :
                                          :
        v                                 : C. A. No.
                                          : 2020-0478-JTL
WALMART INC.,                             :
                                          :
                 Defendant.               :
---------------------------------------X  C. A. No.
NORFOLK COUNTY RETIREMENT SYSTEM,         : 2020-0482-JTL
                                          :
                 Plaintiff,               :
                                          :
        v                                 :
                                          :
WALMART INC.,                             :
                                          :
                 Defendant.               :
                              captions cont'd ...

                        - - -

                   Chancery Court Chambers
                   Leonard L. Williams Justice Center
                   500 North King Street
                   Wilmington, Delaware
                   Monday, October 5, 2020
                   1:30 p.m.

                        - - -

BEFORE:  HON. J. TRAVIS LASTER, Vice Chancellor

                        - - -

  SECTION 220 TRIAL AND RULINGS OF THE COURT HELD VIA
                  VIDEO CONFERENCE

------------------------------------------------------
              CHANCERY COURT REPORTERS
          Leonard L. Williams Justice Center
          500 North King Street - Suite 11400
              Wilmington, Delaware 19801
                   (302) 255-0533

2

1   ... caption cont'd

2   THE ONTARIO PROVINCIAL COUNCIL OF       :
    CARPENTERS' PENSION TRUST FUND,         :
3                                           :
                      Plaintiff,            :
4                                           :
         v                                  : C. A. No.
5                                           : 2020-0697-JTL
    WALMART INC.,                           :
6                                           :
                      Defendant.            :
7

8

9   APPEARANCES:  (via Zoom)

10       GREGORY V. VARALLO, ESQ.
         Bernstein, Litowitz, Berger & Grossmann LLP
11                -and-
         MARK LEBOVITCH, ESQ.
12       DAVID WALES, ESQ.
         ALLA ZAYENCHIK, ESQ.
13       DANIEL E. MEYER, ESQ.
         of the New York Bar
14       Bernstein, Litowitz, Berger & Grossmann LLP
                  -and-
15       NATHANIEL L. ORENSTEIN, ESQ.
         DALTON RODRIGUEZ, ESQ.
16       Berman Tabacco
         of the Massachusetts Bar
17         for Plaintiffs Police & Fire Retirement System
           of the City of Detroit and Norfolk County
18         Retirement System

19       NED C. WEINBERGER, ESQ.
         MARK RICHARDSON, ESQ.
20       Labaton Sucharow LLP
                  -and-
21       DAVID MacISAAC, ESQ.
         of the New York Bar
22       Labaton Sucharow LLP
           for Plaintiff The Ontario Provincial Council
23         of Carpenters' Pension Trust Fund

24

CHANCERY COURT REPORTERS

3

```
1   APPEARANCES:  (via Zoom)  (cont'd)

2         RAYMOND J. DiCAMILLO, ESQ.
          JOHN M. O'TOOLE, ESQ.
3         Richards, Layton & Finger, P.A.
                -and-
4         SEAN M. BERKOWITZ, ESQ.
          NICHOLAS J. SICILIANO, ESQ.
5         WHITNEY WEBER, ESQ.
          RENATTA GORSKI, ESQ.
6         of the Illinois Bar
          Latham & Watkins LLP
7           for Defendant Walmart

8                           - - -

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

4

1              THE COURT:  Welcome, everyone.  Thank

2    you for being here.  What I would like to do is the

3    following:  First of all, if we can do some quick

4    introductions and identify the people who will be

5    doing the speaking.  If you're not going to have a

6    speaking role, it would be great if at that point you

7    could turn off your video, not because it's not

8    wonderful to see you, but because, as everyone knows,

9    you can turn off video participants as I do --

10   nonvideo participants as I do, and so it helps reduce

11   the clutter on the Zoom screen.

12              Then, in terms of conducting the

13   hearing, I'm interested to hear from counsel's view on

14   this, but it seemed to me from looking through your

15   slides that one of you wants to tell me a lot about

16   proper purpose; one of you doesn't really want to talk

17   very much about proper purpose except to tell me how

18   big Walmart is and to point out that this stuff really

19   probably wasn't a major part of this far-flung,

20   worldwide shopping empire.

21              I think that it would be helpful if we

22   all got on the same page on proper purpose before we

23   turn to scope.  So my suggestion is that we spend --

24   we're going to break in an hour because I've already

5

1    been on Zoom all day, and I'm probably not going to be

2    able to go for an hour without a break.  We're going

3    to break at the one-hour mark for ten minutes.

4                    I suggest we use that first hour to

5    talk about purpose.  If we need all of it, we can use

6    it; if we don't, we don't have to.  And imagine that

7    you-all have 30 minutes each.  And then I can give you

8    my views on purpose.  Because unless I hear something

9    quite remarkable, you-all have done a good job of

10   covering the waterfront on that, I think.  And then we

11   can turn to scope.

12                   So I've now talked a little bit.

13   Before what I said I wanted to start was with

14   introductions.  So I think, Mr. Varallo, that's

15   probably your cue.

16                   MR. VARALLO:  Thank you, Your Honor.

17                   Pleasure to appear before you.  Greg

18   Varallo from Bernstein Litowitz on behalf of Police &

19   Fire Retirement System of the City of Detroit and as

20   local counsel for Norfolk County Retirement System.

21   From Bernstein Litowitz today with me, Your Honor, are

22   David Wales who, with Your Honor's permission, will

23   make the principal presentation for the plaintiffs.

24   And after Mr. Wales has completed his presentation,

CHANCERY COURT REPORTERS

6

1    Mr. MacIsaac from the Labaton Sucharow firm will make

2    an additional presentation.

3                      By way of further introductions, my

4    colleagues Alla Zayenchik, Dan Meyer, and Mark

5    Lebovitch are with us today.  Also from -- on behalf

6    of Norfolk County Retirement System, Nathaniel

7    Orenstein and Dalton Rodriguez.  And from Labaton

8    Sucharow on behalf of The Ontario Provincial Council

9    of Carpenters' Pension Trust Fund, Ned Weinberger,

10   Mark Richardson, and David MacIsaac.

11                     THE COURT:  Great, thank you.

12                     Mr. DiCamillo, do you want to do

13   similar honors?

14                     MR. DiCAMILLO:  Yes, Your Honor.

15   Thank you.

16                     Here with us this afternoon from my

17   firm is John O'Toole.  From Latham & Watkins we have

18   Sean Berkowitz, Nick Siciliano, Whitney Weber, and

19   Renatta Gorski.  And from Walmart's legal department,

20   Ross Higman.

21                     THE COURT:  Who's going to be doing

22   the speaking principally for your side, Mr. DiCamillo?

23                     MR. DiCAMILLO:  It will be me and

24   Mr. Berkowitz, Your Honor.

7

1          THE COURT:  Great.

2          MR. BERKOWITZ:  Good afternoon.

3          THE COURT:  Thank you.  All right.

4          Well, Mr. Wales, why don't you go

5    ahead.  As I said, I'd like to first focus on purpose,

6    come to some type of shared understanding -- or at

7    least share my understanding, it may not cohere with

8    your-all's understanding, but we'll see.  And then,

9    move on and have a continued discussion.

10          So, Mr. Wales, please proceed.

11          MR. WALES:  Thank you, Your Honor.

12    Good afternoon.  Thank you for the opportunity to be

13    heard today.

14          I just want to very briefly start out

15    with what's not in dispute.  And what's not in dispute

16    is that the plaintiffs are stockholders, they made the

17    220 demands, that they've owned the stock from 2009 or

18    2011, respectively, and Walmart stated in their

19    pretrial brief they're not making a form or matter

20    defense.

21          Putting aside the disclosure claims,

22    Walmart's entire challenge to proper purpose is two

23    pages.  We really do need to go through that, number

24    one, to establish our proper purpose, but also it

8

1  shows the ties to senior management and the board and

2  it helps inform the scope of the documents that should

3  be ordered.

4            I just have to change view.  I just

5  lost Your Honor when slides went up.  One second,

6  please.  Sorry about that.  Okay.

7            So, obviously, this matter arises in

8  the context of the opioid crisis our country is

9  facing.  And the government has declared the opioid

10 crisis a public health emergency.  That's Exhibit 283.

11 And, according to the CDC, more than 230,000 Americans

12 have died from overdose of prescription drugs.  That's

13 Exhibit 219.

14            While that is the context, our focus

15 today is much more limited.  It's whether there is a

16 credible basis to investigate Walmart's board and

17 senior executives for failing to implement and

18 maintain controls related to suspicious orders of

19 opioids and whether they failed to exercise oversight.

20            Now, the federal regulations place a

21 legal obligation on all parties in the chain of

22 distribution of opioids.  Those legal obligations are

23 set out in the Controlled Substances Act and in DEA

24 regulations, and that's in paragraph 4 of our pretrial

9

1    order, stipulated facts, as well as in Slide 4.

2                    Similarly, a distributor of controlled

3    substances must design and operate its system to

4    identify suspicious orders and report those to the

5    DEA.  That's also paragraph 4 of the pretrial order.

6                    For our purposes, Walmart was involved

7    in two parts of the chains of distributions of

8    opioids.  First, until 2018, Walmart or its

9    subsidiaries were distributors of opioids to its own

10   pharmacies; and, second, Walmart or its subsidiaries

11   operated approximately 4,700 pharmacies, and many of

12   them distributed opioids.  That's pretrial 2 as well

13   as some other exhibits, like JX 60.

14                   Now, I'm going to try to present the

15   credible basis story chronologically, even though it

16   unfolded at different times, with a lot of it coming

17   out in 2019 and 2020.

18                   As Your Honor is aware, there's an

19   opioid MDL in Ohio, and we're well aware of that from

20   *Amerisource*, and it's in our papers.  And these claims

21   arise out of the alleged illegal distribution of

22   opioids by Walmart and many others.  And that's

23   discussed at pretrial order paragraph 9 and Walmart's

24   10-K, which is Exhibit 115, as well as numerous state

10

1    actions by states, other government entities in the

2    state court.  That's also Exhibit 115.

3                    The MDL was created in December 2017,

4    and the evidence and rulings from that became public

5    primarily in 2019 and 2020.  Now, they're up to --

6    they've already had summary judgment in the MDL.  They

7    had a bellwether trial scheduled, and there's more to

8    come.

9                    Now, Exhibit 194, which is in pretrial

10   order 10 -- at paragraph 10, is the MDL ruling denying

11   summary judgment on the civil conspiracy counts

12   against both the distributor and pharmacy defendants.

13   And Walmart is a distributor and pharmacy defendant in

14   both of those.

15                   Now, Exhibit 213 is the MDL ruling

16   denying Walmart's summary judgment motion on public

17   nuance and civil conspiracy for alleged failure to

18   maintain controls against diversion of opioids.  This

19   decision from the MDL court summarizes some of the

20   evidence presented against Walmart.  This decision is

21   paragraph 11 of the PTO.

22                   Now, what I want to do, because this

23   is an important document for us, because it does start

24   establishing timeline and how long this problem

11

1   continued, is to turn to that exhibit, 213.

2               Now on page 2, there's a Section

3   called "Failure to Maintain Effective Controls."  And

4   it says here the Court had denied summary judgment to

5   Walmart.  It says, "Walmart asserts Plaintiffs cannot

6   show it failed to maintain effective controls against

7   diversion ... Plaintiffs respond with evidence

8   suggesting, *inter alia*, the following facts.  From the

9   early 2000s to April 2018, Walmart self-distributed

10  controlled substances to its own pharmacies.  Before

11  2011, Walmart had no written policies or procedures

12  concerning the monitoring of suspicious orders.

13  During this time frame, it relied on employees to look

14  at daily orders and, 'based on their knowledge,' let

15  someone know if 'they saw something that maybe looked

16  like it was kind of high.'  The identity of these

17  employees changed over time, as people left and ...

18  hired.  In determining whether they saw unusual

19  patterns or orders, the employees relied on their own

20  knowledge and experience; Walmart did not provide

21  written information to guide them."

22               So -- and that is our Slide 5.  But

23  there you have a court indicating there's evidence

24  that -- evidence to support that, or at least

12

1  sufficient evidence to have a jury -- let the jury

2  make that determination.

3              Now, moving forward from the 2011 time

4  period and later, there is other -- there's other

5  evidence.  Some of the other evidence is that Walmart

6  pharmacies received letters of admonition from the DEA

7  for failing to comply with their legal obligations

8  related to the dispensing of opioids.  Walmart admits

9  that in their answer.  That's Exhibit 248 at 8980 that

10  Walmart pharmacies received such letters of

11  admonition.  And the ProPublica article, which is

12  Exhibit 221, says more than 50 received such letters.

13              Now, what happened is -- and moving

14  on -- in 2009, the DEA issued an order to show cause

15  to a Walmart pharmacy in California for failing to

16  comply with the requirements for distributing opioids.

17  That's pretrial order paragraph 6.  And the order

18  itself is Exhibit 9, and that's also discussed a

19  pretrial order 7 and 8.  The results of that order to

20  show cause and the subsequent DEA investigation is

21  that Walmart entered into a memorandum of agreement

22  with the DEA in 2011.  So that's two years after the

23  order to show cause.

24              And this memorandum agreement covered

13

1  all current and future Walmart pharmacies, not just

2  the one but the thousands that they have around the

3  country.  And it lasted with a four-year term.

4          Now, JX 9, the memorandum of

5  agreement, specifically provides that on paragraph

6  4(a), "Walmart agrees to maintain a compliance

7  program, updated as necessary, designed to detect and

8  prevent diversion of controlled substances as required

9  by the Controlled Substances Act ... and applicable

10 DEA regulations."  That's discussed on 6 and 7 --

11 Slide 6 and 7.

12          I saw, obviously in Walmart's slide,

13 some comments about that.  And I guess what I'll have

14 to say is if you have an order to show cause for one

15 of 4,700 pharmacies, you have a problem with one

16 pharmacy, you replace a bad apple.  You don't enter

17 into a nationwide agreement covering all 4,700 the

18 last four years.  That's indicative that the

19 investigation found much more and more widespread

20 problems.

21          And the MOU is at Slide 7.  Now, there

22 are also a number of reasons to believe that the

23 senior executives and the board must have known about

24 this memorandum of understanding.  First, the nature

14

1  of the obligation.  You don't obligate all 4,700

2  pharmacies around the country to undertake something

3  without approval at the highest level, number one.

4          Number two, the subject matter of the

5  settlement, it's a legal obligation dealing with

6  public health and safety.  And if they violate it, the

7  consequences could be serious.  There could be civil

8  fines.  There could be penalties.  They could lose

9  their license.  There could even be criminal

10 prosecution.

11          Finally, and I think kind of the most

12 important one, is the Walmart audit committee charter

13 itself.  I would refer Your Honor to Exhibit 227.  And

14 that is Slide 8 of our presentation.  And there, it

15 makes clear that the audit committee has an obligation

16 to "advise the Board with respect to, the Company's

17 policies, processes ... procedures regarding

18 compliance with applicable laws and regulations ...."

19          They have to oversee management to

20 assure compliance by the Company with applicable

21 regulatory -- legal and regulatory requirements.  They

22 discuss with management and advise the board with

23 respect to the company's policies and procedures

24 regarding compliance with applicable laws and

15

1    language, and they meet with the chief legal officer.

2             Similarly, at the bottom of Slide 8,

3    we have a proxy from the time that has the same type

4    of reporting obligations discussed.  So there's every

5    reason to believe that the board knew.  And if they

6    didn't, it was a reporting failure, which itself is a

7    separate basis for potential liability.

8             Now, moving forward in time to the

9    2011-2015 time period, there's evidence that Walmart

10   continued to fail to comply with the legal

11   requirements.  And I'm turning back now to the summary

12   judgment motion decision, which is Exhibit 213, and I

13   am on the third page.

14            And at the top of the third page the

15   Court that is denying summary judgment notes, "From

16   2011 to 2015, Walmart implemented a threshold system

17   that flagged ... orders exceeding 5,000 dos[es] ...

18   orders that were 30 percent higher than a rolling

19   four-week average for a particular item."  And I note,

20   "It is unclear what, if any, due diligence was

21   performed on flagged orders; it appears ... Walmart

22   simply shipped the flagged orders and did not report

23   them to the DEA." That's hardly consistent with their

24   regulatory obligations.  And that is Slide 9.

CHANCERY COURT REPORTERS

16

1            But continuing into the next slide and

2   continuing into the opinion, it says, "Beginning in

3   ... 2012, Walmart implemented 'hard limits' of 20

4   bottles for shipments of Oxycodone ... and 50 bottles

5   of other opioid[s] ...."

6            And "Jeff Abernathy, a Walmart

7   employee who was responsible for reporting to the DEA

8   if there was a suspicious order identified on his

9   shift, testified that, for orders exceeding the

10  threshold limits, he was directed to reduce the order

11  to the threshold limit and ship it anyway.  As to any

12  orders that were cut, Walmart's pharmacies remained

13  free to order the same ... products from other

14  distributors such as McKesson and AmerisourceBergen."

15           So -- and we've also attached some of

16  the testimony of Mr. Abernathy, which is Exhibit 144,

17  to show the support for these facts.

18           Now, it continued.  In 2013, there's a

19  risk -- there's a controlled substance risk

20  assessment, and that's Exhibit 177.  This is a Walmart

21  document obtained from the MDL files.  And if you turn

22  to the third page of that, this is from 2013, it says,

23  "Suspicious Order Identification, Monitoring, and

24  Reporting.  Design & operate a [system] to detect

17

1   suspicious orders and report to the DEA when

2   discovered."  And delivery status to be determined.

3   The next line, "Maximum order limits.  Establish

4   additional maximum order limits of highly abused

5   drugs."  To be determined.

6               So here we are, four years after the

7   order to show cause, two years after their agreement

8   with the DEA, and they don't have this.  This is what

9   they're supposed to do.

10              If you continue on the next page, it's

11  this "Suspicious Order ... Monitoring, and Reporting

12  Timeline."  The boxes are blank.  And then you go to

13  the next page, at the timeline for the maximum order,

14  the boxes are blank.  You go a few pages later in

15  this, and they're talking about pharmacy timeline for

16  setting up certain closed circuit TVs, and it says to

17  "Meet [our] Obligations [under the] DEA MOA."  So here

18  they knew they had these obligations and they weren't

19  doing it.

20              Now, I want to turn to the next

21  document, which is Exhibit 180.  This is a powerful

22  document, Your Honor.  This is from 2014, and, again,

23  it was produced -- it was obtained from the court

24  files in the MDL.  And it says "Portfolio Scoring

18

1    Worksheet, Suspicious Order Monitoring."  And here,

2    I'm on the page that ends with 649.  And you go down

3    the middle of the page it says, "Is the risk being

4    mitigated today by manual, systematic, or a

5    combination of both ..." and then it says "5."  And

6    what does 5 mean?  "No, Emerging Risk ... has no

7    processes in place today."

8                    Next box down:  "What is the

9    likelihood that the events or conditions underlying

10   the Risk will occur?"  "Likely."

11                   Next box down:  "What is the potential

12   financial or reputational impact to the company if

13   [these] events ... occur?"  "Severe."

14                   Turning to the next page:  "What is

15   the extent of the Legal or Regulatory requirement?"

16   "National.

17                   "Is [this] effort related to a

18   settlement [or] agreement with a Government Agency

19   ...."  "Yes."

20                   "Is this effort Executive directed?"

21   "Yes."

22                   "Is this effort Board directed or

23   informed?"  "Board informed."

24                   So here we are, in 2014, five years

19

1  after the order to show cause, three years after their

2  settlement and, in their own words, there's no system

3  in place.

4              Now, turning to Slide 15, it

5  summarizes some of the evidence that we've presented.

6  Some of the evidence is from the ProPublica article.

7  And you have a quote from Mr. Nelson.  He's a

8  gentleman that the U.S. Attorney's Office subsequently

9  wanted to indict.  He's like, you know, I'm not

10  concerned about refusals to fill, I'm more concerned

11  about driving sales.

12              You have testimony from Ms. Hiland,

13  which is Exhibit 148, "didn't make sense for ...

14  business" purposes to have a more rigorous system.

15              And then the summary judgment opinion

16  back in Exhibit 213, which is probably one of the most

17  powerful pieces of evidence.  With respect to the

18  Walmart suspicious order monitoring, "the Court notes

19  the record evidence suggests obvious deficiencies that

20  a layperson could plainly recognize."

21              So -- and it continues.  Exhibit 176.

22  176, again, is another internal Walmart document

23  from -- obtained from the MDL.  It's from 2015.  And

24  they're frankly concerned about a DEA enforcement

20

1  action.  "This initiative will allow program

2  enhancements to help Walmart avoid DEA enforcement as

3  a result of non-compliance with 21 CFR 1301.7 ..."

4  dealing with suspicious orders.

5              So that's some of their own internal

6  documents, and, frankly, they're powerful evidence of

7  their failure to comply with these requirements.

8              I want to turn next now to the stories

9  of Dr. Diamond and Wade and their prescriptions and

10 their thousands and thousands of prescriptions being

11 filled by Walmart.  This is based both on the

12 ProPublica article, which is Exhibit 221, and

13 confirmed, in many respects, by Walmart counsel's

14 letter to the Justice Department, which are

15 Exhibits 139 and 199.

16             This is an important story because it

17 shows how affairs actually manifest themselves in the

18 real world and how Walmart did not have an operating

19 suspicious order system.  As described in the article,

20 pharmacists at Walmart recorded hundreds of thousands

21 of complaints to the compliance department about

22 prescriptions, and they were ignored.  That's on 15.

23             And despite repeat complaints about

24 certain doctors, Walmart refused to enter a blanket

CHANCERY COURT REPORTERS

21

1    refusal and corporate blocks.  In fact, there are

2    quotes here in emails about pharmacists were

3    threatened if they didn't drive the sales.

4                    Now, the article describes that

5    Walmart had a refusal to file reports, the internal

6    reporting system.  And the article subscribes they

7    didn't always report to the DEA as required and, when

8    they did, they would remove information, including the

9    pharmacists' comments, which would have obviously

10   helped the DEA figure out if there's a problem.

11                   Now, we know Drs. Diamond and Wade

12   were -- you know, they were just corrupt people.  They

13   ran a pill mill.  They were criminally prosecuted and

14   sentenced to long prison terms, and that's undisputed.

15   That's number 16, Slide 16.

16                   But what's really remarkable, as

17   described in the article, is that between 2014 and

18   2017, Walmart pharmacies filled 13,000 controlled

19   substance prescriptions from Dr. Diamond.  That's an

20   average of 11 a day, amounting to over 1.3 million

21   doses.

22                   Similarly, between 2011 and 2016, over

23   100 different Walmart pharmacies in 17 states filled

24   controlled substance prescriptions from Dr. Wade, and

22

1    in 2015 and '16 filled, on average, nine controlled

2    substance prescriptions per day from Dr. Wade.

3    That's, again, in the ProPublica article.

4                    Now, as we turn to page 16, what

5    happened is the DEA became involved with Walmart

6    because the agent surveilled people going to

7    Dr. Wade's clinic.  They followed them going to a

8    Walmart to get their prescriptions filled for these

9    painkillers.  And then they -- the DEA subsequently

10   raided the pharmacy.  And in addition, Walmart was

11   served with additional search warrants, information

12   requests, and subpoenas.  And the volume of

13   prescriptions in the geographic area are clearly red

14   flags and -- as are the repeat warnings from

15   pharmacists.

16                    Now, I do want to get to the U.S.

17   Attorney story, which is obviously part of the

18   ProPublica article.  The U.S. Attorney for the Eastern

19   District of Texas was threatening to prosecute Walmart

20   and its compliance manager, Mr. Nelson.  And according

21   to the article, Walmart went to DOJ and DOJ overruled

22   the U.S. Attorney's Office.

23                    Whether or not there was evidence

24   sufficient to warrant an indictment or if the DOJ

23

1   decision was politically motivated isn't really what's

2   important.  What's really important is that the

3   quantum of evidence was sufficient that a U.S.

4   Attorney thought they should be having that discussion

5   that Walmart or its compliance director should be

6   indicted.  Because, as Your Honor knows, the burden of

7   proof for a criminal prosecution is so much higher.

8   It's beyond a reasonable doubt, especially compared,

9   not only to a regular civil case, but the credible

10  basis here.

11             So kind of then coming around full

12  circle, you have Judge Polster on the MDL denying the

13  summary judgment to Walmart because there was evidence

14  sufficient to support a verdict against Walmart that

15  they failed to comply with their reporting

16  requirements.  And we've seen some of this.

17             And not only do you have the MDL and

18  the documents we've seen, but a number of state AGs

19  have sued Walmart on their opioid crisis:  Nevada, New

20  Mexico, South Dakota, and West Virginia.  Those are

21  Exhibits 163, 152, 196, and 262.  Some in the last

22  year or two.  And I'll just say government actions

23  carry a certain weight of credibility.

24             And then, finally, as Walmart has

24

1  admitted in its recent 10-K -- and that's

2  Exhibit 151 -- it is the subject of various

3  governmental investigations.  And that's Slide 21.

4              So taken together, this more than

5  adequately establishes the credible and best basis to

6  investigate Walmart's fiduciaries for failing to

7  implement and maintain controls related to the

8  suspicious orders of opioids and where they failed to

9  exercise oversight.

10              So that's my proper purpose

11  presentation.  If Your Honor has any questions ....

12              THE COURT:  All right.  I take it

13  Mr. MacIsaac is not going to do anything supplemental

14  on proper purpose, or are you?

15              MR. MacISAAC:  I will.

16              THE COURT:  Why don't we get all the

17  proper purpose things covered.

18              MR. MacISAAC:  Very quickly, yes, Your

19  Honor.  And I will be brief.

20              So I think the supplemental demand,

21  which is at JX 257, primarily deals with the years of

22  concealment of the 2011 MOA, the District of Texas'

23  contemplated criminal indictment, as well as the

24  Eastern District of Texas' contemplated civil claims

25

1   which Mr. Wales just briefly discussed.

2              The only disclosure made by the

3   company -- and this is done in two 10-Ks -- but the

4   first disclosure is made in the first quarter of 2018.

5   And that is JX 129, page 16.  That disclosure, which

6   is repeated again in later disclosures, states that:

7   "The Company has also been responding to subpoenas,

8   information requests and investigations from

9   governmental entities related to nationwide controlled

10  substance dispensing ... practices involving [the sale

11  of] opioids."

12             It goes on to state, "the Company can

13  provide no assurance as to the scope and outcome of

14  these matters and no assurance ... whether its

15  business, financial [condition or] results of

16  operations ... will ... be materially adversely

17  affected."

18             Your Honor, the issue here is based on

19  the -- I believe the company's own admissions.  And

20  those admissions were made in letters made publicly

21  available through the ProPublica reporting.  The

22  company's own statements as to the conversations with

23  the government itself call into question the

24  disclosures that had been made by the company.

26

1          As we know, Delaware law prohibits

2   directors from deliberately misleading or concealing

3   material information from stockholders.  That's *Malone*

4   *v. Brincat*.  More recently, *Dohmen v. Goodman* where

5   the Supreme Court recently reiterated the requirements

6   of *Malone v. Brincat*.

7          But more importantly is the overlay of

8   federal law.  I think it's just axiomatic that under

9   Federal Law 10(b), when a company chooses to speak,

10  they must do so truthfully.  And, more importantly,

11  where there is a regulation that requires disclosure

12  of specific information, the company is required to do

13  so.  And here, Your Honor, Item 103 under Federal

14  Securities Laws is where our focus is.  That's at

15  JX 289.

16         Item 103 discusses "material pending

17  legal proceedings."  And what the regulation states is

18  that to the extent a material pending legal proceeding

19  exists, a company must disclose "the name of the court

20  or agency ... the date [the action was] instituted,

21  the principal parties ... [as well as] a description

22  of the factual basis alleged to underlie the

23  proceeding and the relief sought."

24         Now, that Item 103 goes on to state

27

1   that other government authority actions that are

2   "known to be contemplated" must be disclosed and

3   similar information must be disclosed.

4                    Now, there is an issue I believe the

5   parties are, you know, kind of back and forth on,

6   which is Item 103 has a 10 percent threshold.  What I

7   mean by that is to the extent there are monetary

8   reliefs sought in these actions, it has to equal

9   10 percent of their total assets.  But that exclusion

10  relates solely to monetary penalties.

11                   So with respect to the 2011 MOA, the

12  nondisclosure of that, the question we have is:  Is it

13  a material legal proceeding, or was it a government

14  action known to be contemplated?  And the answer here,

15  Your Honor, is it's not me trying to impose a

16  materiality standard on the company.

17                   JX 180, which is a June 2014 Portfolio

18  Scoring Worksheet -- Mr. Wales just showed it to Your

19  Honor -- states in no uncertain terms that the

20  potential reputation or financial harm from this

21  specific agreement could be "severe."  And that was

22  the fourth of five options to check.  And the third

23  option was "material."  So it was greater than

24  material; it was potentially severe to the company.

28

1              So with respect to the 2011 MOA and a

2      question presented, at least by the defendants in

3      their briefings, that we haven't shown that this is

4      material, I'm not trying to show that something is

5      material, but the company's own documents admit as of

6      June 2014 that they viewed this as actually greater

7      than material.  It was severe.

8              With respect to the contemplated

9      criminal indictment.  Again, Your Honor, Item 103

10     states that anything "known to be contemplated by

11     governmental authorities" must be disclosed.  This is

12     a nonmonetary relief sought; an indictment.

13             JX 139, page 5.  Again, this is the

14     company's own letter.  And in that letter they are

15     stating that "AUSA Rattan notified Walmart on

16     March 28, 2018, that she intended to present an

17     indictment against Walmart ...."  There is a known

18     contemplated government proceeding by an AUSA, and the

19     disclosure made by the company immediately after that

20     information is known is merely that there are

21     investigations outstanding.

22             And if you're going to speak as a

23     company, you must speak truthfully, especially when

24     there's a specific regulatory requirement to disclose

29

1  information.  And Item 103 outlines exactly what must

2  be disclosed, similar information to the date

3  instituted, the agency involved, what the factual

4  basis underlying that is, and the relief sought.

5           And I believe the company's own cited

6  case law supports the disclosure of the contemplated

7  indictment.  They cite to *Richman v. Goldman Sachs*.

8  And there, the Court, the SCNY, stated that a

9  proceeding "known to be contemplated by governmental

10  authorities" -- that's the quote, and I'm adding

11  this -- must be disclosed under Item 103 when it

12  "reaches a stage [when the] agency or prosecutorial

13  authority makes known that it is contemplating filing

14  suit or bringing charges."  So that is precisely what

15  had occurred at the period of time when this

16  disclosure about investigations happened.  Yet it

17  wasn't truthful.

18           And the third issue is the

19  contemplated government civil claims.  Your Honor,

20  these are, again, based on the letters that the

21  company had sent to the DOJ.  We know -- and Mr. Wales

22  was just discussing -- that JX 139, page 4, discusses

23  how AUSA Russ notified the company that -- the belief

24  that the civil claims were a billion dollars.  We know

30

1    that JX 199, page 1, note 1, that it had expanded,

2    that the investigation now included 15 attorneys'

3    offices across the nation known formally as a "Working

4    Group" who were investigating these civil claims.

5                    And at no time has the company

6    disclosed the existence of the Working Group, the

7    existence of what those claims may involve, despite

8    being told by the DOJ that this was at least believed

9    to be a billion dollars from a settlement standpoint

10   of value that they believed may be recoverable.

11                   Now, because it's a monetary case,

12   because it's a civil claim, the question then comes

13   under Item 103:  Does this require disclosure?  And

14   the answer is yes.  And the reason is because the

15   company has repeatedly disclosed the opioid MDL in its

16   disclosures.  And, under Item 103, to the extent that

17   you have similar cases that overlap, they must be

18   disclosed after aggregating them, if in the aggregate

19   they equal over 10 percent.

20                   So at least at this stage, there is

21   some evidence to believe that they believe the opioid

22   MDL could potentially implicate 10 percent or more of

23   their assets and that this underlying civil

24   contemplated claim by the government should have been

31

1    aggregated in that analysis.

2                In fact, Your Honor, if you take a

3    look at JX 199, page 3, the company itself admits that

4    all of the documents in the opioid MDL were produced

5    to the government, showing that these two actions are

6    clearly overlapping and clearly intimately involved

7    with one another.

8                Yet again, Your Honor, the disclosures

9    make no mention of this information.  And I think what

10   is troubling is that we see a course of conduct over

11   many years that the disclosures at issue are

12   misleading or omissive of material information.  And

13   it's not just in the disclosures.

14               JX 225 is an article by ProPublica

15   following up on the airing of nonpublic information to

16   the public generally, and how that same information

17   was not disclosed or produced in the opioid MDL to the

18   plaintiffs there as well.  So stockholders and the

19   plaintiffs in the opioid MDL are being left in the

20   dark about these issues, despite Delaware and federal

21   requirements to disclose this information.

22               So I think the question comes --

23   before we move on to scope -- would be:  Well, what's

24   the board involvement?  What was the board's knowledge

32

1   of these issues and their activities in bringing about

2   these disclosures and -- you know, or nondisclosures

3   in this case?

4                    And that's really all that we want to,

5   from a proper purpose standpoint, understand when we

6   go to scope.  So I think, for me, that's everything on

7   proper purpose.

8                    THE COURT:  Thank you very much.

9                    MR. MacISAAC:  You're welcome.

10                   THE COURT:  Mr. DiCamillo?

11                   MR. DiCAMILLO:  Thank you, Your Honor.

12  I'm going to respond to Mr. Wales' presentation, and

13  then Mr. Berkowitz is going to respond to

14  Mr. MacIsaac's presentation.  I think we'll take far

15  less than the half an hour that Your Honor has

16  allotted for this portion.

17                   Your Honor, we've got our slide

18  presentation up.

19                   If we can go to the next slide.

20                   Your Honor, just by way of background,

21  dispensing opioids is a very small part of Walmart's

22  business.  Walmart has never manufactured opioids.

23  Walmart has never distributed opioids to pharmacies

24  outside of its own pharmacies, and it stopped even

33

1    doing that in 2018.

2              Today, Walmart does continue to

3    dispense opioids at its own pharmacies.  And if we

4    look at the slides, Walmart operates largely -- or

5    operates through three business -- three reporting

6    segments.  First is Sam's Club, which we have up on

7    the slide now.  Sam's Club represents 11 percent of

8    Walmart's revenues.  Then we have Walmart

9    International, which represents about 24 percent of

10   Walmart's revenues.  And then we have Walmart U.S.

11   Walmart U.S. constitutes about -- generates about

12   65 percent of Walmart's revenues.

13             If you look down in the bottom right

14   of this slide, you see that dispensing opioids is just

15   a small part of the Walmart U.S. business.  It's part

16   of the Health & Wellness division of Walmart U.S.  And

17   the Health & Wellness division generates about

18   11 percent of Walmart U.S.'s revenues and about

19   8 percent of Walmart's total revenues.  So you see

20   that, as we've indicated and we indicate in our

21   briefing, dispensing opioids is just a small part of

22   Walmart's overall business.

23             With respect to plaintiffs' proper

24   purpose argument, their proper purpose argument is

34

1  based largely on unproven and unadmitted allegations

2  from the MDL litigation, or assertions made in the

3  ProPublica article.  In fact, during Mr. Wales'

4  presentation this afternoon, and we saw it in the

5  brief as well, they rely on a handful of documents

6  that the plaintiffs in the MDL litigation relied upon

7  in connection with their motion for summary judgment.

8          But what's missing is a connection and

9  a link to alleged wrongdoing by Walmart's directors or

10  senior officers.  They haven't linked -- other than

11  showing the audit committee charter, they haven't

12  linked any of their allegations of wrongdoing to

13  allegations by members of the board or senior

14  officers.

15          Walmart's self-distribution practices

16  have never been the subject of a government

17  enforcement action.  As we've seen, and as we can see,

18  there are investigations ongoing, and Walmart has

19  disclosed those investigations since June of 2018.

20          But, unlike in the *AmerisourceBergen*

21  case where there had been specific actions taken by

22  government entities, you don't have that here.  In

23  *AmerisourceBergen*, the license of one of the

24  distribution centers had been suspended.  And we had

CHANCERY COURT REPORTERS

35

1    two Congressional investigations concluding that

2    *AmerisourceBergen* had failed to identify and address

3    suspicious orders.

4                    Here, the linkage between alleged

5    wrongdoing that they claim went on and any alleged

6    wrongdoing by directors or senior officers is missing.

7                    I do want to spend a little bit of

8    time -- that's primarily our proper purpose argument,

9    Your Honor.  As Your Honor indicated at the beginning

10   of this, I think this is well-covered in the briefs,

11   so we relied largely on our briefing for the position.

12   But I do want to spend a few minutes talking about

13   what has been the centerpiece of their proper purpose

14   argument in their demands, in their briefing, and here

15   again today.  And that's the 2011 memorandum of

16   agreement which is Joint Exhibit 9.  That has been the

17   centerpiece of their request for books and records in

18   this case.

19                   The plaintiffs have continuously

20   exaggerated the import of the 2011 MOA.  The 2011 MOA

21   pertained to dispensing -- not distributing, but

22   dispensing controlled substances at one Walmart

23   pharmacy in San Diego.  And we see it on Slide 5,

24   which we have up on the screen, the repeated

36

1    references to "dispensing" and "dispensed," nothing

2    about distribution.

3                        If we go to the next slide, we see

4    Walmart did not admit any liability or admit any of

5    the allegations brought by the DEA that led to the

6    2011 MOA.

7                        If we go to Slide 7, Walmart did not

8    pay any penalty or fine in connection or as a result

9    of the 2011 MOA.  What Walmart did agree to do is

10   maintain the compliance program, which it did.  The

11   2011 MOA imposed no obligations regarding

12   self-distribution or specific suspicious order

13   monitoring.

14                       Again, despite their repeated reliance

15   on the 2011 MOA, there is absolutely no linkage

16   between the conduct that was the subject of the 2011

17   MOA and any allegation of wrongdoing on the part of

18   the directors or officers, because that's the link

19   they need to establish.

20                       Your Honor, we all know the standard

21   for a proper purpose.  Admittedly, it's a low

22   standard, but it requires a credible basis of

23   wrongdoing by fiduciaries.  Here, we don't have that.

24   What we have is a story that's cobbled together from

37

1   allegations, news articles, and documents that

2   plaintiffs in the MDL litigation relied on, not

3   documents that the company relied on.  They haven't

4   satisfied even the low standard of showing a credible

5   basis of wrongdoing on behalf of the fiduciaries.

6                   On that basis, we do not believe

7   they've stated a proper purpose.

8                   THE COURT:  Thank you.

9                   Mr. Berkowitz?

10                  MR. BERKOWITZ:  Thank you, Your Honor.

11  I'm going to talk to the disclosure issues.  There is

12  no credible basis to suspect that any of the company's

13  disclosures weren't proper.

14                  Plaintiffs identify three issues that

15  they say should have been disclosed: first, the

16  existence of government investigations into the opioid

17  portion of Walmart's business before June of 2018;

18  second, whether the company should have disclosed the

19  2011 MOA that you've heard about today; and, finally,

20  whether the company should have disclosed the Eastern

21  District of Texas had threatened an indictment against

22  the company and an employee.  I'm going to speak about

23  each one of those and establish that there's no

24  credible basis and that what's going on here is an

38

1  attempt to develop evidence potentially for a

2  securities class action as opposed to a derivative

3  suit.

4              First, with respect to the

5  investigation.  The securities laws that plaintiffs

6  quote do not require the company to disclose an

7  investigation once it's opened.  Instead, they

8  require, of course, that the company "disclose

9  'material' pending legal proceedings," or material

10 proceedings "known to be contemplated by governmental

11 authorities."

12             And that's the plaintiffs' brief at

13 page 30, but also the *Lions Gate* case, Your Honor, in

14 which case the Court found that there was no need to

15 even disclose the existence of a Wells notice, which

16 was contemplated charges by the SEC.  Here, the

17 investigation was not a material legal proceeding, nor

18 was it a proceeding known to be contemplated by

19 governmental authorities prior to the time the

20 government disclosed it.

21             As federal case law makes clear, a

22 government investigation does not need to be disclosed

23 until it reaches a stage when the agency or

24 prosecution authority makes it known it is

39

1    contemplating filing suit or bringing charges.

2                    Here, the plaintiff themselves admit

3    that Walmart learned the Eastern District of Texas was

4    considering criminal charges in May of 2018.  Walmart

5    disclosed the investigation in its Form 10-Q the

6    following month.  In other words, as soon as -- based

7    on their own allegations, the plaintiffs' own

8    allegations -- the government made known that it was

9    contemplating filing charges, the company disclosed

10   the existence of the investigation.

11                    They were not required to disclose

12   that investigation prior to June of 2018 for another

13   reason as well.  It would not have been material to

14   the company.  Plaintiffs claim that an aggregate of

15   investigations could result in fines of a billion

16   dollars.  Item 103 talks about proceedings being

17   material where the potential damages would exceed

18   10 percent of the company's assets.  And while a

19   billion dollars is a lot of money, with respect to

20   Walmart, its current assets as of January of 2017 and

21   2018 totaled between 57 and $60 billion.

22                    So from a materiality standpoint, even

23   if they were aware of contemplated charges -- which

24   there's no evidence that they were -- they wouldn't

40

1    have needed to disclose it.

2                    Number two, for similar reasons,

3    there's no credible basis -- again, that's the

4    standard here -- to investigate whether Walmart should

5    have disclosed the 2011 memorandum of agreement.

6    Plaintiffs rely on ProPublica's sensationalist

7    reporting, and they make it sound as if the 2011 MOA

8    was some dramatic occurrence within the company.

9                    But, as Mr. DiCamillo said, that's

10   simply not the case.  The MOA arose out of allegations

11   involving a single pharmacy that dispensed controlled

12   substances out of 4,000.  Walmart agreed, as companies

13   do, to resolve the matter to avoid the uncertainty and

14   expense of litigation, but it did not admit to

15   liability, and it didn't pay a cent to resolve the

16   matter.

17                    The MOA significantly also includes

18   language that talks about a single inadvertent or

19   negligent failure to comply not being considered a

20   breach.  Now, plaintiffs talk about this scoresheet

21   that talked about it being a reputational risk.  There

22   is no credible basis to believe that that was

23   something that was disclosed to the board, that it was

24   analyzed under the federal securities laws, or that it

41

1   was material in any sense having to do with the

2   federal securities laws.  And they have not made any

3   connection even close about that document, nor could

4   they.

5                  Finally, there's no credible basis to

6   investigate whether Walmart should have publicly

7   disclosed that the Eastern District of Texas

8   threatened criminal charges against the company and a

9   single Walmart employee.  The law is clear that a

10  company is not required to accuse itself of

11  wrongdoing, nor is there a duty to disclose uncharged

12  or unadjudicated wrongdoing.

13                 That's particularly true here, whereas

14  plaintiffs concede Walmart disclosed the investigation

15  itself shortly after the company learned about the

16  potential -- and I underscore that -- the potential

17  for an indictment.  Walmart was not required to

18  speculate as to whether the indictments would follow

19  the investigation.  Any such speculation would have

20  been wrong.  In fact, we're two years subsequent to

21  that now, and there has been no indictment.

22                 But the concept that in a case that is

23  still being considered that you would need to disclose

24  or predict what the outcome of that would be, is just

CHANCERY COURT REPORTERS

42

1    not realistic, Your Honor.  There are multiple levels

2    of appeals within the Department of Justice.  And, in

3    fact, in a case such as this one, Walmart correctly

4    reported what it knew, which was:  We do not know what

5    the outcome is going to be.

6                    Nor several years after the alleged

7    facts that they contend were disclosed have been made

8    public has there been any shareholder action

9    suggesting that anybody was harmed or fooled about any

10   of this.

11                   And so when you look at the proper

12   purpose, you also have to determine whether there's

13   any trauma associated with this to the corporation.

14   In fact, there's no suggestion or implication that the

15   market was shocked or surprised when the facts that

16   they, plaintiffs contend, were concealed actually were

17   disclosed.

18                   And so, as we think about proper

19   purpose, Your Honor, the disclosure piece -- which was

20   raised only by the final shareholder here -- is an

21   attempt to expand the scope of what it is they're

22   looking to get in the areas where there's no credible

23   purpose.  And we would obviously ask Your Honor to

24   look carefully -- as I know you will -- at each of the

43

1   elements and make sure that the scope of what they're

2   requesting cues to a proper purpose.

3                 Thank you for your time, Your Honor.

4                 THE COURT:  Thank you.

5                 Mr. Wales, do you have any brief

6   thoughts you want to reply with?

7                 You're still muted, sir, so you need

8   to unmute so we can hear your eloquence.

9                 MR. WALES:  Sorry about that.

10                THE COURT:  No worries.

11                MR. WALES:  Just very briefly, Your

12   Honor.

13                The defendant's characterization of

14   the evidence simply ignores most of the evidence that

15   we presented.  For example, the 2011 memorandum of

16   agreement, they don't address the fact that it was

17   expanded to all 4,700 pharmacies for a reason.  They

18   don't address the 2013 controlled substance risk

19   assessment.  They didn't address the 2014 portfolio

20   scoring worksheet.  They didn't address the 2015

21   compliance document about the need to do something to

22   avoid DEA enforcement.

23                They didn't address the whole story of

24   Drs. Wade -- the two doctors and the thousands and

44

1    thousands of prescriptions that they filled.  They

2    don't address the fact that there was a quantum of

3    evidence, enough that the Justice Department was

4    having the conversation about indicting them.  And

5    they don't address -- other than say, "Oh, it's just

6    plaintiffs" -- the MDL rulings.  Collectively, these

7    are all classically types of things that support

8    and -- fully support a credible basis.  Thank you.

9                    THE COURT:  And, let's see,

10   Mr. MacIsaac, do you have anything you want to add on

11   the disclosure issues?

12                   MR. MacISAAC:  Your Honor, I mean, I

13   think, generally speaking, you know, Mr. Berkowitz's

14   presentation ignored kind of most of, I think, what's

15   most important, and that is that whether or not a

16   contemplated indictment is known to the company is

17   stated in their own letter.

18                   And I think the credible basis here,

19   the idea of a trauma -- a lot of what Mr. Berkowitz is

20   discussing, I think, is helpful if the board itself

21   had made these determinations, if the board itself had

22   reflected upon that; that's what we're trying to

23   investigate to determine.  And, you know, the idea

24   that there must be a trauma is somewhat, I think, a

CHANCERY COURT REPORTERS

45

1    little bit too high level of missing the point.

2                    And that is, if there are directors

3    who are involved in a continuing concealment of issues

4    that have been ongoing for many years, stockholders

5    who are investigating should understand and better

6    acknowledge the fact that certain directors -- whether

7    they came on later in the process or earlier in the

8    process -- took on a role in continuing to conceal

9    material facts from stockholders that are material to

10   the underlying claims that might exist.

11                   And we are entitled, I think, on this

12   record and what we have shown, to investigate that.

13   And, you know, we can get into scope on this, but it's

14   not a substantial amount of documents.

15                   So that is everything for me, Your

16   Honor.

17                   THE COURT:  All right.  Great.

18                   Well, I appreciate people's

19   presentations on this.  It's 2:30 -- it's actually

20   2:28, according to my computer clock.  Let's go ahead

21   and take a ten-minute break, and we'll resume at 2:40.

22   Everybody can just turn off their screens, and then

23   we'll get back together when we come back.

24                   So I'm going to turn off my screen

46

1   now, and I'll see you back here in ten minutes.

2        (Recess taken from 2:29 p.m. until 2:39 p.m.)

3             THE COURT:  All right.  Well, for some

4   reason, my camera isn't activating.  I'm going to try

5   it.  There we go.  Guess it took a little bit of time

6   to heat up.  It's been working hard today.  It took a

7   little bit of time to get going.

8             I'm going to go ahead and give you-all

9   a ruling now on proper purpose.  I really don't think

10  this is a close call.  I think that there are reasons

11  to argue about what the stockholder plaintiffs have

12  asked for in terms of scope.  But as to whether they

13  had a credible basis to conduct an investigation, be

14  it on suspicion of corporate mismanagement or to

15  investigate director independence, I do not see this

16  as a close call.  I think this is a quite clear

17  situation.

18            And I say that in a context of a

19  standard, which is:  Do the plaintiffs have a credible

20  basis to suspect?  I do not know whether actual

21  wrongdoing took place.  There is some evidence of

22  that, but that's certainly something that is hotly

23  contested.  But what I think there is, quite clearly,

24  is a credible basis to conduct an investigation.

47

1          I am not going to go through, it would
2     be about ten single-spaced pages of talking points
3     about the factual background, and it would largely
4     parallel what the plaintiffs said in their
5     presentation.  That's not because I think their
6     evidence ultimately will prove persuasive on the
7     merits of a legal claim for wrongdoing, but I think
8     their evidence is clearly sufficient by a
9     preponderance of the evidence to establish that they
10    have a credible basis to suspect wrongdoing, which, as
11    everyone understands, is the lowest standard in our
12    law.
13          So just to cull a few highlights for
14    you.  In terms of obtaining books and records related
15    to overseeing compliance with applicable laws such as
16    the Controlled Substances Act, I held in
17    *AmerisourceBergen* that it's not necessary for a
18    stockholder to provide a credible basis to support
19    actionable wrongdoing by the board of directors,
20    precisely because one of the roles of Section 220 is
21    to enable a stockholder to access information for the
22    purpose of determining whether there's a link to the
23    board of directors.  I think those principles apply
24    here.

48

1          What we have is substantial evidence

2    of problems at Walmart.  We have substantial evidence

3    in the form of these opinions by the judge in the

4    Northern District of Ohio.  Granted, they are denying

5    summary judgment, but they are finding that there is a

6    credible evidentiary basis on which to go to trial and

7    where there are triable issues of fact.  That, to me,

8    translates quite clearly and persuasively into the 220

9    context.

10          I think that the plaintiffs, based on

11   that, have a credible basis to explore whether or not

12   the board was knowledgeable about these issues or

13   otherwise involved.

14          Let's assume that I'm wrong.  Let's

15   assume that, in fact, what the plaintiff has to do is

16   provide a credible basis to suspect actionable board

17   level wrongdoing in a 220 case, such that 220 really

18   doesn't serve the purpose that the Delaware Supreme

19   Court has said on multiple times that it serves, but

20   that actually, to get 220 documents, you have to be

21   able to establish the link to the board that 220 was

22   ostensibly supposed to be used to establish.

23          Here, I think the size and magnitude

24   of the issue is such that one could reasonably suspect

49

1  that there was actionable board level wrongdoing under

2  *Caremark*.  We know that the Controlled Substances Act

3  required Walmart to maintain effective controls

4  against diversion of opioids from legitimate medical,

5  scientific research, or industrial channels, and it

6  required Walmart to design and operate a system to

7  disclose suspicious orders of controlled substances

8  and to inform the DEA of those orders, including

9  orders of unusual size, orders deviating substantially

10  from a normal pattern, and orders of unusual

11  frequency.

12          There is a reasonable basis to suspect

13  that from the early 2000s to 2011, Walmart had no

14  written policies or procedures.  Zero.  None.

15  Nothing.  There's a reasonable basis to suspect that

16  Walmart relied on employees to look at daily orders

17  and simply, based on their knowledge, let somebody

18  know if they saw something that maybe looked kind of

19  high.

20          These are statements taken from Judge

21  Polster's ruling, but what they establish is a

22  credible basis to suspect that the board of Walmart

23  was not doing anything to comply with its duties to

24  oversee the company under *Caremark*.

50

1          Again, I am not finding that.  We are

2   not at that stage yet.  But, assuming for the sake of

3   argument that there is a need to show a credible basis

4   to suspect actionable board level wrongdoing, that's

5   it.  There's a credible basis to suspect that even

6   after the 2009 order and the 2011 agreement, the board

7   continued not to fulfill its duties to oversee

8   compliance of the Controlled Substances Act.

9          There's a reasonable basis to suspect

10  that, despite agreeing that it would maintain a

11  compliance program designed to detect and prevent

12  diversion of controlled substances, that as late as

13  June 2014 Walmart still had no processes in place to

14  mitigate those risks.

15         There's a reasonable basis to suspect

16  that it was not until 2015 that Walmart implemented a

17  system of thresholds.  And even then, Walmart lacked

18  any system to detect and flag orders of unusual

19  pattern or frequency.

20         This is one of the reasons why I think

21  that this is a case where, really, the question ought

22  to be whether there's some basis for fee shifting on

23  the proper purpose element.  There does not appear to

24  have actually been any reasonable basis to dispute the

51

1   proper purpose element.  You've got Judge Polster

2   saying that the record evidence suggests that

3   Walmart's compliance program suffered from obvious

4   deficiencies that a layperson could plainly exercise.

5   That's a federal judge saying that.  That is not an

6   adjudication of liability.  But that is pretty clear

7   in terms of having a credible basis to suspect

8   wrongdoing.

9               In terms of establishing board

10  linkage, you have other sources as well.  You have

11  this June 2014 worksheet indicating that the effort to

12  implement a suspicious order monitoring system was

13  board informed.  That's a document that points

14  directly to the board.  You have proxy filings and the

15  audit committee charter which support a reasonable

16  inference of board involvement.

17              And, again, these are indications of

18  director involvement.  These are not things that would

19  inherently lead to liability.  They're not things that

20  would inherently even lead to the denial of a motion

21  to dismiss under Rule 23.1.  But what they do provide

22  is a credible basis to suspect that the board was

23  involved in this, either to the tune of doing nothing

24  or to the tune of doing it inadequately, which is

52

1    sufficient for purposes of the plaintiffs' ability to

2    obtain books and records.

3                    Again, I just don't think this is a

4    close call.  My colleagues and I have been dealing

5    with a multitude of these 220 trials.  And I think

6    what we need to start doing is paring things down so

7    that we don't waste time on the stuff that's really

8    not fairly litigable and we address the things that

9    are legitimately litigable.

10                    I think scope here is litigable.  I'm

11   happy to hear people's arguments about this.  I don't

12   see how you can say with a straight face that there's

13   not a credible basis to suspect wrongdoing, given the

14   documentary record, given the judicial rulings in the

15   Northern District of Ohio, given the pattern over the

16   years.  It's pretty striking to me when you measure it

17   against the low standard that we're using for purposes

18   of a 220 investigation.

19                    In terms of the disclosures, these are

20   matters governed by federal law, but also by Delaware

21   law, where if you speak, you have to speak truthfully

22   and with candor.  Clearly, as a publicly traded

23   company, Walmart has to make disclosures that are

24   required under the federal securities law.  Not only

53

1  that, but each principal executive officer and

2  principal finance officer has to certify compliance.

3  Those are the Sarbanes-Oxley certifications.

4          They have to say that they reviewed

5  the report, that it doesn't omit or state a material

6  fact necessary in order to make the statements made in

7  light of the circumstances under which such statements

8  were made not misleading, and then, that the financial

9  statements and other information presents in all

10  material respects the financial condition and results

11  of the company.

12          The signing officers, they're

13  responsible for establishing and maintaining internal

14  controls.  They have to certify that they've designed

15  internal controls to ensure that material information

16  is made known to them, et cetera.

17          In terms of the annual reporting

18  requirements, people have talked about those.  And I

19  recognize that, in terms of some type of financial

20  penalty, disclosure is only required if the potential

21  damages exceed 10 percent of the current assets of the

22  registrant and its subsidiaries on a consolidated

23  basis.

24          I don't think that the parties have

54

1    much disagreement in terms of the standards that

2    apply.  Really, where I think the disagreement is that

3    defendant Walmart is arguing this case as if it were a

4    motion to dismiss in a federal securities action.  In

5    other words, you are making the pitch as to whether

6    the plaintiff right now has identified facts that

7    would support a claim.  It seems to me that the test

8    is one step back removed from that.

9            The question is whether the plaintiff

10   has identified facts which, by a preponderance of the

11   evidence, would support a credible basis to suspect

12   that there may be a claim.  And once we are at that

13   point, then I think that the basis for having a

14   credible basis to suspect is established.

15           So, for example, regarding the 2009

16   order and the 2011 agreement, it would be premature at

17   this stage to make a determination as to the

18   materiality of either document.  But I think the

19   plaintiffs have established a credible basis to

20   suspect that Walmart and the board may have violated

21   their disclosure obligations under federal law and

22   under *Malone* by failing to disclose information about

23   that.  And I think that's particularly true when you

24   have this Sarbanes-Oxley certification.

55

1            In the 2007 agreement, Walmart agreed

2    it would maintain a compliance program.  To fulfill

3    this requirement, Walmart would have had to have

4    implemented a new company-wide system of internal

5    controls, because at that point it's reasonable to

6    suspect that Walmart had no process in place.  Yet, we

7    have certifications from the CEO and CFO affirming

8    that there were no significant changes in internal

9    controls or other factors that could significantly

10   affect internal controls.

11            So there's something seemingly wrong

12   there.  It's not the right point in this proceeding to

13   determine whether anything, in fact, went wrong.  It's

14   not even the right point in this proceeding to

15   determine whether there's a legal claim.  What this

16   proceeding is designed to address is whether there's a

17   credible basis to suspect that there's a legal claim.

18   And there's a credible basis to suspect that there's a

19   legal claim.

20            I think the same is true about the

21   disclosure of the U.S. Attorney's threats to indict

22   the company.  That statement, there's reason to

23   suspect that it was made in May 2018 and that the U.S.

24   Attorney told Walmart that it was going to imminently

56

1    indict the company and that the company should pay a

2    billion dollars to resolve the matter civilly.

3    Walmart believed that the U.S. Attorney would indict

4    the company within days.

5                    When the June 2018 Form 10-Q came out,

6    Walmart said that it had been responding to subpoenas,

7    information requests, and investigations from

8    governmental entities, but it made no mention of the

9    criminal proceedings that the U.S. Attorney had

10   threatened to file just one month earlier.

11                    Then, finally, in terms of evaluating

12   director independence, this, to me, is a laydown.

13   This is a proper purpose.  The Delaware Supreme Court

14   has said that it's within a stockholder's power to

15   explore these matters.  They've criticized a plaintiff

16   who didn't explore these issues and only asked for

17   books and records on the merits.

18                    So as to all three of these broad

19   categories -- the underlying wrongdoing related to

20   legal compliance, the disclosure issues under the

21   federal securities laws, and then, finally, director

22   independence -- I think, again, the first is so clear

23   to me under the 220 standard that really the only

24   question for me was whether there ought to be some fee

57

1    shifting for having put us all through this.  The

2    third one I think is also pretty much a laydown.

3                    The disclosure issue, maybe you step

4    back one step from the brink of fee shifting on that.

5    But all of this, to me, is not even a close case.

6                    Where I wanted to spend most of the

7    time today is on the question of scope.  Because here,

8    I think that there is legitimate basis for debate as

9    to what documents the plaintiffs get, how deep in the

10   organization they go, what the time period is.  And

11   it's my job to try to craft an order that

12   appropriately balances the company's interests and

13   protects the company from an excessive investigation

14   but, at the same time, gives the plaintiffs what is

15   necessary and sufficient for their purposes.

16                   So I would suggest that the most

17   constructive way to do this would actually be to walk

18   through the requests one by one and take them

19   individually.  And so, I don't know who I look to for

20   that.

21                   Mr. Wales, is that something that

22   you're the right person to be asking for assistance in

23   terms of the plaintiffs, or does somebody else have

24   the baton for that issue?

58

```
 1                    MR. WALES:  I have the baton for this
 2    issue.
 3                    THE COURT:  All right.
 4                    And, Mr. DiCamillo, is the same thing
 5    true for you?
 6                    MR. DiCAMILLO:  Depending on what it
 7    is, it will be either me or Mr. Berkowitz, Your Honor.
 8                    THE COURT:  Great.  Well, that's super
 9    helpful.  So I think, let's walk through these things.
10    Let's take them one by one and get through them as
11    quickly as we can.
12                    So what I'd suggest we do is each
13    time, Mr. Wales, you can make your pitch,
14    Mr. DiCamillo can respond, and I will potentially have
15    some questions.  And then we'll go from there.  Let's
16    do that.
17                    MR. WALES:  Your Honor, may I just
18    raise one issue?  We had put up front both time
19    period -- because there are some agreements on some
20    categories other than time period, as well as the
21    definition of board materials.  I didn't know if you
22    wanted to do that up front or do that in the context
23    of the first, because they seem to cover a lot of the
24    requests.
```

59

1              THE COURT:  If you think that is

2   easier, that's fine with me too.

3              MR. WALES:  Okay.  Thank you, Your

4   Honor.  I appreciate that.

5              Thank you for your guidance on the

6   proper purpose.  I do think that does heavily inform

7   the time period.  And the time period, that's our

8   Slide 23.  Obviously I don't want to repeat everything

9   that we've just spent an hour, hour and a half

10  discussing and Your Honor summarized.

11             But we do believe that it's important

12  to go back to 2010, because that's when the, kind of

13  the story of the misconduct or potential misconduct on

14  a criminal basis, whatever, really begins.  Because

15  when we talk about, particularly with the memorandum

16  of agreement in 2011, you have a whole new process and

17  procedure being set up.  Clearly the board is going to

18  be involved.  I went through the reasons.  Your Honor

19  found that in the proper purpose.

20             Additionally, as Judge Polster found

21  in denying the summary judgment, there was evidence

22  they had no policies and procedures, which itself

23  would be a separate violation.  And then, as you move

24  forward in time, you have the various documents we

60

1    went through this morning and that Your Honor also

2    cited, including references, you know, like in the

3    worksheet that the board was -- it was an executive

4    directive and the board was informed.

5                    And I can keep going through.  But I

6    just don't want to repeat myself.  So I don't know at

7    this point if the defendants are going to still

8    challenge or try to limit to 2017 or not.  I just --

9    you know, given Your Honor's ruling and what have

10   you --

11                   THE COURT:  Let's find out.  We don't

12   need to belabor it.

13                   Mr. DiCamillo, what's your view on

14   this?

15                   MR. DiCAMILLO:  Thank you, Your Honor.

16                   Our view continues to be that ten

17   years is too much.  And it's plaintiffs' burden to

18   show -- again, we know the standard -- that everything

19   is necessary and sufficient.

20                   They argue that they should be able to

21   go back to 2010 or 2011, largely relying on the 2011

22   MOA.  I understand Your Honor has ruled that the 2011

23   MOA is a piece of the credible basis of wrongdoing.

24   But I do think it's important to focus on what I

CHANCERY COURT REPORTERS

61

```
 1   talked about before, that it dealt with one pharmacy,

 2   was dealing with dispensing, not distribution, the

 3   concept of suspicious ordering in the distribution

 4   context, not a dispensing context.

 5              Also, we understand that Judge Polster

 6   ruled, and Your Honor has referred to that ruling,

 7   that there were no written procedures in place before

 8   2011.  However, if you look at what Judge Polster

 9   relied on to make that finding, Joint Exhibit 179, it

10   shows that there were procedures and controls in

11   place.  Judge Polster focused on the fact that there

12   were no written procedures, and we understand that.

13              But what plaintiffs are asking for

14   here is ten years on everything: ten years on board

15   materials, ten years on senior management materials,

16   ten years on electronic communications regarding some

17   of the issues that are at stake -- or raised in the

18   demand.  We think that is not narrowly defined enough.

19              And, in *AmerisourceBergen*, Your Honor

20   contemplated sort of an iterative process where Your

21   Honor ordered formal board materials for a particular

22   period of time with the ability to come back.  And we

23   think, focusing just on the time period right now, you

24   know, it seems to me that that might be an appropriate
```

62

1    way to handle this, to go back a reasonable period of

2    time.

3              And we picked three years.  And we

4    picked that for a few reasons.  One, it's the statute

5    of limitations.  I understand Your Honor ruled in

6    *AmerisourceBergen* that that is not dispositive, and we

7    understand it's not dispositive.  But it's a period of

8    time, particularly the period of time that they argue

9    things were not disclosed.  It goes back to the time

10   when the MDL litigation was filed.  It also is just,

11   you know, a couple years after the 2011 MOA expired.

12             So, in our view, to say, "Yes, we had

13   this MOA in 2011, so we get everything back to 2011

14   and 2010" is just far too broad and it needs to be

15   more narrowly tailored than that.

16             THE COURT:  So this is one of those

17   places, Mr. DiCamillo, where again, as I adverted in

18   *AmerisourceBergen*, I feel like having some

19   understanding of what is out there and what is

20   actually available would be important to me.

21             So taking that concept a little bit

22   further, I don't think the statute of limitations is

23   dispositive.  And you're giving me credit for that,

24   but I think I relied on *Saito* for that.  It wasn't

63

1   something that I created; I think it was something

2   that was already out there and I followed.

3              Given the story that the plaintiffs

4   want to explore and the account that they want to

5   investigate -- and, really, part of what they're

6   trying to explore is:  Are we dealing with a corporate

7   recidivist on this issue?  Is this something where for

8   ten years there have been problems that weren't dealt

9   with, or is this really, as your side would have it,

10  some relatively isolated smallish things which

11  certainly didn't rise to the level of a decade worth

12  of chronic problems?

13             And I don't view it as the right forum

14  in a 220 proceeding to make some ruling on that.  I

15  feel like the questioning in a 220 -- and I keep

16  coming back to it -- is:  Is there a credible basis to

17  suspect, such that the plaintiffs need to explore or

18  have a right to explore?  And it does seem to me,

19  based on that, that there's grounds to go back to

20  2010.

21             But where I am sympathetic to your

22  position is to go back to 2010 for what?  To go back

23  to 2010 for what, not in the sense of why, but go back

24  to 2010 for purposes of what categories and types of

64

1   documents.

2           And it seems to me that the things

3   that are generally fairly easy for people to get, the

4   low-hanging fruit of 220, are board materials, the

5   minutes, the board packages, et cetera.  But once we

6   get beyond that, that's where I start to feel somewhat

7   at sea, particularly when I'm trying to balance the

8   interests of the company against the interests of the

9   plaintiffs.

10          And without knowing what we're really

11  talking about, I resist making a ruling that would

12  essentially say they get everything back ten years.

13  What I think exists is a basis to go back ten years.

14  But it seems to me that, just as in plenary litigation

15  discovery -- obviously this is not discovery, this is

16  something that should be short of discovery -- but one

17  would, as one goes back further, expect the funnel to

18  narrow, even if it's -- "funnel" is probably too broad

19  a term as it is.  But you would expect the narrowing

20  as you go back further.

21          So that's really what I'm looking for.

22  So if I tell you off the bat -- and I think I am

23  telling you off the bat that there's a basis to go

24  back ten years.  But what I'm not accepting and I'm

65

1  not telling you is you have to go back ten years for

2  everything.  How do we figure out the right balance,

3  particularly as to older issues, so that we're not

4  doing litigation-style plenary discovery but the

5  plaintiffs are getting what is necessary and

6  sufficient for them to explore their purposes.

7           So, Mr. DiCamillo, that's directed to

8  you, and then I'll go back and get Mr. Wales'

9  thoughts.  But this is really something that I

10  struggle with, and I would appreciate your insight.

11           MR. DiCAMILLO:  Thank you, Your Honor,

12  that guidance is helpful.  If you accept, if I accept

13  for a minute that Your Honor believes -- and I will

14  because you just said it -- that there is a basis to

15  go back ten years, it seems to me that the best way to

16  handle that is essentially to do what Your Honor did

17  in *AmerisourceBergen*.  And Your Honor required going

18  back a period of roughly ten years, but it was only

19  for formal board materials.

20           And, to me, I think that is the most

21  logical resting place here.  If Your Honor is going to

22  order ten years' worth of something, I think that is

23  the most appropriate thing to do.  Because while

24  there's certainly a burden in doing that -- and I

66

1    don't want to minimize that burden -- the burden is

2    certainly less than if we had to do, for example,

3    email searches for a ten-year period, even if it's

4    only a handful of custodians.

5                    So it seems to me that this goes

6    across a lot of issues.  But the most, I think, fair

7    result to both plaintiffs while protecting the

8    interests of the corporation is to order the

9    production of the board materials going back that far,

10   with the potential to come back, as Your Honor

11   indicated in *AmerisourceBergen*.  You know, if it comes

12   back and plaintiffs can show we really have a need to

13   go beyond that, then I assume Your Honor is going to

14   hear them on that.

15                   But it seems to me that instead of

16   trying to parse through every request that they've

17   made with respect to, "Okay, does it make sense on

18   this one where they've asked for senior management

19   materials, do we go back three years?  Do we go back

20   ten years?  Do we go back five years?"  It seems to me

21   that it's hard for all of us to articulate why some

22   particular time frame is right.  And if Your Honor is

23   thinking ten years, it made a showing that ten years

24   is appropriate, I would say give them the board

67

1    materials and nothing else for now.

2                    And then we can focus intelligently,

3    once they've got some materials in their possession,

4    on having a discussion.  And this is a discussion we

5    wanted to have with them when we first responded to

6    the demand.  While we did say we weren't going to

7    produce anything, we indicated a willingness to talk.

8    They filed a lawsuit, and kind of events have all

9    overtaken us.  But I think that's the best place to

10   start because it allows us all -- plaintiffs, me and

11   Mr. Berkowitz, and Your Honor, if necessary -- to have

12   an intelligent discussion.

13                    THE COURT:  Let's hear Mr. Wales'

14   thoughts on that, if we could.

15                    Mr. Wales, so, again, the starting

16   point is that I think there's grounds to go back ten

17   years.  But I am -- again, you've heard me tell

18   Mr. DiCamillo that I'm sympathetic to his point that

19   going back ten years for everything is an awful lot of

20   stuff, so help guide me.

21                    You've heard Mr. DiCamillo's side of

22   things.  I know you have -- I counted four categories

23   of documents where you're looking for officer level

24   materials.  But is there a starting point where you

68

1    get board level materials back to 2010 and then we see

2    what happens?

3                    MR. WALES:  Well, thank you, Your

4    Honor.  Thank you for the guidance on that.

5                    I don't think that is a good way to

6    proceed at all.  The 220 is supposed to be a summary

7    proceeding.  And here, Walmart fought very hard on

8    proper purpose when, frankly, they shouldn't have, as

9    Your Honor noted.  And all we're doing then is making

10   this process longer, more difficult, more expensive,

11   and more burdensome for the Court if we have to keep

12   coming back.

13                   So -- and so I think we should really

14   deal with our requests as framed, not as they would

15   like to frame them, and then go through them.  And I

16   think that a lot of them are very specifically defined

17   and are not burdensome.  And let's see what we can do.

18   If we get to one or two categories you say "I need

19   more," then so be it.  But I think that the better

20   way, especially given the record, and here we are in

21   court, is to start going through it.

22                   THE COURT:  Well, let's use our time

23   together.  But at least as a threshold matter, I'm

24   holding that there is a basis to go back to 2010.  I'm

CHANCERY COURT REPORTERS

69

1    not holding that the plaintiffs get everything they've

2    asked for going back to 2010.  But I am ruling at this

3    point that there is a basis to go back to 2010.  And

4    the question is:  What documents within that period do

5    you get.

6                    So, Mr. Wales, why don't you take it

7    away?

8                    MR. WALES:  Sure.  My next slide is

9    24, "Board-Level Materials."  We wanted to define

10   board level materials.  Because there's this parade of

11   horribles, emails and this and that.  I mean, these

12   seem to me to be fairly classic board materials.  You

13   have the board meeting minutes.  You have resolutions.

14   You have preparation materials.  The attachments, what

15   they were given to them to be -- to review before or

16   at the meetings.  That's what kind of is fairly core.

17                    So we don't have this, you know, "Give

18   me every email between every director."  I think board

19   materials like this should be centrally located,

20   especially for a big company like Walmart, and we

21   haven't heard otherwise.

22                    THE COURT:  So let me push on you a

23   little bit, because to the extent it's -- I think

24   minutes are easy, resolutions are easy.  Presentations

70

1    that are in 2010 might have even been given in person

2    or handed out in person or reports but are now loaded

3    up on BoardVantage or some other similar meeting

4    distribution site.  It seems to me that those are easy

5    in the sense of putting them in official board level

6    materials.

7                 Where the question arises for me is --

8    and it's a question for purposes of the company too.

9    In terms of burden, assume there are emails sent

10   around, two, three, four days before the meeting

11   providing some realtime updates on an issue or some

12   follow-up on an issue.  And so it is something that is

13   circulated more informally than what I would think of

14   as this formal board level materials definition.

15                 I have some sympathy that it's one

16   thing to go and look in the folder -- be it a folder

17   that's in a file in the real world or a folder that's

18   on a computer somewhere or on a database -- and find

19   these types of materials.  It seems to me that it

20   could be more difficult to find those realtime update

21   emails, and that that's another step in my mind.  But

22   it could conceivably fall within your definition.  So

23   what's your thoughts?

24                 MR. WALES:  Sure.  I'm sorry.  I

71

1    didn't mean to interrupt you.

2                    THE COURT:  I was trying to wrap up in

3    a coherent way, and you correctly ended the sentence.

4                    MR. WALES:  You know, we served

5    interrogatories to ask about this.  And they basically

6    just said it's not necessary and they're overbroad,

7    and they didn't give the type of specifics that Your

8    Honor went to.  And so -- number one.

9                    Number two, I frankly have trouble

10   believing, given there was an extensive criminal

11   investigation, there was an extensive MDL, that they

12   don't have these sort of documents collected.  I think

13   we have to step back and deal with a certain reality.

14   When you are producing millions of documents to the

15   government and the government's considering a criminal

16   prosecution of an entity, they're going to want to

17   know what the senior-most people did.

18                    Frankly, I was an AUSA for six years

19   in the Southern District of New York, and that's what

20   I wanted to know.  I started from the top down.

21   Because it's one thing to hold a company responsible

22   if, you know, Joe Pharmacist is doing something wrong

23   as opposed to at a much higher level.  So I would,

24   frankly, be surprised if these haven't already been

72

1    collected, number one.

2              Number two, they haven't established

3    that, and we asked them about, you know, a burden, and

4    they basically gave us insufficient answers.  We wrote

5    back to them.  So given, I would think, the kind of

6    straightforward board materials we requested, they

7    should be ordered.

8              THE COURT:  All right.  But what I'm

9    interpreting you to say is this description that

10   you've identified is enough, and if there's the type

11   of stray email periodically that Laster is talking

12   about, you're willing to not stand on getting every

13   potentially responsive document.  This is a fair

14   definition, from your standpoint.

15             MR. WALES:  If there's a stray email,

16   I understand that.  If it's their practice that, you

17   know, for three years they send an update two days

18   before or one day before, I would want to see that.

19   And I think that fairly falls within it because then

20   that's the type of things that they would routinely

21   do.

22             THE COURT:  Mr. DiCamillo, this is,

23   frankly, generally consistent with my understanding of

24   board level materials.  Do you have pushback on

73

1   aspects of this?

2            MR. DiCAMILLO:  If this definition in

3   the slide presentation is consistent with my

4   understanding of board level materials too, it's the

5   first time it's been that narrow.  It's been far

6   broader in their demands and in their briefs.  As

7   written, I'm comfortable with this definition.

8            And I do think there's the possibility

9   of the stray email that Your Honor potentially

10  speculated about.  But I don't have any knowledge, as

11  we sit here today, that that's a regular practice or

12  has ever happened.  I acknowledge the possibility of

13  it, and I think if we're ordered to produce board

14  level materials, we can work to make sure that board

15  level materials within this definition are produced.

16           THE COURT:  All right.  Well, let's

17  use this definition.  I have in my notes about the

18  fight over the definition, but this is one that I'm

19  comfortable with, and I'm going to adopt this as the

20  operative definition for what people mean when they

21  say "board level materials."

22           MR. WALES:  Okay.  Great.  Got one too

23  many documents at my desk.  Category 1 is policies and

24  procedures and -- basically on CSA suspicious order

74

1    monitoring.  And they agreed to produce it, the only

2    two issues were time period and scope.  So in light of

3    the rulings and comments, I don't know if there's

4    anything else to discuss on this.

5                    THE COURT:  Mr. DiCamillo, I have in

6    my notes too that you agreed to produce these

7    documents.  Now that I've ruled that it's 2010, can

8    you produce these going back to 2010?

9                    MR. DiCAMILLO:  We can, Your Honor.

10                   THE COURT:  All right.  Next issue.

11                   MR. WALES:  Okay.  That is policies

12   and procedures regarding oversight, internal

13   investigations, and compliance reviews.  The

14   defendants basically have two arguments on why they

15   won't produce them.

16                   Number one, they say it's a big

17   company and it has lots of different businesses and

18   all of that.  To the extent we weren't 100 percent

19   clear -- and I, frankly, thought it was obvious --

20   we're talking about board level documents dealing with

21   the Controlled Substances Act, opioids, nothing else.

22   So I don't think that's really a real issue.

23                   But I want to make sure that's clear

24   that's what we're seeking so that they don't think

75

```
 1   they have to start looking at anything else, although
 2   I don't think they will.
 3                   The second thing is they say that's
 4   not really covered by your demand.  And I think it is.
 5   And I would ask Your Honor to turn to Exhibit 234,
 6   which is the Detroit demand.
 7                   THE COURT:  All right.
 8                   MR. WALES:  Okay.  And in that, on
 9   page 16 -- tell me when you're there.
10                   THE COURT:  I'm already looking at
11   No. 2.
12                   MR. WALES:  Okay, great.  On those two
13   sections, I would want to point you at, and that is
14   1.A) at the top.  It says:  "The Company's controls,
15   procedures, and policies ... regarding compliance with
16   the CSA ..." blah, blah, blah.
17                   And then "2.A) Board-level systems
18   instituted to monitor or reform the Company's
19   standards or practices with the CSA or DEA
20   regulation."  You know, both of those systems are the
21   policies and procedures.  I mean, that's what you do,
22   you set up systems, you set up controls.  Those are
23   the policies and procedures and systems.
24                   These seem like pretty comprehensive
```

76

1  requests that would cover this.  So we submit that it

2  is covered.  These are comprehensive requests, and we

3  think they should be ordered.

4                    THE COURT:  Mr. DiCamillo?

5                    MR. DiCAMILLO:  Your Honor, I don't

6  actually think we have a dispute here.  Our objection

7  to this request as it was argued in their pretrial

8  brief was that it went beyond CSA and opioid issues.

9  Mr. Wales -- and that's why we also said it wasn't

10 asked for in the demand.

11                   Mr. Wales has confirmed here on the

12 record and these slides that he's just indicated the

13 CSA, DEA, opioid issues, things that are the subject

14 matter of the demand.  As written, we don't object.

15 As narrowed today by Mr. Wales and articulated here,

16 we don't object to it.

17                    THE COURT:  All right.  Well, I will

18 adopt that agreement and order Walmart to produce

19 those materials.

20                    Mr. Wales?

21                    MR. WALES:  Number 3: complaints,

22 reports, investigations, lawsuits, other inquiries.

23 Walmart is willing to produce it back to 2017.  In

24 light of your ruling, I think the only listed time

77

 1   period -- I don't know what Mr. DiCamillo's view is

 2   now.

 3              THE COURT:  Okay.  Mr. DiCamillo?

 4              MR. DiCAMILLO:  We agreed to this.  I

 5   mean, we're only objecting on the time period.  Your

 6   Honor has ruled on the time period, we so will produce

 7   within that time period.

 8              THE COURT:  Fantastic.

 9              Mr. Wales?

10              MR. WALES:  Okay.  We're flying

11   through.

12              Director independence.  Okay.  We

13   wanted director independence questionnaires for three

14   years.  They offered one year.  We want director

15   nomination materials for three years.  They offered

16   three years.

17              The only other thing we want is the

18   original director nomination materials for the current

19   board members.  And we want that because Walmart is a

20   controlled company.  Mr. Walton has 50.2 percent of

21   the vote.  Greg Penner, who's the chairman, is the

22   son-in-law of Mr. Walton.

23              And also in the proxy, which is

24   JX 228, they have this kind of vague analysis of what

78

1    they look at to be considered not -- they have a

2    chart.  It's at page 32, and it says "the Board has

3    determined will generally not affect a director's

4    independence," and there's a whole list of things:

5    Ordinary retail transactions, ownership, transactions,

6    positions, benefits, but they don't say what those are

7    at all.  And given that it's a controlled company, we,

8    frankly, want to know why these folks went on the

9    board.

10                    And so we're not asking for every year

11   going back ten years.  This is more limited.  And so I

12   guess the two places we have a disagreement are:  Will

13   they do the questionnaires for three years instead of

14   one, and the original nominating materials for the

15   current eight non-Walton board members.

16                    THE COURT:  So this is probably set

17   forth somewhere, and it's my fault for missing it.

18   But what is not springing to mind is what you mean by

19   "nomination materials."  Can you refresh my

20   recollection on what that's talking about?

21                    MR. WALES:  Sure.  It would be the

22   board packages, whatever went to the nominating

23   committee or the board as a whole that showed, you

24   know, what the people's qualifications, independence,

79

1    and things like that.

2                    THE COURT:  All right.  That's

3    helpful.

4                    Mr. DiCamillo?

5                    MR. DiCAMILLO:  Thank you, Your Honor.

6                    On this, the question of director

7    independence is relative to -- related to the

8    potential demand futility analysis to the extent

9    plaintiffs bring a derivative lawsuit.  If they do

10   that, the focus is on the independence of the

11   directors, the current directors.

12                   We believe what we've offered is the

13   most recent director questionnaires and nomination

14   materials for three years.  It goes beyond really what

15   is relevant.  And it's more than enough to cover it.

16                   And also, there's -- this is not a

17   case where there's an allegation that Mr. Walton or

18   someone in his family is -- I don't even know what the

19   allegation would be with respect to the issues that

20   we're talking about.  It's not a situation where

21   there's a transaction with a controlling stockholder

22   and you need to look at relationships.  This is, you

23   know, allegations about the company's compliance with

24   the law and controlled substance area.  So I'm not

80

1    sure what relationships with the Walton family will

2    tell you here.

3              But we are willing to give the most

4    recent materials on these issues.  And we think we've

5    offered to give what is -- more than what is normally

6    ordered, which is typically the most recent director

7    independence questionnaires.

8              THE COURT:  All right.  I'm going

9    to -- go ahead, Mr. Wales.

10             MR. WALES:  I was about to say, we

11   usually get three or four years on questionnaires.

12             THE COURT:  My view is that three

13   years is a good number.  So I'm going to order the

14   three years of director independence questionnaires

15   and the three years of director nomination materials.

16             MR. WALES:  Thank you, Your Honor.

17             MR. DiCAMILLO:  Now that we're moving

18   to senior management level materials, Your Honor, I'm

19   going to let Mr. Berkowitz have some time.

20             MR. WALES:  Well, the only other part

21   of board materials would be related to the

22   disclosures, and I should have said that Mr. MacIsaac

23   would deal with that.  So I don't know if you want to

24   deal with that now or at the end, or what Your Honor

81

1  wants.

2           THE COURT:  Why don't we keep going to

3  officer level materials on this, and then we'll shift

4  to the disclosures.

5           MR. WALES:  Okay.  Great.

6           Obviously, the senior management

7  materials we want for a number of reasons.  We could

8  make a demand on the board.  We want to know --

9  particularly we're very focused on the role of the

10 CEO.  Obviously, CEO is at board meetings, and if he

11 has information he should be providing it, and is

12 there a proper reporting system.  So what we were

13 trying to do is put this all in context so we know

14 what we're talking about.  And that was one of our

15 hopes with the interrogatories.

16          And our first category is the Ethics,

17 Compliance, and Risk Committee, and specifically to

18 the extent it deals with opioid distribution,

19 suspicious order monitoring and those sort of

20 compliance issues.

21          Now, while there's some references to

22 this in the public filings, I would refer Your Honor

23 to Exhibit 297.  297 is a letter that Walmart's

24 counsel sent to us on September 23.  As we noted in

82

1   our brief, we were trying to deal with some of these

2   issues and there was some back and forth, and so this

3   was a letter they sent to us addressing a few of the

4   issues we raised.

5                    THE COURT:  All right.  I'm looking

6   for it, and I'm not seeing it.

7                    MR. WALES:  It was 297.  It was an

8   exhibit that was added last night that was sent with

9   the slides.

10                   THE COURT:  All right.  I remember my

11  assistant bringing it in.

12                   MR. WALES:  You know what, there's one

13  paragraph I could just read to you if you want to keep

14  going.  And if we need more, we can deal with it.

15                   THE COURT:  Why don't you start out by

16  reading it to me, and then we'll see if we descend

17  into chaos.

18                   MR. WALES:  Okay, perfect.  Being a

19  bunch of lawyers, we might be able to get into chaos

20  pretty quickly.

21                   THE COURT:  Go ahead.

22                   MR. WALES:  Okay.  Thank you, Your

23  Honor.

24                   This is 297.  It's a September 23,

CHANCERY COURT REPORTERS

83

1   2020, letter from Latham & Watkins to my colleague,

2   Alla Zayenchik.  We asked about specifically the

3   Ethics, Compliance, and Risk Committee.  And on page 3

4   in the middle they wrote:  "The Ethics, Compliance,

5   and Risk Committee is responsible under its charter

6   for assisting each business segment and functional

7   area of the Company through the oversight of ethics

8   and compliance matters."  And then it continues,

9   "[The] oversight includes making recommendations about

10  the identification, monitoring, and mitigation of

11  compliance risks ...."

12              And then a little later in the

13  paragraph it says, "Members of the Ethics, Compliance,

14  and Risk Committee include Walmart's CEO and senior

15  executive team, as well as the Chief Ethics and

16  Compliance Officer and other members of management

17  with responsibility for ethics, compliance, and risk

18  oversight.  The committee meets approximately ten

19  times per year to discuss relevant topics related to

20  ethics, compliance, and risk."

21              So here, we know it's the most senior

22  people, including the CEO.  We know they meet about

23  ten times per year.  So that's a pretty defined --

24  we're looking for something that's defined.

84

1          So what we're really looking for here

2    is basically the equivalent of board materials but for

3    senior management for this one committee -- you know,

4    the minutes and the presentations and things like

5    that -- so we could see what the most senior

6    executives are being told about this.

7          And I think it's discrete, it's

8    defined, and we know what it is.

9          THE COURT:  Thank you.

10          Mr. Berkowitz?

11          MR. BERKOWITZ:  Thank you, Your Honor.

12          With respect to their efforts to get

13    senior management materials, I think what's important

14    to step back and think about here is that there's no

15    explanation from the plaintiffs and no engagement from

16    them on why board level materials that we're willing

17    to provide and have been willing to provide would not

18    allow them to make the assessment that they already

19    want to make.  And they want to dig deeper and deeper

20    to try and get more plenary type of discovery.

21          With respect to the Ethics, Compliance

22    and Risk Committee, Your Honor, in response to a

23    letter that they sent us after the close of discovery,

24    we responded in an effort to engage with them -- as we

85

1  have been willing to do throughout this -- and we

2  identified for them the people who are on that

3  committee, which include, as you saw, the CEO.

4              We also told them in an interrogatory

5  answer that the CEO has not reported to the board, at

6  least in the last three years, on opioid-related

7  issues.  The people who have reported to the board on

8  opioid-related issues include the chief ethics and

9  compliance officer, who was a member of the Ethics,

10 Compliance, and Risk Committee.  So to the extent that

11 there is anything relevant in terms of what the board

12 knew, it would be in the board materials that are

13 presented to them.  And we don't need to dig down and

14 do a committee below that merely because the CEO

15 happens to be on it.

16             And so we would ask that this type of

17 material not be ordered to be produced, certainly not

18 at this stage.  It rewards plaintiffs for failing to

19 engage with us and taking the materials we had offered

20 to provide to them at the board level to dig down and

21 see if there's something that is actually necessary as

22 opposed to something that they're interested in.

23             MR. WALES:  Your Honor, may I respond

24 very briefly?  I don't want to get into the engaging

86

1    or not engaging.  But we have a different view of the

2    world, and I'll leave it at that and -- number one.

3                    And, number two, obviously we're

4    looking at the potential conduct or reporting up from

5    the senior executives to the board, because that tells

6    you, A, did they perhaps do something wrong on a

7    fiduciary level, or B, is there a lack of reporting.

8    Because, for example, if you had tons of information

9    at the ethics committee and those folks aren't

10   reporting up to a board, that's a problem.  So that's

11   why this very narrowly defined, most senior group is

12   appropriate.

13                   THE COURT:  All right.  Well, I'm

14   going to grant this request.

15                   Now, Mr. Berkowitz's argument is one

16   that is going to start prevailing.  You know, there's

17   a few things down here that I'm not comfortable with

18   and I think which go too far.  But this request here,

19   I actually liked it.  It seemed to me that it was

20   properly targeted at the people who were most likely

21   doing exactly what the plaintiffs wanted to know

22   about.  That these committee materials, the extent

23   that they read on the types of issues for which board

24   materials were sought, were likely to be the most

87

1   probative things and to strike the appropriate

2   balancing point.

3              So I am going to grant this request.

4   But to foreshadow things to come, I do think that this

5   is about as deep in the organization as I'm going to

6   be comfortable going.

7              But, Mr. Wales, why don't you keep

8   going.  You may be able to convince me.  But that's my

9   ruling on this one.

10             MR. BERKOWITZ:  And, Your Honor, if I

11  may, and I'm not -- I heard your ruling and I'm not

12  going to reargue yet.  I would ask that you consider,

13  given the narrowing of the funnel, that we cut a time

14  period other than going back ten years on something

15  like this to at least start seeing if there's anything

16  here that is useful or valuable.

17             Because we're now getting into a

18  situation of a committee below that has met

19  approximately ten times a year.  I don't know the

20  extent of the formality of the minutes that are there

21  or the other types of materials.  And I want to be

22  careful that we don't end up going down a rabbit hole

23  here.

24             THE COURT:  Yeah, I just don't know.

88

1  Why don't we find out what these things -- more about

2  what these things look like and what there is.  And

3  why don't you talk to Mr. Wales in the first instance.

4  And then, if I have to parse something on this, I

5  will.

6                  MR. BERKOWITZ:  Thank you, Your Honor.

7                  MR. WALES:  Okay.  On to the next.

8                  Presentations, reports, and memoranda

9  prepared by Walmart's Executive VP of Global

10  Governance.

11                  Your Honor, we're referring -- I'm

12  looking at now Exhibit 121.  It's a 2018 press release

13  from when Rachel Brand joined as executive vice

14  president in global governance and corporate

15  secretary.  And it noted that she will be -- she

16  reports directly to the CEO and "will be responsible

17  for the organization's Legal [and] Global Ethics and

18  Compliance and Global Investigation, Security," and a

19  bunch of other things.  So that's what we understand

20  the role of this person and why we understand it.

21                  And then, obviously, we're very

22  focused on the organization's compliance, right?

23  Because, I mean, that's what we're really talking

24  about here.  So what we tried to do is make this one

89

1  very narrow.

2                    We asked for any formal presentations,

3  reports, or memorandum created for the purpose of

4  reporting to the CEO or the board on opioid compliance

5  related issues.  We're not asking for committee

6  meetings.  We're not asking for that.  We're asking

7  for formal presentations, reports, and memorandum for

8  reporting.

9                    That's a pretty narrow -- that's a

10 very narrow set of documents from a very senior person

11 who has direct reporting to the CEO and oversees this

12 area.  That is an appropriate and narrowly tailored

13 request.

14                    THE COURT:  So how is this different

15 from things that would show up in the committee

16 materials?

17                    MR. WALES:  I don't know.  It could be

18 they come back and say, "It's the exact same stuff,

19 Dave," you know.  The answer is I don't know.  Not

20 being there, I can't know what I don't know.

21                    So -- but we tried to keep it very

22 narrow.  And it could be it is going to be duplicative

23 in part, so it shouldn't be burdensome at all.

24                    THE COURT:  And to anticipate a point

90

1   that Mr. Berkowitz made last time:  Is this something

2   where you're asking going back to 2010?

3                    MR. WALES:  Yes.  Because, again, the

4   issues all go, you know -- the issues go back to 2010.

5   We've seen that this is executive directed.  We saw

6   there was reporting up to the board.  It's the type of

7   thing that the board knew about.  And it's a very long

8   period of -- you know, it's a potentially long period

9   of time that the misconduct occurred.  So, yeah, we do

10  need it.

11                   THE COURT:  Okay.

12                   Mr. Berkowitz?

13                   MR. BERKOWITZ:  Well, Your Honor, to

14  go to your solar system analogy from the oral argument

15  in *AmerisourceBergen*, we keep getting further and

16  further from orbit here.

17                   And, look, this is the chief legal

18  officer of the company who reports to the CEO and to

19  the board.  As we indicated in our interrogatory

20  responses, the Executive VP of Global Governance has

21  reported to the board on opioids, one of less than ten

22  people who has.  They will now be getting minutes and

23  reports given to the board -- subject to privilege,

24  obviously.

91

1              Now they're looking for separately

2    something that is charitably called narrowly defined

3    "formal presentations, reports, or memoranda" that

4    would have been made to the CEO on opioid-related

5    issues.  There is no evidence -- and, in fact, we

6    answered an interrogatory that the CEO did not report

7    to the board on opioid-related issues.

8              So to the extent that the Executive VP

9    of the Global Governance had something relevant to the

10   board, she also reports to the board and that would be

11   captured in those minutes.  We would object to

12   providing this level of information which would

13   presumably be privileged.

14              MR. WALES:  May I just briefly?

15              THE COURT:  Sure.

16              MR. WALES:  Obviously we're looking at

17   the roles of the senior executives and is there a

18   proper reporting system.  And both of those you need

19   to kind of look at:  Was the information slow going

20   up?

21              And this is very narrowly defined for

22   a specific purpose.  And obviously a person making a

23   formal presentation or a report to either the CEO or

24   the board is going to do it carefully, and it's going

92

1  to be on a probably limited number of documents.

2              THE COURT:  I'm going to allow it as

3  framed.  But I'm also going -- I have the same

4  expectations that I think Mr. Berkowitz does, which is

5  most of this, if not all of it, is likely to be

6  privileged.  But I can envision where knowing the

7  times of the formal presentations, reports, or

8  memoranda that were presented to the CEO or the board

9  would be necessary for the plaintiff to be able to

10  show that there was knowledge or, if there was a

11  lengthy period of no reporting whatsoever, some form

12  of, effectively, dereliction of duty.

13              But I'll be surprised if you actually

14  get nonprivileged material out of this as opposed to a

15  log that lists some things.

16              MR. WALES:  We shall see.

17              MR. BERKOWITZ:  And, Your Honor, on

18  that, obviously the definition sitting here today

19  arguing virtually in Delaware court may seem very

20  clear.  To the extent that, you know, we've got issues

21  or questions about what that means, we'll obviously

22  work with counsel and bring any concerns to your

23  attention.

24              THE COURT:  Yeah, please do.  There

93

1  again, I suspect on this one you'll be somewhat

2  protected by privilege.  But I understand where you're

3  coming from.

4               MR. WALES:  Okay.

5               THE COURT:  Mr. Wales?

6               MR. WALES:  Okay.

7               THE COURT:  I can already tell you,

8  this is one where you're going to have to tell me why

9  this isn't just a lot of stuff.

10               MR. WALES:  Fair enough.  No, I

11  understand.  The pharmacist complaints records and the

12  reports obviously are potentially a broader category

13  of documents, I understand that.

14               I think we need to step back a little

15  bit and say:  Look, Walmart's ethics and compliance

16  was led by the global chief ethics compliance officer.

17  That's the CECO, and then you've got a U.S. CECO.  And

18  we know that compliance has specific documents.  We've

19  seen the portfolio scoring worksheet.  We've seen the

20  controlled substance risk assessment and, again, we're

21  trying to get an understanding of what is the

22  reporting system.

23               For example, if there's direct

24  reporting of the summary of this up to the CEO or up

CHANCERY COURT REPORTERS

94

1   to the board, great, we have that answer.  But if we

2   don't have that sort of information going up, then we

3   need to know that because then you don't have the

4   reporting system.

5                   And so, you know, that is an important

6   factor in trying to determine whether there is a

7   breach of fiduciary duty.  I guess the two core types

8   of documents we're aware of are the portfolio scoring

9   worksheet -- which I think was a compelling

10  document -- as well as the controlled substance risk

11  assessment.  So if there's some summary going up to

12  the CEO or the ethics committee or the board, great,

13  we'll take that.  And if there's not, then, frankly,

14  to see if there's a total lack of reporting, we need

15  the underlying materials because -- at least to those

16  two types -- because we know that they are reflective

17  of problems.

18                  THE COURT:  Mr. Berkowitz?

19                  MR. BERKOWITZ:  I think we're actually

20  in a different solar system entirely here.  They're

21  looking for plenary discovery documents that are at

22  the lowest level of wrongdoing in the hopes of

23  determining that, you know, there was a complaint to

24  the pharmacy in California that somehow didn't make

95

1    its way up to the CEO.

2              They've gotten an extensive amount of

3    220 discovery, per your order today, that will show

4    what the board was aware of, what the Ethics,

5    Compliance, and Risk Committee were aware of.

6              And this is -- I won't say a bridge

7    too far, but this is thousands of pharmacy level

8    records and materials.  And it's an overreach that is

9    akin to plenary discovery in litigation and not

10   appropriate, not necessary in a Section 220 matter.

11             THE COURT:  I agree with that.  This,

12   to me, has the feel of plenary discovery.  And it also

13   seems to me that to the extent there are reports that

14   are flowing up to the CEO about these matters, or to

15   senior management, you're going to get them as a

16   result of the other areas.  So this is not a category

17   that I think is necessary or sufficient for purposes

18   of the inspection.

19             MR. WALES:  Okay.  Number 4, that's

20   the Walmart corporate affairs and government relations

21   to the extent they were provided to the board or the

22   CEO.  Again, we tried to narrowly define it to limit

23   it to reporting to the board or CEO.  And perhaps the

24   board stuff -- it will just be in the board materials

96

1   and we don't need it.  We obviously don't know.

2                 As for the CEO, again, here it's going

3   to go to, you know, what did the board and executives'

4   knowledge of these sort of issues -- I mean, if they

5   want to claim they were unaware of these problems at

6   the same time they're authorizing substantial

7   legislative efforts to change a law or to avoid a

8   prosecution, that goes to their knowledge.  And so we

9   do think this is a very appropriate one.  And because

10  it's limited to the CEO or the board, provided to the

11  CEO or the board, it is appropriate.

12                 And I just also wanted to add -- let

13  me pull it out of my pile of documents here.  And this

14  is from their proxy, Exhibit 228, the page that ends

15  with 256.  And the Nominating and Governance Committee

16  "reviews and advises management on ... legislative

17  affairs and public policy engagement."  So we would

18  expect at least some involvement of the board.  But

19  you have to know the role of the senior executive as

20  well to get an understanding of this.  So that's why

21  we tried to define it very narrow.

22                 THE COURT:  Mr. Berkowitz?

23                 MR. BERKOWITZ:  I'm not sure that they

24  were successful in defining it narrowly.  I'm still

97

1   not sure what the purpose for the relationship or the

2   crux of the issue here is.  They start talking about

3   changing of laws, which has never been mentioned

4   before in their papers.  They intimated that perhaps

5   they would report to the board that, "Hey, we talked

6   to elected officials and talked them out of indicting

7   us."  It's all speculation.  There's absolutely no

8   evidence to find that.

9                   To the extent that corporate affairs

10  or government relations talked about the opioid

11  crisis -- or issues related to their demand -- to the

12  board is going to be reflected in the minutes, and

13  they would get that.  Otherwise, Your Honor, this is

14  rank speculation about what might be out there and not

15  tied at all to any proper basis, and certainly not

16  necessary at this CEO level.  Again, it's almost

17  impossible to pin down because it's so speculative.

18                  THE COURT:  Yeah.  So I'm going to

19  deny this request.  I think the idea that it would

20  show knowledge or be relevant is the type of thing

21  that one could get in plenary litigation, and it might

22  be fairly probative for the reasons that Mr. Wales

23  identifies.  But it doesn't seem to me that it's

24  necessary for the plaintiffs' purposes.  And perhaps,

98

1  correlatively, that what I'm already giving the

2  plaintiffs is sufficient.  So this is not a request

3  that I'm going to enforce.

4              MR. WALES:  Thank you, Your Honor.

5              And the last one, putting aside the

6  disclosure stuff, is there's a handful of documents

7  that we've identified in either the MDL or the

8  ProPublica article that we would think have either

9  very specific -- they're not very burdensome, it's

10 only a handful of documents.  They know what's in the

11 MDL.  And we would like to see those because those are

12 going to help inform, you know, obviously issues that

13 we've been discussing today.  And certainly, they

14 could not be deemed burdensome in any way.  And the

15 courts have ordered things like this.

16             For example, in the *United Health* 220,

17 the Court ordered the production of documents cited in

18 the government complaint.  So this seems very narrowly

19 defined.  These are all issues we've been discussing

20 for purpose, and so we'd ask that these be produced.

21             THE COURT:  Mr. Berkowitz?

22             MR. BERKOWITZ:  Again, Your Honor, to

23 the point that you made with respect to the last

24 request, in light of what you have already ordered

99

1  produced, this type of request is not necessary.  It

2  is burdensome.

3           There are confidentiality agreements

4  in place in these areas.  The scope of the MDL is much

5  broader than the proper purpose that they're looking

6  for.  They're looking for depositions, including ones

7  that have been sealed by other parties other than

8  Walmart, about areas to go on what can really be

9  described as a fishing expedition.

10          This is the opposite of what you would

11 get in a books and records type of thing.  There's a

12 reason that those documents are not in the public

13 record.  They have full access to what is in the

14 public record in that matter, including Judge

15 Polster's summary judgment ruling, as well as whatever

16 plays out in the public record, and that's plenty for

17 them to do what is necessary for their purposes.

18          It would be a terrible precedent to

19 set to start ordering the publication of documents

20 that were otherwise -- or the production of documents

21 that were otherwise leaked improperly and are subject

22 to sealings in other matters that would allow them to

23 get the types of things here.

24          THE COURT:  Someone needs to check

100

1    their mic.

2                    Mr. Wales?

3                    MR. WALES:  Look, you know, let's

4    start in reverse.  The ProPublica article is a very

5    public article.  It got a ton of press.  It's out

6    there.  I mean, some of these things are highly

7    relevant.  For example, Walmart had a prior 220, Your

8    Honor --

9                    (Brief interruption.)

10                    THE COURT:  Can we mute whoever is

11    talking right now?

12                    Ms. Bozman, can you take care of that?

13    Thank you.

14                    MR. WALES:  I'm sorry.  Your Honor,

15    you recall there was a prior 220 that went up to

16    Delaware Supreme Court a few times involving Walmart,

17    and that's where they were bribing government

18    officials.  And that was based on a newspaper article

19    and underlying documents that were taken.

20                    So, I mean, look, this is, you know,

21    what happens.  Things get out in the press, and

22    they're in the public domain now.  And so certainly

23    the two email chains in the ProPublica article are not

24    burdensome.  As soon as that article came out, I

101

1  assure you, Judge, someone pulled them and looked at
2  all of them.
3             And as to the MDL, you know, we ask
4  for certain specific items.  There are sealing orders,
5  and there are certainly exceptions to that.  I mean,
6  we did the *McKesson* derivative action, and we got a
7  bunch of the stuff from the MDL.
8             So they haven't shown that what we're
9  asking for is a problem.  But certainly we'll work
10 with them on that.  And this is, you know, a very
11 defined request.
12            THE COURT:  All right.
13            MR. BERKOWITZ:  Your Honor --
14            THE COURT:  I'm hesitant to do this.
15 It seems to me that we need to keep a line between the
16 underlying plenary litigation and then this
17 proceeding.
18            Now, the exception that I will make --
19 because it is my belief that when a court relies on a
20 document, that that becomes public and fair game.  So
21 I will require Walmart to produce, not the materials
22 that were filed in support of the motions, but the
23 materials that were cited by the federal judge in the
24 two summary judgment rulings.

102

1           He had some footnotes with citations

2     to exhibits.  He also had cited pages of deposition

3     testimony.  I will require production of those.

4     Again, because I think that those are now publicly

5     identified as bases for the judge's ruling.  But I'm

6     not going to go beyond that.

7           And, as I said, I'm generally hesitant

8     to cross the line into what is being produced in

9     discovery in the underlying plenary action.

10          MR. WALES:  Understood.  So the two

11    things we have left, Your Honor, at least on my list,

12    are the disclosure documents, and then we have some

13    dispute as to conditions of production.

14          THE COURT:  Yep.  That's what I have

15    too.

16          MR. WALES:  So in what order would you

17    like to take these in?

18          THE COURT:  Why don't we go to the

19    disclosure documents, and then we'll finish up with

20    conditions on production.

21          MR. MacISAAC:  Thank you, Your Honor.

22          I'm trying to think through these

23    issues as you spoke to make this as simple as

24    possible.  And I think the fairest way to look at

103

1   this, you know, there's the -- we kind of look at the

2   2011 MOA as being, I think, one of the trigger points,

3   at least from a credible basis standpoint, that we'd

4   be looking at from a disclosure standpoint.

5              So if I just address the 2011 MOA, I

6   think what would be fair would be an understanding of

7   board materials with respect to, let's say, the year

8   following the 2011 MOA, which -- up to the point of

9   the 10-K that was disclosed following the 2011 MOA,

10  our understanding of board materials with respect to

11  the disclosures of that 2011 MOA.  So that may include

12  audit committee quarterly 10-Q discussions.  That may

13  include the 10-K at the end of that year.  But

14  that's -- limited to that would be for the 2011 MOA.

15  And then to be -- you know, as to the -- as much

16  compromising as possible, kind of the same analysis

17  for the disclosure that occurred in June 2018.

18              So we have a disclosure of

19  investigations at a time when at least internal

20  records are showing there was a contemplated

21  indictment.  So to the extent there are audit

22  committee materials or board materials discussing the

23  2018 Q2, I believe it is -- or Q1, I apologize -- Q1

24  2018 disclosure as well as the 10-Ks, the disclosures

104

1   in the 10-Ks made thereafter, because it included the

2   same disclosure, and it also included board

3   involvement in those disclosures, we would want to

4   review that as well.

5           So I think that's, if I look at it, a

6   total of about seven meetings -- four in 2012, and

7   then three from June 2018 -- and then the 10-Ks in

8   2019 and 2020.  That would be the board materials, and

9   that's it.

10          THE COURT:  Mr. Berkowitz?

11          MR. BERKOWITZ:  So, first of all, I

12  don't know what the universe of these things are.  And

13  let me try and just talk through them a little bit.

14  I'm going to make one last effort, at the risk of

15  incurring your ire, Your Honor, on the 2011 issues,

16  which is, you know, going back that far, even if there

17  were an issue -- which there weren't -- there's a

18  five-year statute of repose.  And so going back

19  literally nine years on something on an MOA seems far

20  afield.

21          To the extent that you want us to do

22  something, I suspect what we would be looking for

23  would be:  Was the MOA mentioned as a possible

24  disclosure item at the audit committee?  And to the

 1  extent that it was, you know, indicate that or reflect

 2  minutes of that.  It may be privileged, but something

 3  that would indicate whether it was even on the radar.

 4             With respect to the 2018 disclosure,

 5  again, I guess what we're talking about is something

 6  that would reflect that there was discussion around

 7  the disclosure or something even at that high level,

 8  Your Honor, as opposed to going into detail or drafts

 9  and so forth with the audit committee were reflected,

10  if we would first look to the minutes to see whether

11  there's anything there and then go from there.

12             THE COURT:  Mr. MacIsaac, do you want

13  to respond to Mr. Berkowitz's proposal?

14             MR. MacISAAC:  I think in a first

15  instance it would be fair to look at minutes

16  materials.  To the extent something comes up that may

17  say some report was relied upon or something was at

18  least not in the materials seemed to be a basis of the

19  discussion, we may kind of cross that bridge and ask

20  and request that information be produced.  But I think

21  that's a fair compromise that Mr. Berkowitz in the

22  first instance provided.

23             THE COURT:  Let me say what I

24  understand to be happening here.  So I do want the

106

1  seven meetings or -- ballpark seven meetings that

2  Mr. MacIsaac identified to be subject to production.

3  I recognize Mr. Berkowitz's argument about the

4  five-year statute of repose.  But I think that for

5  purposes of this, it's legitimately something that is

6  necessary for the stockholders to receive.

7              And I also think that we should -- we

8  are talking in the first instance about the minutes of

9  these meetings.  And then once we go beyond that, I'd

10  like you to confer about it.  But it seems like you're

11  on the same page, at least during this present time

12  when you're in front of me.

13              Why don't we give this a shot and see

14  if you-all can't figure this one out along those lines

15  that I just articulated in summary.

16              MR. MacISAAC:  Thank you, Your Honor.

17              THE COURT:  Mr. Wales, do you want to

18  address the two conditions?  You're back on mute so

19  we're being deprived of your eloquence.

20              MR. WALES:  Sorry about that.

21              So let's just be very clear.  We agree

22  to a reasonable confidentiality agreement, and we

23  agree to an incorporation by reference.  We just think

24  there needs to be a balanced incorporation by

107

1 reference provision.  And that is that, so that

2 neither party can cherry pick, we're going to get a

3 good faith production of what Your Honor has ordered

4 them to produce.

5                    And so we would ask that the

6 incorporation by provision be limited to the documents

7 that Your Honor has ordered them to produce and not

8 something else.  Because they could otherwise throw

9 stuff in that we have no idea whether it's complete,

10 incomplete, or anything like that.

11                    And also that it be limited to, they

12 give us a certification that in good faith they

13 believe this is complete -- and we've obviously done

14 that now in a number of cases.  Because it helps to

15 know that there has been a good faith done to produce,

16 which you would frankly expect from counsel.  And it

17 gives the Court some comfort if they're relying on

18 this, especially if there's a situation, for example,

19 where you say there was no reporting, then you know

20 there was actually no reporting.  There's not 50 other

21 documents out there.

22                    Additionally, we don't want

23 incorporation after they've given that certification.

24 Because we did have a problem in one case where they

108

1  gave the documents, they gave the certification, we

2  filed the complaint, and a week before they filed

3  their motion to dismiss they said, "Oh, we have a few

4  more board materials and we're going to rely on those

5  on the motion to dismiss."  And we didn't think that

6  was a fair thing or appropriate thing to do.

7              And then, finally, we would ask for a

8  privilege log, which I think is pretty standard and

9  necessary for us to understand.  So those are what

10  we're looking for and why.

11              THE COURT:  All right.

12              Mr. DiCamillo?

13              MR. DiCAMILLO:  Thank you, Your Honor.

14              We have no problem providing a

15  privilege log, so we don't have a dispute on that.

16              On the confidentiality agreement, I

17  think we're very close.  I think the only thing we're

18  arguing about is the concept of incorporation by

19  reference.  Both parties seem to agree that the

20  concept of incorporation by reference, as Your Honor

21  first articulated in the *Yahoo!* case, is appropriate

22  and should be adopted in any confidentiality

23  agreement.  What we've been resisting and continue to

24  resist is a requirement that we certify that we

1    produced every document.  We have -- Your Honor at the

2    end of this is probably going to ask us to put

3    together a form of order.  Your Honor will enter that

4    order.  We then have to comply with that order.  And

5    we will comply with that order, and if we don't comply

6    with that order, there will be consequences.  We

7    intend to comply with the order and will produce what

8    we are ordered to produce.  And we will tell Mr. Wales

9    when we are done, when we believe we are done,

10   producing what we have agreed to produce.

11              Mr. Wales wants a firm cutoff; that

12   once we tell them we're done, we then can't produce

13   anything, or if we do produce it, it's not

14   incorporated by reference.  I don't have a problem

15   with that concept, that we shouldn't be allowed to

16   keep producing documents.  You know, for example,

17   after we've seen a brief and we say, "Oh, yeah, here

18   are another couple documents that we want to rely on

19   too."

20              But we also don't think it's fair to

21   have to provide a certification which would not be

22   required of us in plenary litigation with respect to

23   discovery, and have that be the cutoff.  We all know

24   that we're looking at things, we've determined things

110

1   come off of a privilege log.  Something that we argued

2   is privileged, upon further reflection we decide is

3   not privileged so we provide that.

4                    So I don't think our views are really

5   that far apart, Your Honor.  What I think is

6   appropriate is that Your Honor order incorporation by

7   reference.  And that, to the extent there is a dispute

8   about it, the judge -- whether it's Your Honor in the

9   follow-on derivative suit or one of your judicial

10  colleagues -- deals with whether or not the letter and

11  the spirit of the incorporation by reference provision

12  has been complied with.

13                    But trying to deal with all the

14  possible permutations now, I think it's just going to

15  lead to problems.  It should just be a simple

16  incorporation by reference to the extent there are

17  issues that have to be dealt with after the fact.

18                    MR. WALES:  Your Honor, if I may

19  please respond very briefly.

20                    All we're asking for is a

21  certification in good faith, and we've done that in a

22  number of cases.

23                    For example, we included the order, I

24  believe, from *AmerisourceBergen* from after the 220

CHANCERY COURT REPORTERS

111

1   trial which had the language.  Vice Chancellor

2   Glasscock ordered -- he then subsequently issued an

3   opinion fairly recently and discussed the

4   incorporation by reference in *AmerisourceBergen* in

5   denying the motion to dismiss.

6             Similarly, Vice Chancellor Slights in

7   *Clovis* also dealt with this.  As you read, there's a

8   footnote -- I've been reading too much Delaware law,

9   so it's either footnote 216 or 217 -- I sound like an

10  academic -- that deals with this.

11            So it's just really like, "Okay, guys,

12  we've now made our good faith and this is the

13  universe."  And I don't think there's anything wrong

14  with that.  And specifically to the language we showed

15  in the *AmerisourceBergen*, you know, says -- obviously

16  exempts the -- or has a carve-out for the stuff on the

17  privilege log.

18            So we would ask that what the other

19  judges have been ordering and what has been done is

20  really what's fair.  And we would expect, frankly, and

21  we have no reason to doubt they wouldn't do a good

22  faith search.

23            THE COURT:  I'm comfortable doing

24  that, having the certification.  I think it ultimately

112

1   works out the way Mr. DiCamillo is suggesting.  If

2   anything, it just ensures that the burden is on him if

3   he finds something to explain why it wasn't produced

4   earlier and why their certification was, nevertheless,

5   in good faith and consistent, which can happen.  I

6   mean, things can be found or overlooked.  It's just

7   that they then have to be explained with an

8   understandable and credible explanation.

9                  Let's proceed on that basis, and we

10  can use those models that you've cited.

11                  MR. WALES:  Thank you, Your Honor.

12                  THE COURT:  Anything else that we need

13  to cover?

14                  MR. WALES:  No, Your Honor.  I just

15  want to thank you for the opportunity to appear and

16  spend our afternoon with you.  Thank you.

17                  THE COURT:  Well, you're welcome.

18                  Thank you, everyone, for showing up.

19                  And, Mr. DiCamillo, you did anticipate

20  correctly, I think we need to get some form of order

21  that memorializes this so that, A, people can look to

22  that in lieu of the transcript, and, B, obviously

23  people have rights to go to higher powers than I if

24  they feel aggrieved by this decision or any of the

113

1  rulings.

2                  I think I've ruled against your side,

3  Mr. DiCamillo, on purpose and then on a number of the

4  requests, but there's a few issues where the

5  plaintiffs should feel aggrieved as well.  So we ought

6  to get that into place so that people can do whatever

7  they feel they need to do.

8                  MR. DiCAMILLO:  Thank you, Your Honor.

9                  THE COURT:  Everyone have a good day.

10 I appreciate your time, and please continue to stay

11 safe as we navigate these strange circumstances.

12                  MR. DiCAMILLO:  Thank you, Your Honor.

13 You too.

14                  MR. BERKOWITZ:  Thank you, Your Honor.

15                  (Proceedings concluded at 4:09 p.m.)

16                       - - -

17

18

19

20

21

22

23

24

114

<pre>
 1                        CERTIFICATE

 2

 3           I, KAREN L. SIEDLECKI, Official Court

 4  Reporter for the Court of Chancery of the State of

 5  Delaware, Registered Merit Reporter, and Certified

 6  Realtime Reporter, do hereby certify that the

 7  foregoing pages numbered 4 through 114 contain a true

 8  and correct transcription of the proceedings as

 9  stenographically reported by me at the hearing in the

10  above cause before the Vice Chancellor of the State of

11  Delaware, on the date therein indicated, except for

12  the rulings at pages 45-47, 62-65, 68-69, 76, 80,

13  86-88, 92, 95, 101-102, 105-106, 111-112, which were

14  revised by the Vice Chancellor.

15           IN WITNESS WHEREOF I have hereunto set

16  my hand at Wilmington, this 7th day of October, 2020.

17

18

19

20           /s/Karen L. Siedlecki

21           ---------------------------
                 Karen L. Siedlecki
22             Official Court Reporter
             Registered Merit Reporter
23           Certified Realtime Reporter

24
</pre>

CHANCERY COURT REPORTERS