**UNITED STATES DISTRICT COURT**
**DISTRICT OF DELAWARE**

| | |
|---|---|
| ***In re Walmart Inc. Securities Litigation*** | **Case No: 21-cv-55-CFC**<br><br>**JURY TRIAL DEMANDED** |

# SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Dated: October 14, 2022

Brian E. Farnan (Bar No. 4089)
Michael J. Farnan (Bar No. 5165)
**FARNAN LLP**
919 N. Market St., 12th Floor
Wilmington, DE 19801
Telephone: (302) 777-0300
Facsimile: (302) 777-0301
Email: bfarnan@farnanlaw.com
mfarnan@farnanlaw.com

*Liaison Counsel for Plaintiffs*

**THE ROSEN LAW FIRM, P.A.**
Laurence Rosen
Phillip Kim
Sara Fuks
275 Madison Avenue, 40th Floor
New York, NY 10016
Telephone: (212) 686-1060
Facsimile: (212) 202-3827
Email: lrosen@rosenlegal.com
pkim@rosenlegal.com

*Lead Counsel for Plaintiffs*

# TABLE OF CONTENTS


NATURE OF THE ACTION ..... 1

JURISDICTION AND VENUE ..... 12

PARTIES ..... 13

ALLEGATIONS OF MISCONDUCT ..... 16

I. Introduction ..... 16

A. Walmart's Systematic Violations of the CSA ..... 16

B. Walmart's CSA Obligations as a Pharmacy and a Distributor of Controlled Substances ..... 19

C. The Opioid Crisis ..... 24

II. Walmart As a Pharmacy Violated the CSA Prior to and Throughout the Class Period and Designed its Opioid Sales Operations to Prioritize Profits and Disregard Legal Compliance ..... 25

A. Walmart Was Well Aware of Its Legal Obligations under the CSA, as Evidenced by Its Internal Policies and the 2011 MOA, Which Walmart Flagrantly Violated ..... 31

B. Walmart Prohibited Pharmacists from Categorically Refusing to Fill Prescriptions Issued by Pill-Mill Prescribers and Kept Filling Illegal Prescriptions Issued by Known Pill-Mill Prescribers ..... 39

C. Walmart Filled Prescriptions Showing Glaring Red Flags of Illegality on Their Face ..... 45

III. Walmart Violated the CSA in its Role as A Distributor of Controlled Substances ..... 49

A. Internal Documents Informed Defendants that its SOM Was Inadequate; That Walmart Was in Violation of the 2011 MOA and that Walmart Was at Risk of DEA Enforcement ........51

B. Walmart's Specific CSA Violations in its Role as a Distributor ........60

1) Walmart Failed to detect and report orders of unusual frequency or pattern ........60

2) Walmart Failed to detect and report unusually large orders ........60

3) Walmart Ignored Specific Signs of Diversion from its Own Walmart Branded Pharmacies ........64

4) Walmart Failed to Adequately Staff and Train its Compliance Personnel and Shipped Flagged Orders Before Compliance Personnel Could Examine Them ........65

5) Walmart Failed to Investigate and Report to the DEA Flagged Orders and Failed to Document its Evaluation of Flagged Orders ........66

6) Walmart's Failure to Detect and Report Suspicious Orders Occurred on A Grand Scale ........67

IV. Undisclosed Government Activity Related to Walmart's Opioid Business .68

V. Walmart's "Opioid Stewardship Initiative" ........90

VI. Walmart's Actions in Connection with its Membership in the National Association of Chain Drug Stores ........92

VII. Post-Class Period Events Confirm Walmart's CSA Violations and Defendants' Efforts to Conceal the Investigations ........94

VIII. SEC Rules and Regulations and Accounting Principles Governing Defendants' Class Period Disclosures ........100

A. Item 103 ........100

B. ASC 450 ........103

IX. Defendants' Class Period False and Misleading Statements and Omissions of Facts that the Company Was Required to Disclose ....................................106

A. Defendants' False and Misleading Statements Concerning Disclosure of All Reasonably Possible Liabilities that "May" Be Material ..........................106

B. Defendants' Violations of ASC 450 ......................................................117

C. Defendants Violations of the Affirmative Disclosure Obligations Imposed by Item 103. ..........................................................................................120

D. Defendants' False and Misleading Portrayal of Walmart as a "Steward" in the Opioid Crisis ..............................................................................121

E. Defendants' False and Misleading Risk Disclosures................................123

F. McMillon's and Biggs's False and Misleading Sarbanes-Oxley Certifications ..........................................................................................128

THE TRUTH BEGINS TO EMERGE ..........................................................130

ADDITIONAL SCIENTER ALLEGATIONS....................................................135

A. The Complaint Pleads a Strong Inference of Scienter as to Defendant McMillon..................................................................................................137

B. The Complaint Pleads a Strong Inference of Scienter as to Defendant Biggs ..............................................................................................................139

C. MDL Court's Summary Judgment Opinion, the Jury Verdict, and the Abatement Order Supports Scienter ......................................................140

D. Walmart's Efforts to Withhold Evidence and Improperly Interfere with the Investigations Supports Scienter ............................................................141

E. Walmart's Inconsistent Representations Concerning the Status of the DOJ's Criminal Investigation Supports Scienter ...............................................143

F. Defendants' Motive Supports Scienter ....................................................144

G. Walmart's Actions in Connection with its Membership in the National Association of Chain Drug Stores Supports Scienter ............................145

H. Walmart's Hiring of a Former Top-Ranking DOJ Official During the Height of the DOJ Investigation Supports Scienter ................................146

LOSS CAUSATION/ECONOMIC LOSS ........................................................147

APPLICABILITY OF PRESUMPTION OF RELIANCE:.................................149

Fraud-on-the-Market Doctrine ......................................................................149

Affiliated Ute ....................................................................................................151

INVESTORS' CLASS ACTION ALLEGATIONS ............................................151

NO SAFE HARBOR ..........................................................................................153

COUNT I ............................................................................................................154

Violations of Section 10(b) And Rule 10b-5 Promulgated Thereunder Against All Defendants ..................................................................................154

COUNT II ...........................................................................................................157

Violations of Section 20(a) of the Exchange Act Against the Individual Defendants ...................................................................................................157

PRAYER FOR RELIEF ......................................................................................159

JURY TRIAL DEMANDED ...............................................................................159

Lead Plaintiff Kim Kengle, as trustee of the Kim K. Kengle 2000 Trust ("Lead Plaintiff") and named plaintiff Roseanne Lacy (together with Lead Plaintiff, "Plaintiffs" or "Investors"), individually and on behalf of all others similarly situated, alleges the following based upon personal knowledge as to Investors' own acts and upon information and belief as to all other matters based on the investigation conducted by and through Investors' attorneys. This investigation included, among other things: (1) review and analysis of U.S. Securities and Exchange Commission ("SEC") filings by Walmart, Inc. ("Walmart" or the "Company"); (2) Walmart press releases and earnings call transcripts; public information regarding Walmart, including information posted on the Walmart website; analyst reports and media reports about Walmart, (3) documents filed in *In Re: National Prescription Opiate Litigation*, Case No. 1:17-md-2804 (N.D. Ohio) ("Opioid MDL"); and (4) the complaint filed by the United States of America in *U.S. v. Walmart Inc. and Wal-Mart Stores East, LP*, 1:20-cv-01744-CFC (D. Del.) ("DOJ Action"). Investors believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. Investors bring this securities class action on behalf of all persons or entities who purchased Walmart publicly traded common stock between March 31,

2017, and December 22, 2020, inclusive, (the "Class Period") and who held such shares on March 24, 2020, and/or December 22, 2020, and suffered compensable damages thereby (the "Class").

2. Investors bring this case because Walmart violated the Controlled Substances Act ("CSA") for over a decade and concealed from investors the Government's intensifying criminal and civil investigations into Walmart's legal violations. As Walmart's internal documents prior to the Class Period acknowledge, Walmart failed to comply with a secret 2011 settlement with the Drug Enforcement Administration ("DEA") and did not have a system to monitor suspicious orders of opioids. As early as June 2014 Walmart acknowledged that it was "likely" that the Company would therefore face "*severe* financial and reputational harm."

3. As investors are now aware, in May 2018 the U.S. Attorney for the Eastern District of Texas ("EDTX DOJ") told Walmart that an indictment of the Company was imminent. While the EDTX DOJ began its criminal investigation (the "Criminal Investigation") into Walmart in 2016, it was not until March 2020 that investors would learn that Walmart had been on the brink of indictment, and, that while Walmart had seemingly escaped criminal prosecution, it was still the subject of a DOJ civil investigation ("Civil Investigation," together with the Criminal Investigation, "Government Investigations" or "Investigations") related to Walmart's dispensing and distributing opioids.

4. Then, in December 2020 the DOJ filed an enforcement action against Walmart, laying bare the Company's brazen misconduct and utter disregard of well-established legal requirements under the CSA.

5. During the Class Period Defendants made false and misleading statements that concealed the Government Investigations and the risks related to the Company's failure to comply with the CSA.

6. Defendants violated SEC regulations and Generally Accepted Accounting Principles ("GAAP") that required the Company to disclose the Government Investigations and the risks related to the Company's opioid dispensing and distribution business.

7. Defendants affirmatively represented in Walmart's Class Period SEC filings that it had disclosed all reasonably possible liabilities that may be material even though Walmart never specifically disclosed the Government Investigations. Further, in Walmart's Class Period SEC filings Defendants set forth boilerplate risks related to Walmart's pharmacy business and characterized, as hypothetical, risks that had already transpired related to Walmart's pharmacy business. Additionally, Walmart engaged in a PR campaign characterizing Walmart as a "steward" in combatting the opioid crisis.

8. Walmart is the largest operator of discount retail stores in the United States. In addition to a diverse assortment of retail offerings Walmart stores have

self-contained pharmacies. Accordingly, shoppers can fill prescriptions at nearly 5,000 Company-owned and operated retail pharmacies in the U.S. Indeed, Walmart operates pharmacies to draw customers into its stores who then buy other non-pharmacy goods.

9. Since 2011, Walmart's 5,000 pharmacies nationwide, which dispense prescription opioids and other controlled substances, have accounted for more than 10% of Walmart's domestic net sales. In addition, until 2018, Walmart "self-distributed" controlled substances which serviced Walmart's own retail pharmacies in the U.S.

10. Because Walmart dispensed and distributed controlled substances, including highly addictive and dangerous Class II opioids, Walmart was subject to the comprehensive but well-established requirements of the CSA and related regulations.

11. The CSA required Walmart to implement reporting mechanisms and controls designed to, *inter alia,* (i) identify and report to the DEA suspicious orders of controlled substances; (ii) identify and investigate suspicious prescriptions (*e.g.*, large, repeat orders from "pill-mill" doctors) and "refuse to fill" ("RTF") such orders; (iii) report RTF events to the DEA; (iv) provide internal reporting such that Walmart pharmacists could identify red-flagged prescriptions across its nationwide platform; and (v) prevent theft of controlled substances by Walmart employees.

12. Walmart's failure to comply with the CSA prompted the DEA to take nationwide action against it in 2009. In November 2009 the DEA issued an Order to Show Cause seeking to revoke the registration of a Walmart in California to dispense controlled substances.

13. To resolve the enforcement proceeding stemming from the 2009 Order to Show Cause ("2009 OTSC"), and "avoid the uncertainty and expense of litigation" Walmart and the DEA entered into a nationwide memorandum of agreement in 2011 ("2011 MOA").[1] The 2011 MOA was for a four-year term, was national in scope, and required Walmart to implement a variety of compliance measures within no later than four years and maintain a robust compliance program to ensure compliance with the CSA. The 2011 MOA essentially put Walmart on probation.

14. Despite this, Walmart egregiously violated the 2011 MOA. As Brad Nelson, a controlled substances compliance director at Walmart wrote in an email to a regional manager less than a month before the MOA's expiration: "The [2011] MOA requires that the reporting of Refusal to fills expires in 30 days. ***We have not invested a great amount of time and effort in doing analysis on the data since the agreement is virtually over. Driving sales and patient awareness is a far better use of our Market Directors and Market manager's time.***"

[1] The 2011 MOA is attached hereto as Exhibit A.

15. Indeed, in 2014, Walmart's corporate compliance department internally acknowledged, in a corporate governance "worksheet," of which Walmart's board of directors was informed, that Walmart had "no processes in place" to comply with its legal requirements to have a functioning suspicious order monitoring system pursuant to the 2011 MOA and the CSA. The Company further recognized that because of its CSA violations Walmart was "likely" to experience "severe financial and reputational impact." Then, in 2015, Walmart internally acknowledged that its suspicious order monitoring system required "immediate and substantial enhancements" to "help Walmart avoid DEA enforcement as a result of non-compliance with [the CSA]."

16. Unsurprisingly, EDTX DOJ began a criminal investigation into Walmart's dispensing and distribution practices in December 2016. The Criminal Investigation came after the DEA raided one of Walmart's stores- a rare occurrence for a Fortune 500 company.

17. The Criminal Investigation uncovered Walmart's systematic CSA violations. Walmart pharmacists from all over the country told the Company that they did not want to fill prescriptions of opioids because they were from doctors running pill mills. Customers in Texas had died after taking suspect prescriptions that Walmart filled. Pharmacists pleaded with Walmart's corporate office. Walmart refused to take corporate-wide action. Instead, it provided bonuses to pharmacists

based on the number of prescriptions filled and pressured pharmacists to fill prescriptions as quickly as possible.

18. On March 28, 2018, U.S. attorneys at EDTX DOJ informed Walmart that it was going to indict the Company. In May 2018, EDTX DOJ told Walmart that the indictment was *imminent* and that the Company should pay $1 billion to settle the civil charges.

19. In the months that followed Walmart's top lawyers met with EDTX prosecutors. Walmart's lawyers consulted Defendant McMillon who approved the Company's presentation to the DOJ wherein it attempted to convince the DOJ not to indict Walmart. Walmart's top outside counsel at Jones Day highlighted the damage an indictment would cause to Walmart and its shareholders describing the "profound negative impact on the lives and families of the Company's 1.5 million U.S. employees and its innocent shareholders. The decision to indict Walmart could ultimately result in layoffs. It would also likely mean the loss of billions of dollars in the value of Walmart shares held in retirement saving accounts for millions of Americans and the pension funds of countless nonprofits and public employees."

20. The U.S. Attorneys working on the Criminal Investigation characterized Walmart's pleas as no different than that of a criminal defendant who pleads for leniency stating his children will be harmed by his incarceration. They stated that Walmart's size did not make it above prosecution.

21. According to federal prosecutors working on the case, Walmart exploited its access to high level DOJ officials by lobbying to quash the contemplated criminal indictment. Around the same time, Walmart hired Rachel Brand, A DOJ official in Washington DC- to further influence the DOJ. Shortly thereafter, DOJ leadership instructed the U.S. Attorney for EDTX to drop the criminal indictment.

22. Notwithstanding the declination, of which Walmart was informed on August 31, 2018, the Civil Investigation against the Company continued. According to prosecutors, Walmart did not cooperate with the investigation. For example, Walmart never gave prosecutors a full list of doctors that pharmacists were concerned about; Walmart did not give prosecutors full information on its internal databases to analyze prescribing information and patterns; and most importantly, Walmart refused to produce emails between compliance officials and the Company's senior management.

23. Defendants concealed from Investors the existence of the Government Investigations, as well as the 2009 OTSC and 2011 MOA.

24. On March 25, 2020 before the market opened, the Pulitzer-prize winning investigative journalism news source *ProPublica* published a 7,500 word expose disclosing for the first time that the EDTX DOJ had been criminally investigating Walmart for violating the CSA and related laws since 2016. The article

revealed that in March 2018 Defendants became aware that EDTX DOJ intended to indict the Company and that even after the DOJ declined to indict the Company it remained the subject of an ongoing DOJ civil investigation. The article also revealed that Walmart entered a secret settlement with the DEA in 2011 in which it agreed to implement measures to comply with the CSA, and that Walmart had received more than 50 "Letters of Admonition" from the DEA from 2000 to 2018 for its opioid prescribing practices. The article further revealed that Walmart did not comply with the 2011 MOA, prompting the EDTX DOJ to pursue criminal charges against the Company. The article noted that it was "troubling to the federal investigators" that Walmart violated the CSA from 2011 to 2016, despite the fact that "for much of this period, Walmart was operating under a secret settlement…with the DEA" Indeed, "[p]rosecutors believed that Walmart was not fulfilling the terms of its agreement with the DEA."

25. On this news, shares of Walmart fell nearly 5%, or $5.63 per share from its closing price of $115.03 on March 24, 2020, to its close at $109.40 on March 25, 2020, damaging investors.

26. Then, on December 22, 2020, the DOJ announced that it had filed a lawsuit against Walmart for alleged violations of the CSA. The DOJ's complaint alleges that from June 26, 2013 onward, Walmart "knowingly filled thousands of controlled substance prescriptions that were not issued for legitimate medical

purposes or in the usual course of medical practice, and that it filled prescriptions outside the ordinary course of pharmacy practice." The DOJ complaint also alleged that, "as the operator of its distribution centers, which ceased distributing controlled substances in 2018, Walmart received hundreds of thousands of suspicious orders that it failed to report as required to by the DEA." The DOJ stated that "these actions helped to fuel the prescription opioid crisis." The DOJ's press release stated that it sought civil penalties which "could total in billions" and injunctive relief.

27. On this news, Walmart's stock price fell $2.75 per share, or 1.88%, over the next two trading days to close at $144.20 per share on December 23, 2020, damaging investors.

28. Despite Defendants' awareness of: (1) the 2011 MOA, (2) Walmart's CSA violations, (3) the EDTX DOJ's Criminal Investigation and intent to indict the Company, (4) the Civil Investigation and (5) Walmart's own acknowledgment that it was likely the Company would face severe financial and reputational damage based on its CSA violations and failure to comply with the 2011 MOA, Defendants:

1) Misrepresented that they had disclosed all legal proceedings where a liability is "reasonably possible" and "*may* be material," despite having never disclosed the Government Investigations (or the 2011 MOA);

2) violated Generally Accepted Accounting Principles governing the disclosure of contingent liabilities by failing to disclose the Government

Investigations as a contingent liability in Walmart's Class Period financial statements despite being aware that it was at least reasonably possible (GAAP's threshold requiring disclosure) that Walmart would incur a material liability as a result of the Government Investigations;

3) violated Item 103 of the SEC's Regulation S-K, 17. C.F.R. §229.30 ("Item 103") which requires disclosure of material legal proceedings known to be contemplated by governmental authorities, by failing to disclose the Government Investigations;

4) set forth boilerplate risk disclosures related to Walmart's pharmacy business and characterized, as hypothetical, risks that had already transpired while concealing the Government Investigations; and

5) falsely portrayed Walmart as a "steward" in the opioid crisis with "comprehensive policies and training to help support its pharmacists in filling prescriptions only for legitimate medical reasons" when in truth Walmart's policies were specifically designed to prevent pharmacists from refusing to fill illegitimate prescriptions.

29. Additionally, Defendants McMillon and Biggs issued false and misleading Sarbanes Oxley certifications attesting to the accuracy of the Company's financial statements and statements in the Company's quarterly and annual reports,

despite the violations of GAAP and SEC regulations and false statements described above.

30. As a result of Defendants' wrongful acts and omissions, and the decline in the market value of the Company's securities following a series of corrective disclosures, Investors and other Class members suffered significant damages.

## JURISDICTION AND VENUE

31. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

32. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 27 of the Exchange Act (15 U.S.C. §78aa).

33. Venue is proper in this judicial district pursuant to 28 U.S.C. §1391(b) and Section 27 of the Exchange Act (15 U.S.C. §78aa(c)) as the alleged misstatements entered and the subsequent damages took place in this judicial district.

34. In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails,

interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

35. Lead Plaintiff Kim Kengle as trustee of the Kim K. Kengle 2000 Trust purchased shares of Walmart common stock during the Class Period and was damaged thereby. *See* D.I. 15 Ex. 2.

36. Named Plaintiff Roseanne Lacy purchased shares of Walmart common stock during the Class Period and was damaged thereby. *See* D.I. 29 Ex. E.

37. Defendant Walmart engages in retail and wholesale operations in various formats worldwide. Walmart Stores Inc. changed its name to Walmart Inc. in February 2018. Walmart operates approximately 5,000 pharmacies within its Walmart and Sam's Club Stores. Walmart's pharmacy business earned $21.1 billion in prescription drug dispensing revenue in 2019, making it the fifth largest pharmacy chain in the United States by that metric. Walmart is incorporated in Delaware with headquarters at 702 SW 8th Street, Bentonville, AR 72716. Walmart's securities trade on New York Stock Exchange ("NYSE") under the ticker symbol "WMT."

38. Defendant Douglas C. McMillon ("McMillon") has been the Company's President and CEO since February 2014 and a Company director since 2013. McMillon is the Chair of the Executive Committee (which he joined in

November 2013) and a member of the Ethics, Compliance and Risk Committee. McMillon has worked at Walmart for almost 30 years, including in a variety of leadership positions. McMillon signed all the Company's annual reports on Form 10-K ("10-K's") and quarterly reports on Form 10-Q ("10-Q's") filed with the SEC during the Class Period.

39. Defendant M. Brett Biggs ("Biggs") has been the Company's Executive Vice President and CFO since January 2016. Biggs is a member of the Ethics, Compliance and Risk Committee. McMillon signed all of the Company's 10-K's and 10-Q's filed with the SEC during the Class Period.

40. Defendants McMillon and Biggs are collectively referred to as the "Individual Defendants."

41. Each of the Individual Defendants:

(a) directly participated in the management of the Company;

(b) was directly involved in the day-to-day operations of the Company at the highest levels;

(c) was privy to confidential proprietary information concerning the Company and its business and operations;

(d) was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e) was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(f) was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

(g) approved or ratified these statements in violation of the federal securities laws.

42. Walmart is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

43. The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to Walmart under *respondeat superior* and agency principles.

44. Defendants Walmart and the Individual Defendants are collectively referred to herein as "Defendants."

***Walmart's Ethics, Compliance and Risk Committee***

45. Walmart's Ethics, Compliance and Risk Committee is responsible for assisting each business segment and functional area of the Company through the oversight of ethics and compliance matters. This oversight includes making

recommendations about identification, monitoring, and mitigation of compliance risks.

46. Members of the Ethics, Compliance and Risk Committee include Walmart's CEO and senior executive team as well as the Chief Ethics and Compliance Officer and other members of management with responsibility for ethics, compliance and risk oversight. The committee meets approximately ten times per year to discuss relevant topics related to ethics, compliance and risk.

47. McMillon and Biggs, as members of Walmart's Ethics, Compliance and Risk Committee, had specific insight into and awareness of compliance risks, including the risks related to Walmart's business dispensing and distributing controlled substances.

## ALLEGATIONS OF MISCONDUCT

## I. Introduction

### A. Walmart's Systematic Violations of the CSA

48. As detailed below, prior to and during the Class Period Walmart acted as both a pharmacy that dispensed controlled substances and a distributor of controlled substances to its own Walmart and Sam's Club branded pharmacies. At all relevant times, Walmart was subject to the Comprehensive Drug Abuse Prevention and Control Act of 1970 ("Controlled Substances Act" or "CSA").

49. Prior to and during the Class Period Walmart flagrantly violated the CSA. On December 22, 2020, after conducting a "painstaking" investigation, the United States Department of Justice filed a civil enforcement action against Walmart in this Court. A copy of the complaint in the DOJ Action ("DOJ Complaint") is attached hereto as **Exhibit B** and incorporated by reference herein.

50. The DOJ Complaint alleges that "Walmart chose, for years, to disregard a well-established legal obligation on a systematic basis and a huge scale involving at least hundreds of thousands of orders of controlled substances. In doing so, Walmart substantially benefitted itself while increasing the risk of undetected unlawful conduct and serious widespread harm to Americans in the midst of a nationwide prescription drug abuse epidemic."

51. Walmart is also the subject of scores of civil lawsuits stemming from its CSA violations, subjecting it to billions of dollars in liability and severe and irreversible reputational damage.

52. Walmart is a defendant in a multidistrict litigation that thousands of states, counties, cities, municipalities, and towns across the United States have brought related to the opioid epidemic. *See In re National Prescription Opiate Litig.*, 17-md-02804 (N.D. Ohio) ("Opioid MDL" or "MDL").

53. The Opioid MDL has been pending since December 1, 2017. On January 27, 2020 the MDL Court denied Walmart's motion for summary judgment stating that:

> "A jury could review the record evidence and find that Pharmacy Defendants [including Walmart] shares a ***general conspiratorial objective***, with themselves and other Defendants, to ***expand the opioid market using false information and disregarded regulatory obligations*** in order to achieve that goal; and
>
> "[T]he record evidence ***suggests obvious deficiencies that a layperson could plainly recognize"*** in Walmart's compliance program.

A copy of the MDL Court's decision denying Walmart's motion for summary judgment is attached hereto as **Exhibit C.**

54. After the first bellwether trial in the Opioid MDL, which lasted six weeks, on November 23, 2021 a jury found Walmart liable for helping fuel the opioid crisis. ("Opioid Jury Verdict"). A copy of the Opioid Jury Verdict is attached hereto as **Exhibit D.**

55. On August 17, 2022 the MDL Court issued an Abatement Order and Injunction requiring Walmart to pay a penalty of $216,866,667 and undertake numerous actions to comply with the CSA, including having an independent CSA compliance monitor for a period of 15 years. A copy of the Abatement Order is attached hereto as **Exhibit E**.

56. In connection with the Opioid MDL, the MDL Court permitted plaintiffs to depose Defendant McMillon, finding evidence demonstrating

McMillon's personal knowledge of and involvement in both Walmart's opioid compliance policies and the Criminal Investigation.

57. Specifically, in October 2016 McMillion bumped into a friend, Jerry Jones, who had lost a son to opioids. McMillion asked Jones what Walmart could do to help his "mission" of combatting the opioid crisis, making clear that he was serious and not asking just to be polite. The Opioid MDL Court found that "there are emails showing suggestions Jones made to McMillon, and McMillon forwarding those ideas to other Walmart executives." Additionally, the MDL Court found that "plaintiffs also offer evidence and colorable argument that McMillon has personal knowledge about PowerPoint presentations made by Walmart's counsel to the Department of Justice…and there is evidence that McMillon was consulted during the formulation and approval of Walmart's response to the DOJ investigation." A copy of the MDL Court's Ruling Regarding Deposition of Walmart CEO McMillion is attached hereto as **Exhibit F.**

### B. Walmart's CSA Obligations as a Pharmacy and a Distributor of Controlled Substances

58. Congress enacted the Controlled Substances Act (CSA), Pub. L. No. 91-513, tit. II, 84 Stat. 1236, 1242-84 (1970) (codified as amended at 21 U.S.C. §§ 801-904), in 1970 to, among other things, "provide meaningful regulation over legitimate sources of drugs to prevent diversion into illegal channels."

59. The CSA creates a category of drugs, known as "controlled substances," that are subject to strict federal monitoring based on their potential for abuse.[2]

60. The CSA comprehensively regulates every participant in the supply chain for controlled substances, from manufacturers to wholesale distributors to retail pharmacies. Because controlled substances, by definition, are drugs with the potential for abuse, this comprehensive scheme is designed to prevent the "diversion"—i.e., the illegal misuse—of controlled substances, including prescription opioids. Under the CSA, every participant in the supply chain bears responsibility for preventing the misuse of controlled substances.[3]

61. Controlled substances are grouped into five categories. Schedule II controlled substances have a high potential for abuse, which, if abused, "may lead to severe psychological or physical dependence." Despite this, they have "a currently accepted medical use in treatment in the United States or a currently accepted medical use with severe restrictions." Schedule II includes opioid-based painkillers such as oxycodone, hydrocodone, and methadone, and stimulants such as amphetamine.[4]

---

[2] *See* DOJ Complaint (**Exhibit B**) ¶55.
[3] *Id.* ¶¶2-3.
[4] *See* 21 C.F.R. § 1308.12; DOJ Complaint ¶57.

62. Any person who manufacturers, distributes or dispenses a controlled substance must register, and maintain registration, with the DEA.

63. The CSA requires distributors of controlled substances to "design and operate a system to disclose to the registrant suspicious orders of controlled substances," and "shall inform" DEA of those suspicious orders "when discovered." See 21 C.F.R. § 1301.74(b). Thus, a distributor must itself detect and identify suspicious orders and report them to DEA. This requirement protects against diversion and abuse by requiring distributors to monitor pharmacies for warning signs of such misconduct.[5]

64. Suspicious orders "include orders of unusual size, orders deviating substantially from a normal pattern, and orders of unusual frequency." In other words, orders that are unusual in one or more of those three ways—size, pattern, or frequency—are deemed "suspicious orders," and a distributor must detect and report them. The regulation does not limit "suspicious orders" to those three categories, however. It states, non-exclusively, that suspicious orders "include" those categories.[6]

65. Because Walmart acted as its own distributor for controlled substances (up until November 2017), it had a special advantage: Walmart had access to

[5] DOJ Complaint ¶28.
[6] *Id.*

extensive data and other information that gave it the ability—had it wanted to—to investigate the circumstances underlying orders for controlled substances.

66. Walmart was subject to numerous requirements under the CSA as a pharmacy dispensing controlled substances. These requirements are specifically enumerated in the DOJ Complaint.[7]

67. A registrant who dispenses a drug issued without a valid prescription may be subject to civil penalties or, under certain circumstances, criminal penalties.[8] The CSA also authorizes the Attorney General to seek declaratory and injunctive relief for such violations of law.[9] 21 U.S.C. § 843(f).

68. Part 1306 of the CSA has three rules that pharmacists must follow. A pharmacist must first determine that the prescription was issued by a licensed medical practitioner in the usual course of their practice; the pharmacist must next determine that the prescription is for a legitimate medical purpose; and finally, the pharmacist must adhere to the usual course of their own practice in filling the prescription. Walmart, as a pharmacy, was bound by these rules.

69. Pharmacists are not permitted under law to rely exclusively on the fact that a prescription was issued by a licensed medical professional in determining whether a prescription is valid. Pharmacists are instead required to consider "red

---

[7] *Id.* ¶¶64-88.
[8] 21 U.S.C. § 842(a)(1),(c).
[9] 21 U.S.C. § 843(f).

flags" when they appear and when their appearance brings into question the validity of a prescription which a medical professional has issued. Such "red flags" include, but are not limited to, a medical professional who issues large quantities of controlled substances- for example a doctor who issues prescriptions for opioids in large quantities to large numbers of patients; prescriptions which are themselves dangerous- for example certain combinations of drugs which are known to be susceptible to abuse and/or dangerous in combination; and the circumstances of the patient themselves- for example a customer who the pharmacist knows always refills their large opioid prescriptions well before the individual should have used up the previous supply of pills from an earlier prescription.

70. If the pharmacist cannot resolve the red flag, the pharmacist must refuse to fill the prescription. If the pharmacist can resolve the red flag the pharmacist must document its resolution. A lack of documentation is evidence that the pharmacist did not resolve the red flag.

71. Violations of the CSA's dispensing rules are subject to civil penalties not to exceed $25,000 for each violation on or before November 2, 2015, and not to exceed $67,627 for each violation after November 2, 2015.[10]

[10] See 21 U.S.C. § 842(c)(1)(A); 28 C.F.R. § 85.5; DOJ Complaint ¶93.

72. Distributors of controlled substances are also required to abide by certain legal obligations when they receive controlled substance orders from pharmacies.[11]

73. Distributors are required to register with the DEA and maintain effective controls against the diversion of controlled substances.[12]

74. A distributor is required to design and operate a system to detect suspicious orders of controlled substances and inform the DEA of suspicious orders. Failing to detect and report a suspicious order is a violation of the law. The civil penalty associated with such violation is up to $10,000 for each violation on or before November 2, 2015 and up to $15,691 for each violation after November 2, 2015.[13]

**C. The Opioid Crisis**

75. In the late 1990's pharmaceutical companies reassured the medical community that patients would not become addicted to opioid pain relievers and healthcare providers began to prescribe them at greater rates. Based on these assurances from the pharmaceutical industry and industry sponsored doctors and medical foundations, doctors even began prescribing opioids to children.

[11] DOJ Complaint ¶¶96-104.
[12] *Id.* ¶98.
[13] *Id.* ¶104.

76. Increased prescription of opioid medications led to widespread abuse and addiction, making it clear that opioids could in fact be highly addictive.

77. In 2017 the U.S. Department of Health and Human Services declared the opioid crisis a public health emergency. Between 1999 and 2018, more than 232,000 people in the United States died from overdoses involving prescription opioids. Two out of three drug overdose deaths in 2018 involved an opioid.[14] In 2019, an estimated 10.1 million people aged 12 or older had misused opioids in the past year.[15]

78. An estimated 40% of opioid overdose deaths involved a prescription opioid. Some individuals who filled invalid prescriptions for controlled substances at Walmart died soon thereafter of overdoses related to those prescriptions.[16]

## II. Walmart As a Pharmacy Violated the CSA Prior to and Throughout the Class Period and Designed its Opioid Sales Operations to Prioritize Profits and Disregard Legal Compliance

79. The DOJ Complaint states that from June 26, 2013 to the present, "Walmart violated the CSA's dispensing rules on a sweeping national scale, filling enormous amounts of invalid controlled-substance prescriptions" due to "Walmart's failure to take seriously its duty to comply with the CSA obligations

[14] Opioid Crisis Statistics | HHS.gov (last visited June 25, 2021).
[15] *Id.*
[16] DOJ Complaint ¶44.

and [ ] the ways Walmart made it difficult for its pharmacists to fulfill those obligations."[17]

80. Walmart's pharmacy operations are part of the company's Health and Wellness Division. The Health and Wellness Division included a compliance team, located at Walmart's Corporate Headquarters, that was responsible for ensuring that pharmacy operations complied with all relevant federal and state laws. This compliance unit included managers who fielded questions about legal compliance from Walmart's agents in the field, including pharmacists and distribution center staff. Walmart's Health and Wellness compliance unit helped develop Walmart's internal controlled substances guidance and procedure documents.[18]

81. Walmart's compliance unit oversaw nationwide dispensing practices. Walmart pharmacies were staffed by a pharmacy manager, line pharmacists and pharmacy technicians. Pharmacy managers reported to market directors, who oversaw multiple Walmart pharmacies. These market directors in turn reported to market managers, who were responsible for multiple areas of operation.[19]

---

[17] DOJ Complaint ¶¶105-106.
[18] *Id.* ¶¶123-124
[19] *Id.*

82. Walmart's pharmacies ultimately reported to Walmart corporate executives in Walmart's Health and Wellness Division located at Walmart's corporate headquarters.[20]

83. Walmart knew that many of the controlled-substance prescriptions it filled were not issued for a legitimate medical purpose or in the usual course of medical practice or both. Walmart became aware of this through several ways.

84. First, Walmart pharmacists repeatedly identified problem or "pill-mill" prescribers. Walmart pharmacists submitted these "refusal-to-fill" forms ("RFTs") identifying pill-mill prescribers to Walmart's corporate compliance unit who oversaw nationwide dispensing practices. Second, Walmart pharmacists were aware that certain prescriptions showed obvious red flags and were therefore indicative of prescription drug abuse. Third, Walmart pharmacists would sometimes refuse to fill prescriptions because they were obviously illegal and presented unresolved red flags. Those same prescriptions would then later be filled by a different Walmart pharmacist who would fill the prescription without resolving the red flag.[21]

85. Walmart intentionally impeded its pharmacists' ability to comply with the law so that it could attract and retain customers.

---

[20] *Id.* ¶¶108, 113.
[21] DOJ Complaint ¶¶108-112.

86. Retailers like Walmart operate pharmacies to draw customers in to buy other non-pharmacy goods. For example, Walmart's annual reports since at least 2017 have stated that risks to its pharmacy business could "result in the loss of cross-store or club selling opportunities, and in turn, adversely affect our overall net sales, other results of operations, cash flows and liquidity."[22] Additionally, Walmart's Sam's Club stores sometimes offered drastic discounts on opioids to drive customer traffic to its stores.[23]

87. To attract pharmacy customers to its stores, Walmart collaborated with McKesson to make trial offers, savings cards, and e-coupons to promote discount opioids including OxyContin, Butrans, Hyslinga, Ultram ER, Magnacet and Nucynta. Walmart and CVS alone handled 49% of all claims for the Magnacet loyalty program. Walmart was in the top four of pharmacies for amount of claims in the Nucynta loyalty program.[24]

88. Walmart also agreed to partner on direct mail campaigns to sell Butrans on behalf of Purdue Pharma, using Walmart's prescription data to reach prior buyers of these products to encourage them to seek more prescriptions.[25]

---

[22] Walmart Inc. Annual Report, at 20 (2021); Walmart, Inc., Annual Report, at 19 (2020); Walmart, Inc. Annual Report at 19 (2019); Walmart, Inc. Annual Report, at 222 (2018); Walmart, Inc. Annual Report, at 22 (2017).
[23] DOJ Complaint ¶114.
[24] Expert Report, Anna Lembke, at 70, Opioid MDL, 1:17-MD-2804-DAP (N.D. Ohio, Dec. 29, 2021), Dkt. No. 4219-8 ("Lembke Report").
[25] Lembke Report at 70.

89. Walmart pressured its pharmacists to fill prescriptions as quickly as possible because "shorter wait times keep patients in store." Walmart managers told pharmacists to "[h]ustle to the customer, hustle from station to station" because filling prescriptions "is a battle of seconds."[26]

90. Managers ranked stores for the volume of prescriptions filled. Walmart Health and Wellness Directors set the unrealistic goal for pharmacists to fill prescriptions in less than 15 minutes. In 2013 Walmart adopted "Pharmacy Facilities Management Incentive Plans" providing monetary incentives to employees based on the number of prescriptions the store's pharmacy filled.[27]

91. Walmart's pharmacy incentive plan provided bonus payments based on number of prescriptions filled regardless of whether the sales were generated from sales of controlled substance. As the number of prescriptions went up so did the incentive payments Walmart awarded its employees. A Management Incentive Plan ("MIP") bonus provided additional payments to eligible associates based on the extent to which the number of annual prescriptions exceeded 190,000. The MIP made no mention or patient safety goals or red flag detection goals. These programs disincentivized pharmacists from exercising their professional judgment in

[26] DOJ Complaint ¶¶115-116.
[27] *Id.* ¶¶117-19.

protecting against illegal diversion of controlled substances and instead emphasized speed and profits.[28]

92. Walmart also advocated with the National Associated of Chain Drug Stores ("NACDS") DEA Compliance Working Group to include controlled substances within the pharmacist incentive programs, insisting that "[i]ncentive programs should be entirely agnostic as to the type of prescriptions (controlled substances or non-controlled substance drugs) filled." Walmart disagreed with NACDS proposal for identifying a red flag for "[e]xcessive volume and rate of growth of dispensing controlled substances.[29]

93. Walmart's compliance department threatened pharmacists if they did not fill prescriptions despite obvious signs of illegality. For example, on January 8, 2015, Walmart Compliance Director Brad Nelson discussed a pharmacist who had reported "that he is feeling pressured" by his supervisor to fill prescriptions of controlled substances despite obvious signs of illegality, explaining that if the pharmacist doesn't fill prescriptions, "then that would be a significant issue."

94. Indeed, Walmart conducted surveys of its pharmacy employees in June 2012, July 2014 and October 2014. The survey results evidence that pharmacists felt rushed when filling prescriptions, felt that the pharmacies were understaffed,

---

[28] Lembke Report at 114-15.
[29] Lembke Report at 114.

and felt that patient safety was undermined as a result. Many employees responded to the surveys with specific pleas indicating that they felt at risk for making mistakes and unsafely filling prescriptions for Class II controlled substances. For example, one employee responded to the October 2014 survey stating: "Since … new Control Class II Change for Hydrocodone we have been added more responsibility and time-consuming tasks, but our allotted hours for pharmacy staff has not changed…. [T]his can add to pharmacy staff being more rushed to fill Rx, therefore more chance of mistakes happening in the pharmacy." One comments states: "Our [District Manager] continually sends our pharmacy nasty emails and chastises us for not having a [sic] high enough numbers in our input and fill accuracy and times. We are therefore instructed to cheat the system …." Another comment states: "[B]ecause of the constant harassment from our market manager about us not getting [prescriptions] done in 20 min, we often take shortcuts in filling and counseling rx's that could lead to patient safety issues."[30]

### A. Walmart Was Well Aware of Its Legal Obligations under the CSA, as Evidenced by Its Internal Policies and the 2011 MOA, Which Walmart Flagrantly Violated

95. Walmart acknowledged that it had to comply with the CSA's requirements when dispensing controlled substances. Walmart maintained a

[30] DOJ Complaint ¶¶121-22.

Pharmacy Operations Manual ("POM") which serves as a central resource for its pharmacies. In 2009 Walmart added a policy to its POM which, according to a Walmart Senior Director of Pharmacy Professional Services and Government Relations, "provides guidance on the pharmacist's responsibility to ensure that a prescription has been issued for a valid purpose…." The policy thus would serve as a "reference for pharmacists regarding," among other things, "'prescription mills.'" Walmart's POM listed and identified criteria for determining when a proper patient prescriber relationship might not exist. Walmart even revised its POM to add more details concerning red flags of illegality.[31]

96. In April 2015, as the opioid crisis in the U.S. continued to escalate, Walmart again amended its POM, specifically quoting the CSA and explaining that the regulation requiring pharmacists to dispense controlled-substance prescriptions that were written for a legitimate medical purpose and a proper prescriber patient relationship was the basis for nearly all criminal actions the DEA took against pharmacies and pharmacists. The amendment even listed the red flags the DEA identified, listing 18 red flags in total and encompassing prescriber red flags, patient red flags and prescription red flags.[32]

---

[31] *Id.* ¶¶125-131.

[32] *Id.* ¶¶133-34.

97. Defendants obtained a heightened awareness of their obligations under the CSA in March 2011 when Walmart entered into a secret nationwide settlement agreement ("2011 MOA") to resolve a DEA administrative action. The administrative action came after the DEA discovered major dispensing violations at a California Walmart and issued an Order to Show Cause ("2009 OTSC").

98. The 2011 MOA, (discussed further in ¶¶187-196 below), bound all Walmart stores for four years and required the Company to maintain an adequate compliance program to detect and prevent diversion of controlled substances. Given the escalating opioid crisis, the consequences for potentially violating the CSA, and the seriousness of the allegations leading up to the 2011 MOA, the Individual Defendants would have undoubtedly been aware of the 2011 MOA. The 2011 MOA was signed by Walmart Senior Vice President and head of Health & Wellness John O. Agwunobi, and King & Spaulding Partner Catherine M. O'Neill, each of whom "represent[ed] and warrant[ed] that they [we]re authorized by Walmart to execute this Agreement."[33]

99. Walmart flagrantly violated the 2011 MOA. It did not adopt a robust compliance program. And while it gathered information from pharmacists concerning red flags of diversion, it took an approach that intentionally denied

[33] 2011 MOA (Exhibit A hereto), at pages 1-2, 6-7.

pharmacists information necessary to comply with the CSA's dispensing obligations.

100. To be sure, Walmart maintained extensive prescription and dispensing data. Pharmacists sent red flag reports to Walmart's compliance unit in RFTs or other direct communications. In many instances pharmacists could tell that a prescription was invalid just by looking at the identity of the prescriber, e.g., where the prescriber continually wrote prescriptions for massive amounts of narcotics and operated "basically a walk-in pain clinic" or prescribed dangerous "cocktails" of drugs.[34]

101. Pharmacists sent these reports directly to a central email address which a senior compliance manager in Walmart's Health and Wellness Division monitored. The compliance manager then gathered this information into spreadsheets. These spreadsheets contained important information. Through these spreadsheets Walmart's compliance unit could quickly spot which prescribers were "pill-mills" and which patients were doctor or pharmacy shoppers. ***But Walmart refused to share this important information with Walmart pharmacists, the on-ground personnel who needed it.*** And while Walmart sometimes sent "refusal-to-fill" forms to the DEA as the MOA mandated, when it did so it removed the

[34] DOJ Complaint ¶¶142-165; 486-495.

pharmacists' comments which contained the important information necessary for the DEA to prosecute these prescribers and stop diversion.[35]

102. By withholding necessary information to detect diversion, and requiring pharmacists to fill prescriptions in an unreasonable amount of time, Walmart intentionally enabled its pharmacists to fill illegal prescriptions, fueling the opioid crisis. And even when a Walmart pharmacist would refuse to fill a prescription a customer could just go to another Walmart pharmacy where it would most likely get filled. Walmart's compliance unit was aware of this. For example, in May 2014, a Walmart Market Health and Wellness Director emailed a senior manager in Walmart's compliance unit stating: "these patients and prescriptions will simply move to another location and I was hoping we had a process for flagging doctors that are under investigation so all locations are aware?" The senior compliance manager responded: "[t]here is no communication we can put out."

103. Indeed, in 2013 one former Walmart pharmacist ("Whistleblower") filed a whistleblower (which remained under seal until December 2018) in which he alleged that Walmart fired him directly in retaliation for notifying local police and the DEA of suspicious prescriptions.[36] On August 24, 2012 the Whistleblower

[35] DOJ Complaint ¶¶145-151.

[36] *See U.S. ex rel Ashwani Sheoran v. Walmart Stores East, LP, d/b/a Walmart, et al.*, 4:13-cv-10568-LVP-MJH, Dkt. No. 57 (Second Amended Complaint) ("Whistleblower Complaint").

contacted Walmart's "Executive Open Door Services" to "lodge his concerns regarding illegal controlled substances prescriptions" and sent an e-mail to Walmart's top management including then-CEO Michael Duke and Chairman of Walmart's Board of Directors Robson Walton.[37] The Whistleblower alleged that within a one and a half-month window between July 14 and August 30, 2012, he:

> -Saw Walmart pharmacists fill prescriptions bearing red flags of illegality and did not meet proper record requirements under the CSA, were "indicative of illegal diversion activities," and "did not meet the legal requirements necessary for a pharmacist to fill them";[38]
>
> -Received significant pushback from Health & Wellness regarding his whistleblower claims;[39] and
>
> -Knew that "illegal controlled substance prescriptions were being filled [by Walmart pharmacists] from at least 2007 to July 2012."[40]

104. Defendant McMillon was a member of Walmart's Executive Committee at the time the Whistleblower Complaint was filed and would have learned about the Whistleblower Complaint.

105. The Whistleblower later told NPR that despite notifying his bosses as well as Walmart's corporate headquarters that based on the illegitimate prescriptions he was receiving Walmart's pharmacies were feeding a black market for opioids, Walmart pressured him to "just be quiet and not to say anything more."

---

[37] *Id.* ¶119.
[38] *Id.* ¶¶37-49.
[39] *Id.* ¶¶116-66.
[40] *Id.* ¶¶49-50.

He further stated that he was told: "do not reach out to the DEA, do not call the police. If you do so, your employment is going to be terminated." Walmart first reassigned, and then terminated the Whistleblower. [41]

106. Walmart's compliance unit recognized that pharmacists could not obtain the necessary information about red flags they needed to comply with the CSA. In 2013, a Walmart "Controlled Substances Work Group" reported that it needed to "[e]stablish a process for the analysis of refusal to fill data and reporting problematic prescribers or patients internally."[42]

107. Walmart never did this, even up until now. As the DOJ Complaint states "even as of recently, Walmart still had not adopted a system that affirmatively alerts pharmacists, in some way, to the critical red-flag information in a manner that enables its pharmacists to comply with their legal duties. At the same time, Walmart has continued to tout on its website how it has used its pharmacy data to "enhance, customize and optimize the shopping experience" and to "make Walmart pharmacies more efficient."[43]

---

[41] NPR, "Former Walmart Pharmacists Say Company Ignored Red Flags as Opioid Sales Boomed," Jan. 3, 2021, available at: https://www.npr.org/2021/01/03/950870632/former-walmart-pharmacists-say-company-ignored-red-flags-as-opioid-sales-boomed

[42] DOJ Complaint ¶156.

[43] *Id.* ¶164.

108. Evidence in the Opioid MDL confirms Walmart's failure to make refusal-to-fill/red flag information easily accessible to all pharmacists who might need it. In an e-mail admitted as an exhibit in the Opioid MDL, dated July 29, 2018, Jacob Creel, Director, U.S. Ethics and Compliance, Health and Wellness Practice Compliance explained:

> Currently, in the pharmacies, if the pharmacist makes a professional judgment, based on identified red flags, to not fill a prescription for controlled substances, the pharmacist submits a refusal to fill form in Archer. These forms are collected and stored in Archer. ***However, pharmacists do not have easy access to this information, especially if the pharmacist is from a different store.*** This information could be used to clear red flags, or identify red flags that may indicate the prescription was not issued for a legitimate medical reason. ***In order to ensure the pharmacist is equipped to make the most appropriate decision, this information needs to be readily accessible***.[44]

109. Walmart's senior executives were aware of this. The above-quoted email states that "[t]his project is a priority of Rachel Brand, Executive Vice-President of Global Governance and Corporate Secretary."[45]

110. Rather than comply with its legal obligations under the CSA and the terms of the MOA Walmart elected to focus on increasing sales. Walmart compliance director Brad Nelson told a vice president in Health and Wellness Operations that during the MOA, the compliance unit had "not invested a great

---

[44] Plaintiffs Trial Exhibit P-26705_00002, Opioid MDL, 17-MD-02804 (N.D. Ohio Nov. 8, 2021) Dkt. No. 4128-31. (Exhibit G hereto).
[45] *Id.*

amount of effort into data analysis." He stated that "[d]riving sales and patient awareness" was "a far better use of our Market Directors and Market Manager's time."[46]

### B. Walmart Prohibited Pharmacists from Categorically Refusing to Fill Prescriptions Issued by Pill-Mill Prescribers and Kept Filling Illegal Prescriptions Issued by Known Pill-Mill Prescribers

111. Even when pharmacists determined a prescriber was running a "pill-mill[47]" Walmart refused to allow the pharmacist to categorially refuse to fill prescriptions that prescriber wrote. Walmart's insistence that a pharmacist consider each individual prescription despite this, coupled with the stringent time pressures Walmart placed on its pharmacists to fill prescriptions, caused pharmacists to fill illegal prescriptions.

112. Between at least 2012 and 2017 Walmart's controlled substance compliance department prohibited pharmacists from exercising their professional judgment in refusing to fill prescriptions by prescribers clearly operating "pill mills." In the Opioid MDL, Regional Compliance Director for Controlled Substances Brad Nelson testified that it was Walmart's policy throughout this time period of not permitting blanket refusals to fill.

[46] DOJ Complaint ¶159.

[47] A "pill mill" is an operation in which a doctor, clinic, or pharmacy prescribes and/or dispenses narcotics such as opiate prescription drugs without a legitimate medical purpose.

113. Despite pharmacists repeatedly raising concerns up the chain about their inability to control prescriptions from pill mills, Walmart's Health & Wellness Compliance provided them with identical guidance, instructing that "***no blanket refusals are allowed by the Boards of Pharmacy. I believe these prescription[s] fall into this category***"[48] regardless of the severity of the red flags that they raised or whether the state in question actually prohibited such refusals.[49]

114. As the DOJ Complaint details, even after Walmart pharmacists informed its compliance unit about pill-mill prescribers whose practices raised egregious red flags, Walmart continued to fill invalid prescriptions those prescribers issued. The DOJ Complaint sets forth in painstaking detail 20 examples of prescribers whose illegal prescribing practices Walmart knew about. In each example, Walmart pharmacists recognized, and reported to Walmart's compliance unit, that a particular prescriber was issuing prescriptions with no legitimate medical purpose or outside the usual course of professional practice. As the DOJ Complaint states: "In each example, Walmart's compliance unit knew that its pharmacists were continuing to be presented with prescriptions issued by those prescribers, and that,

[48] Plaintiffs Trial Exhibit P-26882, Opioid MDL, 1:17-MD-2804-DAP (N.D. Ohio Oct, 28, 2021), ECF No. 4094-32 (Exhibit H hereto).
[49] DOJ Complaint ¶174.

based on the reported red flags, there was a very high probability that the prescribers were regularly issuing invalid controlled-substance prescriptions."[50]

115. "In each example, despite possessing this knowledge of red flags, Walmart's compliance unit withheld from pharmacists the detailed information the compliance unit had compiled. Nor did Walmart give its pharmacists the time, guidance, and tools they needed to prevent the filling of further invalid prescriptions. ***Rather, in each example, despite Walmart's knowledge of prescriber red flags indicating a very high probability that the prescriber regularly issued invalid prescriptions for controlled substances, Walmart continued to fill hundreds, and in some cases thousands, of prescriptions by the same problem prescriber***."[51]

116. The twenty examples set forth in the DOJ Complaint are shocking and disturbing.[52] Walmart's illegal dispensing practices and knowledge thereof set forth in these examples spans from June 2012 through August 2018. These 20 examples are a sample of the numerous prescribers whose egregious and illegal prescribing practices were known to Walmart.[53]

[50] *Id.* ¶178.
[51] *Id.* ¶179.
[52] *Id.* ¶¶180-356.
[53] *Id.* ¶178.

117. Most notorious among these is the case of Dr. Howard Diamond, who pled guilty and received a 20-year sentence for the improper prescribing of opioids. Walmart's compliance department first became aware of Diamond in February 2014. Diamond was not subject to a corporate block until March 2017 despite repeated requests from pharmacists to Walmart's compliance department with concerns regarding Diamond's prescriptions. One Walmart pharmacy manager wrote: "filling for him is a risk that keeps me up at night." Despite many emails to compliance about Diamond, Brad Nelson wrote "[r]emember, we are not allowed to blanket refuse to fill for any prescriber." In total, Walmart filled 14,700 controlled substance prescriptions Diamond wrote, amounting to over 1.5 million doses over a six-year period.[54]

118. In another example, a Walmart pharmacist observed that 95% of the prescriptions from the prescriber were for controlled substances. Despite this, Walmart filled more than 650 controlled substance prescriptions that he wrote. This doctor's license was ultimately suspended. In one example, the doctor in question had been banned by other pharmacies and wrote a dangerously high dose for a controlled substance, writing on the prescription itself as the reason for prescribing

[54] *Id.* ¶¶ 228, 237, 239.

"*that's what the patient wants*." Nevertheless, Walmart filled 6,500 prescriptions the prescriber issued.[55]

119. In another example, a concerned pharmacy manager wrote the following about a doctor whose was obviously issuing illegal prescriptions: "“[D]epending on how long it might take co[r]porate to decide on what to do, we might start to refuse to fill prescriptions for some patients. ***I have too much invested in my career and family to continue to risk it***." When Walmart compliance manager Brad Nelson received this email, he explained that he was aware that prescriptions from problematic prescribers would continue to be presented to Walmart pharmacists because "the traffic [to Sam's Clubs] and routines of these patients have already been established" by the "drastic" discounts that Sam's Club once offered for oxycodone.[56] Indeed, Walmart offered drastic discounts on opioids to customers in Sam's Club stores and repeatedly told pharmacists to fill prescriptions as quickly as possible, because "shorter wait times keep patients in store.[57]" These efforts were in furtherance of Walmart's goal of "driving sales" by attracting shoppers to Walmart who came in to fill opioid prescriptions and then purchased other non-pharmacy goods.

---

[55] *Id.* ¶¶180-84.
[56] *Id.* ¶¶212-226.
[57] *Id.* ¶¶115, 219.

120. Pharmacy managers explicitly warned Walmart that filling these prescriptions was illegal. In just one example, in October 2015, a pharmacy associate sent an email concerning a doctor who ran a "known pill mill" and was then subject to three Department of Health administrative actions stating, "***this is something that should be looked into before the DEA comes knocking on our door.***" This email was forwarded to a Market Health and Wellness Director, a Corporate Compliance Director, a Controlled Substances Director, and Brad Nelson, also a Director of Corporate Compliance.[58]

121. Of the twenty examples the DOJ Complaint describes many involve doctors who were charged with federal crimes and/or whose medical licenses were revoked. In most instances Walmart filled illegal prescriptions these doctors wrote numbering in the thousands. In all instances pharmacists and other Walmart personnel warned Walmart's Corporate compliance department about these "doctors'" illegal and dangerous prescribing practices multiple times over the course of a period that spanned years. Nevertheless, Walmart did nothing, in violation of its known legal obligations.[59]

---

[58] *Id.* ¶272.
[59] *Id.* ¶¶178-383.

### C. Walmart Filled Prescriptions Showing Glaring Red Flags of Illegality on Their Face

122. Walmart pharmacists also dispensed numerous controlled-substance prescriptions exhibiting, on their face, red flags—including the dose or amount prescribed, combination of drugs, or prescribing pattern—that Walmart pharmacists would have easily recognized as indicating a high probability that the prescriptions were invalid. But on numerous occasions, Walmart pharmacists filled the prescriptions without resolving the red flags. For example, Walmart's compliance unit repeatedly found that prescriptions showing obvious red flags had been filled with no documentation by the pharmacist that the red flags had been resolved.[60]

123. Indeed, Walmart's own POM recognized that prescriptions can show obvious red flags on their face when they are "presented in a combination that can cause medical complications" or are "for an unusually large quantity or high starting dose."

124. Because Walmart's pharmacists were under enormous pressure to fill prescriptions quickly and received little training prior to 2018 on how to handle prescriptions raising red flags they frequently failed to resolve any red flags before filling the prescription.[61]

---

[60] DOJ Complaint ¶¶357-59.
[61] *Id.* ¶¶357, 115-122.

125. While Walmart had the ability in its compliance software to set "edits" to automatically alert a pharmacist if a prescription contained red flags, it did not design its software to do this.[62]

126. The DOJ Complaint sets forth in detail the various "red flags" and how Walmart repeatedly filled prescriptions that on their face presented these obvious red flags.[63]

127. One example of these facial red flags is multiple prescriptions for immediate release opioids for the same person. By filling duplicative prescriptions for multiple immediate-release opioids, Walmart dispensed, in some cases, opioids that had a sum total morphine milligram equivalent ("MME," a measure of the potency of a dose of opioids) that reached dangerous levels. This not only increased the risk of an overdose but could also signal that the pills were being diverted to persons other than the patient (such as for illegal sale). Nevertheless, between June 2013 and June 2018, Walmart pharmacists filled thousands of prescriptions for multiple immediate-release opioids for the same person, on the same day or close in time, in some cases for not only two but three or more immediate-release drugs.[64]

128. A prescription for dangerous "cocktails" of opioids and non-opioids is another red flag. Walmart's POM recognized that red flags include prescriptions

---

[62] *Id.* ¶358.
[63] *Id.* ¶¶361-426.
[64] *Id.* ¶¶363-383

"that represent a 'cocktail' of commonly abused drugs." A compliance unit director explained in an internal email in February 2016 that "[a] cocktail is a red flag that should alert the [pharmacist] to use their professional judgment to refuse to fill the [prescription]." These combinations increase euphoric effects but also increase the risk of abuse and overdose. Walmart pharmacists filled thousands of prescriptions that fall into four distinct "trinity" categories of combinations of opioid/non-opioid prescriptions that on their face presented an obvious red flag as to the prescriptions' validity.[65] Each category was known to be popular among individuals who were abusing or misusing prescription drugs.

129. Between June 2013 through the date the DOJ filed its Complaint in December 2020, Walmart filled thousands of prescriptions comprising dangerous "trinity" combinations, many of which had additional red flags. For example, hundreds of these prescriptions were paid for in cash and hundreds were for a patient in a different state than the prescriber, signaling that the patient and the doctor did not have a legitimate relationship.[66]

---

[65] DOJ Complaint ¶¶384-85. These categories consist of the "classic trinity," the "zopidem trinity," the "stimulant trinity," and the "trinity plus." For example, the stimulant trinity, (also called the "blackout trinity") consists of: a) an opioid, b) a benzodiazepine, and c) a stimulant. This combination is dangerous, given that the effects of the stimulant may lead the user to overdose in an effort to achieve the desired euphoria. *Id.* ¶¶ 387, 391, 394, 401.

[66] *Id.* ¶¶384-408

130. Another red flag is repeated fills of very high dosages of opioids. Walmart's POM recognized that prescriptions presented red flags if they were "for an unusually large quantity starting at a high dose." Nevertheless, from June 2013 through the date of the DOJ Complaint, Walmart filled numerous high dose prescriptions. Many of them contained additional red flags such as being paid for in cash, were for a patient in a different state than the prescriber or were written by prescribers running known pill-mills.[67]

131. Another red flag is unusually early refills for Schedule II controlled substances. Refilling a prescription for a controlled-substance significantly early- i.e. before the patient should have exhausted the prior months' supply- signals abuse or diversion. In such cases, the individual is likely taking a higher quantity of the drug than prescribed or diverting some of the pills to others.

132. Walmart's own policy recognized that early refills could signal abuse. Despite this, from June 2013 through the date the DOJ filed its Complaint, Walmart filled thousands of these prescriptions early. These prescriptions were filled so early that they indicate that Walmart pharmacists would have known that substantially all of them were illegitimate.[68]

---

[67] *Id.* ¶¶409-415.
[68] *Id.* ¶¶422-426.

## III. Walmart Violated the CSA in its Role as A Distributor of Controlled Substances

133. 21 C.F.R. § 1301.74(b) requires distributors of controlled substances to design and operate a system to detect suspicious orders of controlled substances and to report those suspicious orders to the DEA. Suspicious order monitoring is referred to as "SOM."

134. Walmart acted as a distributor of controlled substances, delivering large shipments to its pharmacies throughout the U.S. Walmart violated the CSA "at least hundreds of thousands of times" by failing to design and operate a system to detect and report suspicious orders to the DEA. Suspicious orders include, but are not limited to, orders that are unusual in size, pattern, or frequency.

135. From 2000 to approximately May 2018 Walmart self-distributed tens of millions of shipments of controlled substances to its own Walmart and Sam's Club pharmacies. Walmart operated at least six distribution centers in various states. Only one distribution center, located in Bentonville Arkansas, distributed Schedule II controlled substances.[69]

[69] DOJ Complaint ¶¶481-82.

136. From 2012 to 2018, Walmart was the largest self-distributor in the country for oxycodone, hydromorphone, and hydrocodone in terms of both dosage units and grams.[70]

137. Walmart had access to a wealth of data such that it could readily have designed a system to adequately detect suspicious orders. Walmart had data about individuals who filled prescriptions at its pharmacies, information about the prescribers, and reports from its own pharmacists who raised concerns.[71]

138. Walmart also had the ability to use sophisticated data analytics to detect suspicious orders. Walmart has emphasized that it relies on "big data" in its pharmacy operations to "enhance, customize and optimize the shopping experience" and "to make Walmart pharmacies more efficient," namely by using the data to "help[] the pharmacy with staff scheduling and to reduce the amount of time it takes a prescription to be filled."[72]

139. Walmart also had access to additional data and information it could use to determine whether an order was suspicious, including, for example, knowledge of pill-mill prescribers, historical order quantities and patterns, previously flagged

[70] *Id.* ¶483.
[71] *Id.* ¶¶484-87.
[72] *Id.* ¶488

orders, previous suspicious order reports and prior and current suspicious order monitoring (SOM) remediation plans (discussed below) for its pharmacies.[73]

140. Despite possessing a wealth of data and other information to detect suspicious orders Walmart did not create or employ an effective SOM program. As a result, Walmart failed to detect and report hundreds of thousands of suspicious orders that its pharmacies placed with distribution centers, in violation of the CSA. Walmart's specific violations in this regard are discussed more fully below.

### A. Internal Documents Informed Defendants that its SOM Was Inadequate; That Walmart Was in Violation of the 2011 MOA and that Walmart Was at Risk of DEA Enforcement

141. On or about December 27, 2007, the DEA sent letters to all registered distributors of controlled substances, including Walmart, reminding them of their legal obligation under 21 C.F.R. § 1301.74(b) to detect and report suspicious orders to DEA.[74]

142. In the December 27, 2007 letter, DEA advised distributors that failing to comply with their obligations could lead to great harm: "[A]ll registrants—manufacturers, distributors, pharmacies, and practitioners—share responsibility for maintaining appropriate safeguards against diversion. Nonetheless, given the extent of prescription drug abuse in the United States, along with the dangerous and

[73] *Id.* ¶487.
[74] DOJ Complaint ¶¶506-507.

potentially lethal consequences of such abuse, even just one distributor that uses its DEA registration to facilitate diversion can cause enormous harm.[75]"

143. Despite this, prior to 2010 Walmart had no written policies or procedures related to the identification or reporting of suspicious orders. Walmart therefore shipped suspicious orders regularly.[76]

144. In November 2010 Walmart implemented a formal policy titled "Pharmacy Manual 21-402 ("Controlled Substance Monitoring"). ("PM 21-402") which had numerous flaws and was wholly ineffective for several reasons.[77]

145. In or around October 2013, the Company's U.S. Compliance department generated a document titled "Controlled Substance Risk Assessment: Executive Summary" ("October 2013 CSRA")[78] that stated Walmart had not "[d]esigne[d] & operate[d] a system [sic] to detect suspicious orders and report them to the DEA when discovered." The October 2013 CSRA did not contain an expected date for such a system, listing only "TBD" in the delivery date field. The October 2013 CSRA recognized that it was necessary to create and operate such a system to "meet obligations of DEA MOA."

---

[75] *Id.* ¶507.
[76] *Id.* ¶508.
[77] *Id.* ¶¶509-12.
[78] Opioid MDL, 1:17-MD-02807 (Aug. 13, 2019) (Dkt. No. 2218-7) (Exhibit I hereto).

146. In January 2014 Walmart hired an outside consultant to evaluate a revised statistical methodology to identify suspicious orders. The expert consultant, a company called Mu Sigma, provided a report to Walmart in which it identified serious flaws in Walmart's proposed statistical methodology. These shortcomings included an inability to detect patterns over time and one-size-fits-all minimum thresholds.[79]

147. Mu Sigma proposed an alternative methodology that would capture suspicious orders missed by Walmart's flawed approach. Walmart rejected Mu Sigma's proposal, at least in part because it cost ***$185,000.***[80] To put this in perspective, in a little over a four-year period Walmart shipped approximately 15.2 million orders of Schedule II controlled substances and Schedule III narcotics to its own pharmacies, having a retail value of well over $750 million.[81]

148. By mid-2014 Walmart recognized that it was at risk of a DEA enforcement action because it was not complying with the 2011 MOA and the CSA's requirements for detecting and reporting suspicious orders. A June 14, 2014 email from Walmart's then Director of Compliance states that Walmart considered

[79] DOJ Complaint ¶¶636-37.
[80] *Id.* ¶¶638-39.
[81] *Id.* 682.

modifying its SOM system to "help Walmart avoid DEA enforcement as a result of non-compliance with 21 CFR 1301.74(b).[82]"

149. According to a June 2014 Walmart "Portfolio Scoring Worksheet, Suspicious Order Monitoring" ("June 2014 PSW")[83] that Walmart's Health & Wellness department generated, Walmart's board of directors- which included Defendant McMillon- was informed that Walmart was not complying with the 2011 MOA (and the CSA) and was likely to face severe potential financial and reputational consequences as a result.

150. The June 2014 PSW is titled "Portfolio Scoring Worksheet" with the "Project Name" "Suspicious Order Monitoring" and "Program Name" "Health and Wellness Logistics". Walmart created the document in response to the 2011 MOA. It is a scoring sheet assessing the effectiveness of Walmart's suspicious order monitoring program. The document contains a "Corporate Governance Scoring Section." With respect to suspicious order monitoring, it says: "Is the risk being mitigated today by manual, systematic or a combination of both…" The response is "5", which means "No, Emerging Risk, has ***no processes in place today".*** In the next box it says: "What is the likelihood that the events or conditions underlying the Risk will occur?" Response is: "***Likely***." In the next box down: "***What is the***

[82] DOJ Complaint ¶513.
[83] Opioid MDL, 1:17-MD-02804 (Aug. 13, 2019 (Dkt. No. 2218-3) (Exhibit J hereto).

***potential financial or reputational impact to the company if [these] events…occur?*** "***Severe***." The next page: "What is the extent of the Legal or Regulatory requirement?" Response: "National." "***Is [this] effort related to a settlement [or] agreement with a Government Agency***…" Response: "***Yes***." "Is this effort ***Executive directed***." Response: "***Yes***." "Is this effort Board directed or informed?" Response: "Board informed." The PSW makes clear that the suspicious order monitoring program was the product of an ***executive directive that the Board was being informed about the program***.

151. Accordingly, June 2014 PSW discloses that suspicious order monitoring was an "***existing risk***" for which the Company had "***no processes in place today***." The Board and management also knew that it was "***likely***" that the "events or conditions underlying the Risk would occur," leading to a "***severe***" risk of "***financial and reputational impact to the Company***[,]" which included "physical security risks," "health and safety risks," and "***fraudulent activities***."

152. In 2015, a proposal from Walmart's U.S. Compliance Department ("2015 Proposal")[84] to "design and operate a system to identify 'Suspicious Orders' of controlled substances" acknowledged that the Company's suspicious order monitoring program still required immediate and substantial enhancements in order

[84] Opioid MDL, 1:17-MD-02804 (N.D. Ohio Aug. 13, 2019) (Dkt. No. 2218-4) (Exhibit K hereto).

"***to help Walmart avoid DEA enforcement as a result of non-compliance with [the CSA].***" The 2015 Proposal indicates that Walmart's U.S. Compliance Department requested that a project be performed to modify Walmart's suspicious order monitoring system to "allow program enhancements to help Walmart to avoid DEA enforcement as a result of non-compliance with 21 CFR 1301.74(b). The 2015 Proposal noted that the "benefits" to be achieved from "completing this initiative" are "Compliance with federal law and VAWD accreditation standards."

153. DEA diversion investigators even directly told Walmart that it was violating the law in failing to report suspicious orders. For example, in a February 2015 meeting, DEA diversion investigators informed Walmart that its practice of reducing the quantity of suspiciously large orders for controlled substances without informing the DEA that the order was suspicious (as discussed further below) violated the CSA.[85] Despite this, Walmart continued to engage in this illegal practice through at least November 29, 2017.[86]

154. In addition, by March 2014 Walmart knew that the DEA was holding other companies that dispensed and/or distributed controlled substances- two of which were ultimately Walmart's "Pharmacy" co-defendants in the Opioid MDL- accountable for their CSA violations in connection with the opioid crisis. A March

---

[85] DOJ Complaint ¶567.
[86] *Id.* ¶568.

29, 2014 “Health & Wellness Compliance” presentation by Jim Langman, Walmart’s Vice President, Health & Wellness Compliance, US (“2014 Compliance Presentation”) contains a slide titled “DEA Headlines.”[87] The slide contains six bullet points (two of which are fully redacted) listing DEA actions against pharmacies and distributors of controlled substances:

> -“September 2012- DEA revokes Controlled Substance permit for 2 CVS pharmacies;
>
> -“DEA suspends Cardinal’s controlled substances license at it’s [sic] Lakeland, Florida distribution center, which serves 2,500 pharmacies in Florida, Georgia, and South Carolina.”;
>
> -“Walgreens Jupiter Distribution Center and six Florida Walgreens retail pharmacies had their controlled substances licenses suspended [Redacted];
>
> -“[Redacted] the settlement revokes the Registrants’ ability to distribute or dispense controlled substances listed in Schedules II-V [Redacted]. As part of the settlement, Walgreens admitted that it failed to uphold its obligations as a DEA registrant.”

155. On March 11, 2015 the 2011 MOA’s four-year term expired without Walmart ever having achieved legal compliance, in violation of both the MOA and the basic legal requirements of the CSA.

156. After the 2011 MOA expired, Walmart’s SOM barely changed and remained entirely ineffective. Walmart’s modifications, which it implemented in August 2015 consisted of “a few modifications to its existing Reddwerks system”

---

[87] Opioid MDL,17-MD-02802, Plaintiffs Trial Exhibit P-14585, p. 31, (Dkt. No. 4128-29) (Nov. 8, 2021), (Exhibit M hereto).

and "implement[ed] pharmacy-specific and drug-specific thresholds to replace the 20-bottle and 50-bottle thresholds that Walmart had been using in Reddwerks."[88]

157. Walmart's August 2015 modifications- which Walmart knew were flawed based on the Mu Sigma report- failed to fix previously identified defects, or implement basic functions necessary for a CSA compliant system, such as: (i) "detect[ing] whether orders were of an unusual frequency or unusual pattern, much less report those kinds of unusual orders;" (ii) responding to "known incidents of diversion occurring at its pharmacies;" (iii) "consider[ing] whether a pharmacy was ordering the same controlled substance of the same drug strength, but with multiple [National Drug Codes];" and (iv) not "ignore[ing] at least hundreds of thousands of orders that its pharmacies placed with independent distributors."[89]

158. Testimony in the Opioid MDL corroborates that Walmart made no real attempts to comply with the 2011 MOA for "business" reasons. For example, Brad Nelson, the controlled substance compliance director responsible for Walmart's refusal to fill (RTF) project associated with the 2011 MOA emailed a regional manager at Walmart just a month before the 2011 MOA expired, writing:

> The [2011] MOA that requires the reporting of Refusal to fills expires in 30 days. ***We have not invested a great amount of effort in doing analysis on the data since the agreement is virtually over. Driving***

[88] DOJ Complaint ¶¶634-42.
[89] *Id.* ¶¶634-50.

> ***sales and patient awareness is a far better use of our Market Directors and Market manager's time.***[90]

159. Walmart's 30(b)(6) representative in the Opioid MDL, Susanne Hiland, similarly testified that Walmart chose not to adopt a more rigorous limit system in connection with the 2011 MOA and the CSA because it "***didn't make sense for the business.***"

160. In denying Walmart's motion for summary judgment in the Opioid MDL, Judge Polster found that Walmart's suspicious order monitoring program "***suggests <u>obvious</u> deficiencies that <u>a layperson</u> could <u>plainly</u> recognize***."

161. The October 2013 CSRA, the June 2014 PSW, and the 2015 Proposal all make clear that Defendants were aware that Walmart failed to meet its legal obligations under the CSA and the 2011 MOA, subjecting the Company to increased risks of a DOJ enforcement action and corresponding criminal and/or civil penalties and reputational damage.

162. In April 2018, *almost immediately after learning of the DOJ's planned indictment,* Walmart exited the distribution business altogether. Walmart's decision to exit the distribution business shows that its CSA compliance controls were so deficient that rather than attempt belatedly to adopt and maintain a legally compliant suspicious order monitoring system Walmart would rather cease its business

[90] *ProPublica* Article.

distributing opioids. Walmart's decision to end its business distributing opioids after the DOJ threatened to indict Walmart demonstrates that Walmart was aware of its legal violations.

163. Walmart's CSA violations as a distributor which resulted from its knowing failure to have an effective suspicious order monitoring system are summarized below.

## B. Walmart's Specific CSA Violations in its Role as a Distributor

### *1) Walmart Failed to detect and report orders of unusual frequency or pattern*

164. The CSA required Walmart to evaluate orders showing unusual size, frequency, or patterns. Walmart's SOM system focused exclusively on the size of the orders.

165. Because Walmart's SOM system did not flag orders for unusual frequency and pattern Walmart did not report any of these orders to the DEA, in violation of the law.[91]

### *2) Walmart Failed to detect and report unusually large orders*

166. At some point prior to July 2014, Walmart's SOM program began using weekly size "thresholds" and "hard limits" limiting the quantity of controlled substances its pharmacies could order from its distribution centers. An order that hit

[91] DOJ Complaint ¶¶ 519-26.

a "threshold" was supposed to trigger a temporary hold to the order for further evaluation (i.e. to determine if that order was suspicious for purposes of the CSA). A "hard limit" was supposed to serve as the maximum amount of a particular drug the pharmacy could order per week.[92]

167. Walmart's thresholds and hard limits ignored differences between its pharmacies. Because of differences in customer characteristics and populations among pharmacies a one-size-fits-all approach to thresholds and hard limits made no sense. For example, Walmart knew that its pharmacies varied in many ways. Some pharmacies served sparsely populated rural communities and other pharmacies served large urban communities with big populations. Accordingly, it did not make sense for two pharmacies- one serving a large population and one a small population- to be subject to the same limitations with respect to the size of controlled substance orders. Despite this, Walmart utilized this arbitrary approach. As a result, Walmart failed to detect and report many unusually large orders.[93]

168. The only controlled substance dose and strength Walmart imposed a "hard limit" on was Oxycodone 30mg, wherein Walmart placed a hard limit of 20 bottles per store per week. Despite this, Walmart violated this hard limit at least 216 times between June 2013 and July 2015.[94]

---

[92] *Id.* ¶¶529-31

[93] *Id.* ¶¶529-537.

[94] *Id.* ¶¶538-45.

169. Additionally, Walmart's size thresholds were based on the number of bottles of a particular controlled substance as opposed to the number of dosage units in the actual bottles. This approach was flawed and ineffective and simply allowed pharmacies to evade the bottle-based threshold by ordering fewer bottles which contained more pills per bottle.

170. Walmart was aware, based on memos from pharmacy managers, that setting thresholds based on bottle quantity rather than dosage units was a loophole where pharmacies could, and did, order excessive amounts of controlled substances. For example, the General Manager of one of Walmart's six distribution centers wrote in a memo that "several control….items have changed from a 100 count bottle to a 1000 count bottle," such that a pharmacy that had previously ordered 20 bottles of a controlled substance for a total of 2,000 dosage units was now able to order 20 bottles of that same controlled substance for a total of 20,000 dosage units. The General Manager concluded "[t]he system now should flag pills verses [sic] bottles." Walmart recognized this problem in October 2013 and did not change its policy in this regard until at least August 2015.[95]

171. Another flaw in Walmart's size thresholds was that Walmart's SOM program failed to aggregate and flag multiple orders a pharmacy placed for the same drug and strength where those orders were for products that had different National

---

[95] *Id.* ¶¶546-53.

Drug Codes ("NDC") because they were made by different manufacturers. In other words, if multiple manufacturers made the same drug, the drug would have multiple NDCs. Because of this flaw, Walmart's SOM system failed to flag orders that exceeded size thresholds.[96]

172. Walmart also avoided reporting suspicious orders by "cutting" the size of orders that exceeded the threshold. For example, if it received an order for 50 bottles and the threshold was 20, it would reduce the order and ship 20 bottles. Walmart did so without reporting these suspicious orders to the DEA, in violation of CSA mandates.

173. Walmart branded pharmacies, in addition to receiving its controlled substance orders from Walmart's distribution hubs, also received hundreds of thousands of orders from two other distributors: McKesson and AmerisourceBergen. However, Walmart did not factor in shipments from these two distributors when considering whether its pharmacies had exceeded thresholds and size limits. Walmart was aware of this flaw. An October 2014 Walmart internal presentation assessing the efficacy of its SOM system noted "McKesson orders are not considered in evaluation."[97]

---

[96] *Id.* ¶¶554-58.
[97] *Id.* ¶¶569-578.

174. To cover up its legal violations Walmart began classifying unusually large orders as "errors," when there was absolutely no indication that the pharmacy had intended to order a smaller quantity. In so doing Walmart failed to report suspiciously large orders to the DEA, in violation of the CSA.[98]

#### *3) Walmart Ignored Specific Signs of Diversion from its Own Walmart Branded Pharmacies*

175. In addition to ignoring orders that were suspicious by virtue of their unusual size, frequency and pattern, Walmart also ignored other warning signs that orders Walmart pharmacies placed were suspicious.

176. The DOJ Complaint sets forth in detail numerous examples where Walmart pharmacists contacted Walmart's compliance department about prescriptions written by "pill mill" prescribers, and illegal diversion occurring inside Walmart stores and Walmart failed to take any remedial action or notify the DEA of suspicious orders from those stores in violation of the CSA's clear legal requirements.

177. For example, in June 2016, Walmart's Director of Controlled Substances notified Walmart's Regional Health and Wellness Director for Florida, Alabama, Mississippi and Georgia that a certain doctor was one of the top three prescribers for oxycodone 30mg for a store in Tampa; that 75% of this doctor's

---

[98] *Id.* ¶¶579-83.

prescriptions for oxycodone 30 mg were for quantities of 120 doses or greater; and that the top three drugs this doctor prescribed were oxycodone 30mg, hydromorphone 8 mg and methadone 10 mg. Despite this knowledge, Walmart took no action to limit shipments of controlled substances to Walmart pharmacies that routinely filled prescriptions for this and other "pill mill" prescribers.[99]

### *4) Walmart Failed to Adequately Staff and Train its Compliance Personnel and Shipped Flagged Orders Before Compliance Personnel Could Examine Them*

178. Despite being the largest employer in the United States, and despite having 5,000 pharmacies, Walmart failed to devote sufficient personnel to operate its SOM program. Walmart recognized this. For example, an "Overview of SOM project Progress" attached to a November 23, 2014 email noted problems including "Inconsistent application of monitoring standards by associate across DC [distribution center] facilities"; "No consistent training for associates"; "No dedicated [Home Office] resource"; and "SOM policy only included DC associate responsibilities – no [Home Office] involvement or cross-functional collaboration."[100]

[99] *Id.* ¶¶584-595.
[100] *Id.* ¶¶596-99.

179. Walmart also did not allow its staff adequate time to examine flagged orders, chose not to review every flagged order, and failed to provide employees with training specific to monitoring suspicious orders of controlled substances.[101]

### *5) Walmart Failed to Investigate and Report to the DEA Flagged Orders and Failed to Document its Evaluation of Flagged Orders*

180. As a Walmart Senior Manager for Logistics stated in an August 27, 2014 email "our obligation is to monitor all orders, investigate 'orders of interest' (potentially suspicious orders), hold any 'order of hold any 'order of interest' until/unless the order is investigated and cleared and report any 'suspicious' orders to DEA."[102]

181. Despite this, Walmart routinely failed to investigate thousands of flagged orders.

182. Walmart also had no process to document facts about orders that exceeded threshold limits. In the instances when Walmart did conduct due diligence on flagged orders it often did not even keep a record of this due diligence.[103]

---

[101] *Id.* ¶¶608-09.
[102] *Id.* ¶612.
[103] *Id.* ¶¶626-33.

### *6) Walmart's Failure to Detect and Report Suspicious Orders Occurred on A Grand Scale*

183. As a result of Walmart's failure to implement an effective system for detecting and monitoring suspicious orders Walmart failed to report at least hundreds of thousands of suspicious orders to the DEA in violation of the CSA.[104]

184. The DOJ Complaint states: "Walmart's ultralow rate of suspicious-order reporting is incredible. The small number of suspicious orders Walmart reported cannot be credibly attributed to a lack of unusual or otherwise suspicious orders placed by its pharmacies. By comparison, McKesson, the independent distributor that served as the back-up distributor to Walmart-branded pharmacies, received far fewer orders from Walmart's pharmacies but reported to DEA more than 13,000 suspicious orders from Walmart pharmacies between June 26, 2013, and November 29, 2017. Walmart would have been notified of these 13,000 suspicious orders in all instances where McKesson rejected them because they were suspicious.

185. The DOJ Complaint further states:

> ***Walmart's failure to report suspicious orders stems from Walmart's decisions to operate a system that failed to detect suspicious orders and to manipulate that system to avoid reporting to DEA those suspicious orders that were detected***….When Walmart fulfilled suspicious orders, Walmart's approach allowed dangerous controlled substances to enter the market. Even in those circumstances where

[104] DOJ Complaint ¶¶643-680.

> Walmart recognized that certain orders were "suspicious" after those orders had already been shipped to its stores, Walmart's failure to report those orders and take other remedial steps allowed the ordered drugs to "enter the market." ***Walmart's systematic failure, for years, to comply with its legal obligation to detect and report each of its suspicious orders thus created a major obstacle to efforts to combat the prescription drug abuse epidemic***.[105]

186. The DOJ Complaint also explains that Walmart financially benefited from these violations of law:

> ***Walmart chose to avoid the expense of creating and implementing a proper program for monitoring and reporting suspicious orders***. For example, Walmart avoided the expense of creating and implementing a remediation plan for each suspicious order, which could have imposed burdens on Walmart and might also have uncovered improper activity that Walmart would have to remediate. Likewise, Walmart avoided the expense of paying for adequate numbers of compliance personnel. ***Most critically, Walmart profited by providing its pharmacies with unusually large quantities of controlled substances to sell, and from selling other products to customers who came to Walmart stores only because Walmart pharmacies would readily provide these controlled substances. In sum, Walmart <u>chose</u>, for years, to disregard a well-established legal obligation on a systematic basis and a huge scale involving at least hundreds of thousands of orders of controlled substances. In doing so, <u>Walmart substantially benefited itself</u> while increasing the risk of undetected unlawful conduct and serious widespread harm to Americans in the midst of a nationwide prescription drug abuse epidemic***.[106]

## IV. Undisclosed Government Activity Related to Walmart's Opioid Business

187. Unbeknownst to investors, the government has targeted Walmart's

---

[105] *Id.* ¶695.
[106] *Id.* ¶696.

unlawful opioid dispensing and distribution practices for over a decade.

188. In 2009, the DEA took nationwide action against Walmart. In November 2009, the DEA issued an Order to Show Cause seeking to revoke the registration of a Walmart pharmacy in California to dispense controlled substances. The 2009 OTSC alleged that the Walmart pharmacy:

(1) Improperly dispensed controlled substances to individuals based on purported prescriptions physicians who were not licensed to practice medicine in California had issued;

(2) Dispensed controlled substances based on Internet prescriptions physicians issued that were not for a legitimate medical purpose and/or outside the usual course of professional practice; and

(3) Dispensed controlled substances to individuals the pharmacy knew or should have known were diverting controlled substances.[107]

187. To resolve the threatened enforcement proceeding stemming from the 2009 OTSC, in March 2011 the DEA and Walmart entered into a nationwide 2011 MOA. The 2011 MOA required Walmart to adopt a national compliance program designed to ensure that it fulfilled its legal obligations under the CSA when filling controlled substance prescriptions. Walmart also agreed to collect reports from its pharmacies when those pharmacists determined that controlled substance prescriptions were invalid and refused to fill them.[108] While Walmart's compliance unit collected these refusal-to-fill reports, it chose, for years not to alert Walmart's

[107] 2011 MOA (Exh. A) at 1.
[108] *Id.* at 2, ¶4b.

pharmacists so that they could use that information to determine whether to fill similar prescriptions.[109] The failure to share these important reports among pharmacists rendered the reports themselves useless.

188. The 2011 MOA had a four-year term. Accordingly, the MOA was in effect from March 11, 2011 to March 11, 2015.[110]

189. Pursuant to the MOA, Walmart promised to "maintain a compliance program, updated as necessary, designed to detect and prevent diversion of controlled substances as required by the Controlled Substances Act and applicable DEA regulations."[111]

190. Walmart authorized its Senior VP and President, Health and Wellness, John Agwanobi, along with its outside counsel at King & Spaulding LLP, Catherine M. O'Neill to sign the 2011 MOA on Walmart's behalf. Even though the 2009 OTSC involved one specific Walmart pharmacy, the 2011 MOA bound the *entire Company*, i.e., each of Walmart's then 4,700 pharmacies.[112]

191. The 2011 MOA was between the DEA and "Wal-Mart Stores, Inc. on its behalf as well as on behalf of its subsidiaries that operated pharmacies registered

---

[109] DOJ Complaint ¶19.
[110] 2011 MOA, p. 6 ¶13, p. 7.
[111] *Id.* p. 2, ¶4.
[112] *Id.* p. 1, 2, ¶4a., p. 7.

with [the] DEA." The 2011 MOA states that Walmart and the DEA entered it "***to avoid the uncertainty and expense of litigation.***"[113]

192. In the 2011 MOA Walmart recognized that to comply with its legal obligation not to dispense controlled substances based on prescriptions "issued by physicians for other than a legitimate medical purpose and/or outside the usual course of professional practice…," Walmart needed to create a process that would ensure that its pharmacists were identifying common signs of diversion.

193. The 2011 MOA specifically mandated Walmart to include in its compliance program procedures to ensure that pharmacists identified red flags:

> The program shall include procedures designed to identify the common signs associated with the diversion of controlled substances including, but not limited to, doctor-shopping requests for early refills, altered or forged prescriptions, prescriptions written by doctors not licensed to practice medicine in the jurisdiction where the patient is located, and prescriptions written for other than a legitimate medical purpose by an individual acting outside the usual course of his professional practice.[114]

194. In the MOA, Walmart also agreed that if one of its pharmacists concluded that a prescription was not issued for a legitimate medical purpose by a practitioner acting in the usual course of professional practice, was forged, or had been altered, and it refused to fill that prescription, Walmart would notify the local DEA field office within seven business days of the refusal to fill.[115]

---

[113] *Id.* p. 1, 2 ¶1.
[114] *Id.* p. 2, ¶4a.
[115] *Id.* p. 2-3, ¶4b.

195. Walmart was also required to institute policies and procedures to block the early refill of controlled substances, maintain and enforce a policy allowing pharmacists to obtain and review patient or doctor profiles from the prescription monitoring program before dispensing controlled substances, implement procedures to routinely verify the validity of DEA registration numbers on prescriptions, implement policies and procedures designed to ensure that pharmacies comply with other applicable laws, and notify the DEA whenever Walmart refuses to fill suspicious prescriptions for controlled substances.[116]

196. Additionally, the 2011 MOA provided that "Walmart acknowledges and agrees that the obligations taken in this subparagraph do not fulfill the totality of its obligations under the CSA and its implementing regulations."[117]

197. As detailed in the DOJ Complaint and herein, Walmart flagrantly violated all of the 2011 MOA's provisions.

198. Defendants were aware that Walmart violated the 2011 MOA and that the consequences to Walmart of having violated it would be severe. Defendants' awareness is evidenced, *inter alia*, by the October 2013 CSRA, the 2014 PSW and the 2015 Proposal. (*See Infra* ¶¶145-46; 150-53).

---

[116] *Id.* p. 3, ¶¶4c.-4k.
[117] *Id.* p.2, ¶4a.

199. First, the 2013 CSRA explicitly states that Walmart had not designed a SOM. Second, the 2014 PSW states that Walmart's SOM program was the product of an ***executive directive*** and that the board was being informed of it. It states that Walmart's SOM program was related to a settlement agreement with the government (i.e. the 2011 MOA). Nevertheless, the 2014 PSW recognizes that Walmart had "***no processes in place***" to comply with its legal requirements to have a functioning SOM pursuant to the 2011 MOA and the CSA. It further acknowledges that the risks related to not having a SOM program ***are severe financial and reputational impact to the Company***, which include physical security risks, health and safety risks and fraudulent activities. Further, it states that these ***severe*** risks are ***<u>likely</u>*** to occur. Third, Walmart's 2015 Compliance Department Proposal admits that Walmart's SOM program required ***immediate and substantial enhancements*** to "***help Walmart avoid DEA enforcement as a result of non-compliance with [the CSA]***." (*Infra* ¶¶145-52).

200. In the summer of 2016, federal prosecutors began investigating two Texas doctors (Howard Diamond and Randall Wade) who were prescribing vast amounts of opioids. DEA agents surveilled Wade's clinic is August 2016 and

followed three women to a Walmart pharmacy in McKinney, Texas. The three women walked out with large quantities of painkillers.[118]

201. On December 7, 2016, the DEA raided Walmart Store 206 in McKinney, Texas obtaining records about Diamond and Wade (who were both eventually convicted of illegal distribution of opioids and sentenced to 20 and 10 years, respectively). Raids of Fortune 500 companies are extremely rare.[119]

202. Walmart has acknowledged that on December 7, 2016 it learned that the EDTX DOJ was criminally investigating the Company following the DEA's raid.[120]

203. In addition to the EDTX DOJ Investigation, Walmart received more than 50 "Letters of Admonition" from the DEA for its prescribing practices from 2000 to 2018.[121] The DEA issues a Letter of Admonition if it finds deficiencies in an unannounced inspection auditing controlled substance storage locations and laboratories. In a typical audit, DEA Diversion Investigators inspect the controlled substance licensee/registrant for compliance with the CSA. A Letter of Admonition

[118] *Walmart Was Almost Charged Criminally Over Opioids. Trump Appointees Killed the Indictment,* Jesse Eisenger, *ProPublica*, March 25, 2020 ("*ProPublica* Article") available at: https://www.propublica.org/article/walmart-was-almost-charged-criminally-over-opioids-trump-appointees-killed-the-indictment
[119] *Id.*
[120] https://www.documentcloud.org/documents/6818266-2019-09-27-Letter-From-K-Hewitt-to-G-Eyler-Final.html. ("September 2019 Hewitt Letter") p. 3.
[121] *ProPublica* Article.

requires a written response describing the actions to correct deficiencies. Walmart also entered two Controlled Substances Act settlements in 2007 and 2008, one for filling unlawful prescriptions and the other for recordkeeping violations.[122]

204. Just three months before learning of the EDTX DOJ's criminal investigation, in October 2016, Defendant McMillon bumped into a friend named Jerry Jones, whose adult son had ended his life after becoming addicted to prescription opioids. Jones was speaking at a conference on prescription drug abuse prevention. Defendant McMillon asked Jones what Walmart could do to help his "mission" of combatting prescription drug abuse and fighting the opioid epidemic. Defendant McMillon made clear to Jones that he was serious and not just asking to be polite.[123]

205. Plaintiffs in the Opioid MDL have produced emails evidencing that Defendant McMillon received emails from Jones with suggestions, and that McMillon then forwarded those emails to other "Walmart executives." According to Jones, in the months immediately following these emails, Walmart told Jones it would start "throwing technology" at the opioid crisis to "monitor prescriptions" stating, "if we detect over-prescribing, we are going to cut them off."[124]

---

[122] *ProPublica* Article.

[123] Exh. F, p. 3-4 (Opioid MDL Ruling Regarding Deposition of Walmart CEO McMillon)

[124] *Id.*

206. From December 7, 2016 onward the Criminal Investigation progressively intensified.

207. Federal prosecutors discovered that Walmart flagrantly violated the 2011 MOA. According to *ProPublica* "as far as federal prosecutors and the DEA were concerned- the MOA had placed Walmart on parole—and the company had violated its terms."

208. In March 2017 EDTX Assistant U.S. Attorney Heather Rattan issued an email search warrant to the Company. The search warrant related to documents involving certain pharmacists in Texas.[125]

209. In June 2017 AUSA Rattan expanded the search warrant, seeking information related to Walmart's dispensing controlled substances generally.[126]

210. Between June 2017 and July 2018 EDTX issued five DEA Administrative Subpoenas in connection with its criminal investigation of Walmart.[127]

211. In November 2017 Walmart also began responding to what it described as "broad document demands" from EDTX Civil AUSA Joshua Russ. AUSA Russ

---

[125] September 2019 Hewitt Letter, p. 3.
[126] *Id.*
[127] *Id.* p. 3-4.

informed Walmart that he was conducting a parallel civil investigation of potential CSA violations related to Walmart's dispensing of controlled substances.[128]

212. In connection with the Investigations, Walmart produced nearly one million pages of documents and *six million prescription records*,[129] evidencing the breadth and scope of the Investigations in addition to the liability involved (since each illegal prescription carries a penalty). Civil penalties for violating the CSA are up to $67,627 for each unlawful prescription filled and $15,691 for each suspicious order not reported.[130]

213. Then, on March 28, 2018, AUSA Rattan informed Walmart of her intention to indict the Company.[131]

214. Walmart immediately requested a meeting with federal prosecutors in the EDTX. Walmart told the prosecutors that they hoped to resolve any criminal and civil proceedings in one shot and insisted that EDTX AUSA in charge of the civil division Joshua Russ attend the meeting. Prosecutors demanded that Walmart make this request in writing. Walmart complied.[132]

---

[128] September 2019 Hewitt Letter p. 5.
[129] *Id.* p. 1.
[130] DOJ Complaint ¶93.
[131] August 10, 2018 Letter from K. Hewitt to Hon. Brian Benczkowski ("August 2018 Hewitt Letter") p. 5 (Exhibit L hereto).
[132] *ProPublica* Article.

215. In April 2018 Walmart met with EDTX federal prosecutors. Walmart's inside counsel, Bob Balfe, Chief Counsel for Global Investigations, and Walmart's lead outside counsel, Karen Hewitt of Jones Day attending the meetings. Walmart and federal prosecutors reportedly agreed on the facts but differed over whether they justified a criminal charge.[133]

216. The details of the meetings and conversations between Walmart and federal prosecutors that took place in the spring and summer of 2018 are set forth in correspondence between Walmart's outside counsel at Jones Day, Karen Hewitt and Assistant Attorney General Brian Benczkowski and Gustav Eyler, co-head of the national Walmart Working Group within the DOJ and director of the Consumer Protection Branch of the DOJ.

217. On May 3 and 4, 2018 Walmart and its top attorneys again met with federal prosecutors at the United States Attorneys' Office in Plano, Texas. EDTX U.S. Attorney Joe Brown, as well as the criminal and civil AUSA's working on the case, attended the meetings.[134] During the first six hours of the meeting Walmart's lawyers described the results of their internal investigation. While they claimed that they had not found evidence of criminal wrongdoing they admitted that "Walmart could have and should have done more to voluntarily combat the opioid crisis."[135]

---

[133] *ProPublica* Article.
[134] August 2018 Hewitt Letter, p. 4.
[135] *ProPublica* Article.

218. At the May 3-4 meetings federal prosecutors for the EDTX told Walmart that it would ***imminently indict the Company.*** Prosecutors told Walmart the Company should pay $1 billion to resolve the matter civilly.[136]

219. On June 6, 2018, Assistant Deputy Attorney General Iris Lan at the DOJ in Washington, D.C. told Walmart that the DOJ's Narcotics and Dangerous Drug Section was assigned as a partner to both the criminal and civil aspects of the case.[137]

220. As far as the civil case, some of the prosecuting attorneys were willing to trade off a large fine in exchange for Walmart agreeing to a more detailed public statement of facts. EDTX Civil Chief Randi Russell stated that Walmart would have to admit it had "killed people." Walmart was eager to avoid this admission because it would bring negative publicity and make the company vulnerable to private and state lawsuits.[138]

221. On July 2, 2018, EDTX U.S. Attorney Joe Brown, AUSA Rattan and AUSA Maureen Smith traveled to Walmart's corporate headquarters in Bentonville Arkansas. They met with Walmart's inside and outside counsel and counsel for

---

[136] August 2018 Hewitt Letter, p. 4.
[137] *Id.*
[138] *ProPublica* Article.

Walmart's Audit Committee. At the meeting they provided a "reverse proffer" of the criminal case against Walmart.[139]

222. During the July 2, 2018, meeting EDTX federal prosecutors told the Company that it intended to indict Walmart on July 11, 2018, nine days later. Walmart's counsel at Jones Day stated that at the meeting "U.S Attorney Brown noted that the planned indictment should not come as a surprise to Walmart as EDTX had stated its plans during the May 2018 meetings."[140]

223. During the July 2, 2018, meeting Walmart was able to convince the prosecutors to postpone the July 11 indictment date to August 8 so that Walmart would have time to make a presentation to prosecutors.[141]

224. On July 26, 2018, Walmart made its presentation to federal prosecutors at the U.S. Attorneys' Office in Plano, Texas.[142]

225. According to the MDL Court, the evidence shows that Defendant McMillon has personal knowledge about the PowerPoint presentations to the DOJ that Walmart's counsel made at the July 26, 2018 meeting. The evidence indicates

---

[139] August 2018 Hewitt Letter, p. 4-5.
[140] *Id.* p. 4.
[141] *Id.* p. 4-5.
[142] *Id.* p. 5.

that Walmart's lawyers specifically consulted McMillon during the formulation and approval of Walmart's response to the DOJ's criminal investigation.[143]

226. In attempting to convince the U.S. Attorneys not to criminally indict Walmart, Walmart's outside counsel at Jones Day highlighted the damage an indictment would cause to Walmart and its shareholders, describing the "***profound negative impact on the lives and families of the Company's 1.5 million U.S. employees and its innocent shareholders. The decision to indict Walmart could ultimately result in layoffs. It would also likely mean the loss of billions of dollars in the value of Walmart shares held in retirement saving accounts for millions of Americans and the pension funds of countless nonprofits and public employees.***"[144]

227. In response, AUSA Rattan said that Walmart was no different from an individual criminal defendant who pleaded for leniency with the government by stating that her children would be harmed by her incarceration. Civil Chief Randi Russell stated that Walmart's size did not make it above prosecution.[145]

228. On August 7, 2018, Walmart's outside counsel and U.S. Attorney Brown, Criminal Chief Matt Quinn and AUSA Rattan had a conversation.

[143] Exhibit F, p. 3-4 (Opioid MDL Ruling Regarding Deposition of Walmart CEO McMillon).
[144] August 2018 Hewitt Letter, p. 24.
[145] *ProPublica* Article.

Notwithstanding Walmart's pleas, EDTX federal prosecutors would proceed with the indictment. As Walmart's counsel stated: "***U.S. Attorney Brown stated he intends to indict Walmart. AUSA Rattan then said that her intention was to present an indictment to the grand jury on September 12.***"[146]

229. On August 10, 2018, Assistant U.S. Attorney Lan directed Walmart's counsel to present Walmart's submission to the Criminal Division.[147]

230. According to *ProPublica*, in the weeks that followed Walmart sought to quash the criminal indictment by undermining the independence of public prosecutors and appealing directly to the President's administration and top DOJ officials in Washington.

231. Further, EDTX federal prosecutors believed that Walmart had exploited its access to high-level DOJ officials in Washington, D.C. during the investigation to influence the outcome of the investigation. For example, Company lawyers met with Attorney General William Barr during the Investigation. The Company also hired Rachel Brand, who had left the DOJ in February 2018 to take a high-level job in Walmart's legal department.[148]

---

[146] August 2018 Hewitt Letter p. 5.
[147] *Id.*
[148] *ProPublica* article.

232. On August 31, 2018, the DOJ informed Walmart it was then declining to criminally prosecute the Company.[149]

233. Notwithstanding the declination, in September 2018 AUSA Rattan told Walmart that the investigation into the Company remained ongoing and that Walmart should continue to comply with the DEA's administrative subpoenas.[150]

234. Texas federal prosecutors felt strongly that the evidence supported a criminal prosecution. In October 2018 EDTX federal prosecutors and DEA agents who had been working on the Criminal Investigation went to Washington to appeal to the DEA's acting administrator Uttam Dhillon to revive the criminal case.[151]

235. EDTX U.S. Attorney Joe Brown and AUSA Rattan laid out the evidence against Walmart. They told Dhillon that Walmart pharmacists from all over the country told the Company that they did not want to fill prescriptions of opioids because they were from doctors running pill mills. Customers in Texas had died after taking suspect prescriptions that Walmart filled. Pharmacists pleaded with Walmart's corporate office. Walmart refused to take corporate-wide action. A Walmart opioid compliance manager told a Walmart executive in an email that

[149] September 2019 Hewitt Letter p. 4.
[150] *Id.*
[151] *ProPublica* Article.

Walmart's focus should be on "driving sales." Dhillon reportedly exclaimed "Jesus Christ" "Why aren't we talking about this as a criminal case."[152]

236. Dhillon then accompanied the group of prosecutors and DEA officials to the DOJ in D.C. to meet with the then-deputy attorney general Rod Rosenstein. Rattan explained to Rosenstein that Walmart was a repeat offender and had violated the 2011 MOA, justifying the extraordinary path of criminal prosecution.[153]

237. Rosenstein declined to permit a criminal prosecution of the Company but directed the prosecutors to focus on bringing criminal charges against individual Walmart employees. Brian Benczkowski, the head of the DOJ's Civil Division told Joe Brown: "you have a whopper of a civil case."[154]

238. On November 20, 2018, AUSA Russ (who was now the EDTX Civil Chief) and Gus Eyler contacted Walmart's counsel and stated that DOJ had formed a "Working Group" to investigate Walmart for civil violations of the CSA. The Working Group consisted of 15 separate U.S. Attorneys' Offices and three litigating components of the DOJ.[155]

239. On February 13, 2019 the Working Group issued an Omnibus Subpoena to Walmart seeking evidence across 36 broad categories related to

---

[152] *Id.*
[153] *Id.*
[154] *Id.*
[155] September 2019 Hewitt Letter, p. 5.

dispensing and distribution of controlled substances, including records of all prescriptions filled and all pharmacies in the Working Group's 15 districts over a five year period; prescription records for all prescribers who have been corporately blocked by Walmart, along with 329 additional prescribers over a five-year period; and all witness statements, transcripts, pleadings, and discovery materials that the Company produced in the MDL.[156] The breadth of the Omnibus Subpoena demonstrates both the scope and gravity of the DOJ's Civil Investigation.

240. Walmart entered into a tolling agreement with the DOJ through October 2019. Twenty DOJ attorneys in the Working Group met with Walmart in person on December 14, 2018, February 27, 2019, and August 22, 2019, for a total of approximately 12 hours.[157]

241. According to prosecutors, Walmart did not cooperate with the Investigation. For example, Walmart never gave prosecutors a full list of doctors that pharmacists were concerned about; Walmart did not give prosecutors full information on its internal databases to analyze prescribing information and patterns; and most importantly, ***Walmart refused to produce emails between compliance officials and the Company's senior management***.[158]

---

[156] *Id.* p. 5-6.
[157] *Id.* p. 5.
[158] *ProPublica* Article.

242. In August of 2019 Walmart learned that federal prosecutors were preparing to indict Brad Nelson,[159] the Walmart Compliance Director who refused pharmacists' desperate pleas to block prescribers who operated pill-mills and who stated that "driving sales" was a better use of time than analyzing data to comply with the 2011 MOA. In response, on September 27, 2019, Walmart's counsel at Jones Day wrote to Gus Eyler objecting to the threat of a Nelson indictment and threatened to cease cooperating with the investigation.[160]

243. In the September 2019 Hewitt Letter Walmart also complained about the Walmart Working Group's request for all suspicious order reports submitted to the DEA and corresponding internal remediation plans issued during one phase of its Suspicious Order Monitoring Program. Walmart lamented that "the Company [had] to comb through various custodians' information to retrieve relevant data and then compile the disparate information into an organized format."[161]

244. Walmart successfully delayed federal prosecutor's case against it by improperly appealing to high-level officials in the DOJ. Joshua Russ resigned on October 25, 2019. Russ stated in his resignation letter that Walmart "abused the Department's fairness, largely ignored our subpoena, and scoffed at our larger work on behalf of all Americans."

[159] September 2019 Hewitt Letter, p. 8.
[160] *Id.* p. 22.
[161] *Id.* p. 6.

245. The same day that Russ resigned he filed a confidential whistleblower complaint with the DOJ's inspector general alleging interference by the DOJ's political leaders, stating that they blocked prosecutors' efforts to obtain key evidence and provided special treatment to Walmart.[162] Despite the DEA's sign-off on the suit and despite opioid death victims being notified of the "landmark multibillion-dollar lawsuit" against Walmart, Russ was, in his words "handcuffed by political appointees." Russ stated in an interview that he "wasn't able to do the key investigation into Walmart and that "Main Justice" interfered into his team's attempt to collect "key evidence core to the case." Russ bluntly stated, "I had never seen that in an investigation."[163]

246. Having successfully interfered with the Investigations, Walmart next attempted to preempt the DOJ's eventual enforcement action by suing the DOJ and the Attorney General in Federal Court in EDTX.

247. In the suit, Walmart asked the court to issue a declaratory judgment clarifying the obligations of pharmacists to intervene if they suspect illegal prescribing practices. Walmart's interpretation would limit its liability and CSA obligations.

---

[162] "The Whistleblower: 'We weren't trying to make headlines. We were just trying to follow the evidence.,' *Dallas Business Journal,* Sept. 9, 2021: https://www.bizjournals.com/dallas/news/2021/09/09/joshua-russ-whistleblower-doj.html
[163] *Id.*

248. In the suit Walmart sought to cast itself as the victim and shift blame to federal regulators alleging that "DOJ and DEA should not be allowed to outsource to pharmacists and pharmacies the job the DEA has failed to do" and the "DEA's comprehensive failures have dramatically exacerbated the opioid crisis over at least the past twenty years." Walmart further alleged, referring to the Investigations, that "DOJ [s]pent [y]ears on an [i]nvestigation of Walmart [t]ainted by [e]thical [t]ransgressions."

249. On February 4, 2021 the court dismissed Walmart's complaint. Former U.S. Attorney Booth Godwin observed that "Walmart tried an end-around and was tackled." *Bloomberg* described the tactic as "a spectacular failure" in "attempted forum shopping." *Reuters* called "Walmart's tactic [] a complete flop," that "did not stave off the DOJ's complaint. Unsurprisingly, Walmart lost its appeal to the Fifth Circuit Court of Appeals.[164]

250. Despite Walmart's attempts to obstruct the government's case, the DOJ filed its civil complaint on December 22, 2020.

251. Additionally, according to Walmart's own representations to at least one court, the DOJ's criminal investigation into Walmart remained open through at least October 2020. According to Walmart's October 2020 representations to the

[164] *See Walmart Inc. v. U.S. Department of Justice*, 21 F.4th 300, 305 (5th Cir. 2021).

Circuit Court of Kanawha County, West Virginia in *In re Opioid Litigation*, Civil Action No. 19-C-9000, the Criminal Investigation into Walmart continued even after the declination.

252. In an October 20, 2020 order compelling Walmart to produce documents related to government investigations the West Virginia court chastised Walmart for its inconsistent positions concerning the status of the DOJ's criminal investigation. The court stated: "Plaintiffs point out that although ***Walmart represents to this Court that the DOJ's criminal investigation into it is ongoing***, Walmart has represented to at least one court that the investigation finished without an indictment issuing. Walmart's inconsistent representations to this court and others concerning the status of the DOJ's criminal investigation into it is concerning, to say the least."[165]

253. Defendants concealed from Investors the 2009 OTSC, the 2011 MOA, the Criminal Investigation, and the Civil Investigation. Investors only learned of the Investigations and the DEA/DOJ's decade-long focus on Walmart's CSA violations from the *ProPublica* expose.

[165] *In Re: Opioid Litigation*, No. 19-C-9000, Order Granting Plaintiffs' Motion to Compel Walmart to Produce Investigation Materials (Transaction ID 66038539), Oct. 20, 2020.

## V. Walmart's "Opioid Stewardship Initiative"

254. At the same time as Defendants were actively concealing the intensifying Criminal Investigation Walmart launched a PR campaign touting the Company's purported efforts to combat the opioid crisis.

255. In early 2017 Walmart established the "Walmart Opioid Stewardship Initiative" claiming that "the health and safety of [Walmart pharmacy] patients is a critical priority." Walmart's Opioid Stewardship Initiative was an effort by Walmart to portray itself to investors and the public as a good corporate citizen vis à vis the opioid crisis and distinguish itself from other companies under fire for their roles in the opioid crisis.

256. In Walmart's webpage dedicated to its Opioid Stewardship Initiative, Walmart states:

> At Walmart, we see and feel the impact of the opioid crisis in the communities we serve. Our mission is to help people "live better," and this means helping to fight the opioid crisis facing our country.
>
> As part of our commitment, in early 2017, we established the Walmart Opioid Stewardship Initiative to identify concrete, high-impact actions to help fight the opioid epidemic. The Initiative focuses on supporting solutions in three core areas:
>
> *Stewardship*:
>
> ***Adopting policies and practices to help safeguard our patients***
>
> *Education:*

> Supporting education programs for our patients, pharmacists, associates and communities
>
> *Advocacy:*
>
> ***Supporting legislation and public policy solutions aimed at reducing opioid misuse and dependence***. Our efforts, together with those of governments at the state and federal levels and others in the private sector, are beginning to yield results. But more work needs to be done. We will continue working with individuals and organizations in our communities to protect patients and families from the risks of prescription opioid misuse and abuse.
>
> Together, we can help make a difference.

257. Indeed, Walmart's Opioid Stewardship Initiative garnered public praise. The Oklahoma Attorney General, Mike Hunter stated "We appreciate good corporate citizens like Walmart for serving as an example of how private businesses can play a major role in ending this epidemic."

258. On January 17, 2018 Walmart issued a press release titled "Walmart Launches Groundbreaking Disposal Solution to Aid in Fight Against Opioid Abuse and Misuse." According to the press release:

> In an effort to help curb abuse and misuse, Walmart is launching a first-of-its-kind opioid disposal solution- available at no cost- in all company pharmacies….
> ***'The health and safety of our patients is a critical priority***; that's why we're taking an active role in fighting our nation's opioid issue- an issue that's affected so many families and communities across America,' said Marybeth Hays, executive vice president of Consumables and Health and Wellness at Walmart U.S. 'While this issue requires many resources to solve, we are confident this unique, easy-to-use disposal solution, DisposeRx, will make a meaningful impact on the lives of many. Walmart is incredibly proud to fund this initiative that provides

> our patients with an opioid disposal solution they can access nationwide, at no cost.'

259. On May 7, 2018- just days after Walmart's two-day meeting with federal prosecutors from Texas who informed Walmart of their intent to "imminently indict the Company-" Walmart issued a press release titled "Walmart Introduces Additional Measures to Help Curb Opioid Abuse and Misuse." The press release stated:

> Walmart, Inc. supports policies and programs aimed at helping curb opioid abuse and misuse…***In an effort to continue to be part of the solution to our nation's opioid epidemic,*** Walmart is introducing new policies, programs and tools aimed at curbing opioid misuse and abuse…
>
> 'We are taking action in the fight against the nation's opioid epidemic,' said Marybeth Hays, executive vice president of Health & Wellness and Consumables, Walmart U.S. 'We are proud to implement these policies and initiatives as we work to create solutions that address this critical issue facing the patients and communities we serve.'

260. Walmart's Opioid Stewardship Initiative was an effort by Walmart to portray itself to investors and the public as a good corporate citizen vis à vis the opioid crisis and distinguish itself from other companies under fire for their roles in the opioid crisis.

## VI. Walmart's Actions in Connection with its Membership in the National Association of Chain Drug Stores

189. The plaintiffs in the Opioid MDL allege that the "Distributor Defendants" (consisting of companies that distributed opioids) were members of

the Healthcare Distribution Alliance ("HDA") and that the "Pharmacy Defendants" (which includes Walmart) and the Distributor Defendants were members of the National Association of Chain Drug Stores ("NACDS").

190. The Opioid MDL Plaintiffs alleged that Walmart and other members used the HDA and NACDS to protect the supply chain of opioids through various means, including: (1) Drafting a "best practices" model for dealing with "suspicious orders," better known as the Industry Compliance Guidelines ("ICGs"), as a ruse to avoid regulatory enforcement; (2) Coordinating to invalidate enforcement actions; (3) Coordinating to fight the stricter controls for hydrocodone combination products and (4) Circumventing the DEA through the creation of a coalition on controlled substances that aimed to limit the scope of DEA restrictions on their continued distribution of controlled substances.

261. In denying Walmart and the other MDL Defendants' summary judgment motions on plaintiffs' civil conspiracy claims, Judge Polster held that the evidence showed that the Pharmacy Defendants: (i) used their membership and leadership positions in NACDS and their relationship with Distributor Defendants to "grow and protect the Opioid Supply Chain," (ii) coordinated with Distributor Defendants to form a "coalition" on controlled substances to limit the scope of DEA regulations on the distribution of controlled substances, and (iii) worked "in partnership" with the HDA to develop "solutions to the DEA enforcement issues"

and "strategies" concerning "ongoing problems that NACDS members are having with DEA enforcement actions."[166]

## VII. Post-Class Period Events Confirm Walmart's CSA Violations and Defendants' Efforts to Conceal the Investigations

262. Walmart has gone to great lengths to conceal the details of the Criminal Investigation and the PowerPoint presentations Defendant McMillon helped prepare in connection with Walmart's attempts to convince the DOJ not to indict the Company. For example, the discovery order in the Opioid MDL required that Walmart produce all documents it produced in other related opioid litigations, including government investigations. In the Opioid MDL, Walmart objected to producing the PowerPoint presentations to the DOJ that McMillon provided input into and reviewed based on F.R.E. 408 and 410- despite having produced them in a Massachusetts litigation four weeks prior. In granting the MDL plaintiffs' motion to compel production of the PowerPoint presentations, and sanctioning Walmart's improper discovery conduct, the MDL Court stated, in an April 19, 2021 order that:

> "Walmart's excuses for not timely producing this discovery require convoluted or illogical understandings of the Court's clear and repeated messages to the parties. ***It is vexatious for Walmart to reach and pretend to see exceptions where none exist, and then use these***

[166] Opioid MDL, 17-MD-002804, (Sept. 3, 2019) (Dkt. No. 2562). 2019 WL 4178610, at *5 (Exhibit C).

***<u>phantom exceptions as a means to delay or avoid complying with clear Court Orders</u>***.[167]

263. The MDL Court further noted Walmart's repeated attempts to cabin discovery stating: "Defendants' obligation has been set forth with clear language for three years, and ***<u>the Court has rejected each attempt since by Defendants to suggest the obligation should be constrained</u>***.[168]

264. The first trial in the Opioid MDL lasted six weeks. On November 23, 2021 the jury returned its verdict, finding Walmart guilty of creating a public nuisance in connection with its dispensing and distribution of opioids. Specifically, the jury answered "Yes" as to "Walmart" in response to the questions: 1) "Did Trumbull County prove, by the greater weight of the evidence, that oversupply of legal prescription opioids, and diversion of those opioids onto the illicit market outside of appropriate medical channels, is a public nuisance…" and 2) Did Trumbull County prove, by the greater weight of the evidence, that any of the following Defendants[169] engaged in intentional and/or illegal conduct which was a

---

[167] Order Granting Motion to Compel and for Sanctions, Opioid MDL, 1:17-MD-2804 (N.D. Ohio April 19, 2021) (ECF No. 3700), p. 8.
[168] *Id.* at 7.
[169] In addition to Walmart as a Defendant to which the verdict sheet refers, the additional Defendants are CVS Pharmacy, Inc. and Walgreen, Co. The jury also found CVS and Walgreens guilty.

substantial factor in producing the public nuisance that you found exists in Question 1?"[170]

265. Following the guilty verdict Walmart engaged in failed attempts to have the jury verdict overturned and/or have the case retried. After extensive briefing on F.R.C.P. 59 and 60 motions, the MDL Court concluded that: (1) the verdict was supported by the weight of the evidence (2) defendants were not entitled to a new trial.[171]

266. The core facts the Opioid MDL plaintiffs alleged and proved are the same core facts that formed the basis for the Government's case against Walmart, and date all the way back to the 2011 MOA. For example, the Opioid MDL Plaintiffs alleged that Walmart "had the ability and the obligation to look for red flags on a patient prescriber, and store level, and to refuse to fill and to report prescriptions that suggested illegal diversion," yet "systematically ignored red flags that were fueling a black market." Walmart allegedly failed to:

- "adequately train their pharmacists and pharmacy technicians on how to properly and adequately handle prescriptions for opioid painkillers";

- "put in place effective policies and procedures to prevent their stores from facilitating diversion and selling into a black market";

[170] Jury Verdict (Exh. D), p. 2-4; 6-8.
[171] Abatement Order (Exh. E), p. 6-7.

- "conduct adequate internal or external reviews of their opioid sales to identify patterns regarding prescriptions that should not have been filled";

- "effectively respond to concerns raised by their own employees regarding inadequate policies and procedures regarding the filling of opioid prescriptions"; and

- "take meaningful action to investigate or to ensure that they were complying with their duties and obligations under the law with regard to controlled substances."

267. These are the same deficiencies that Walmart promised to address in the 2011 MOA, but did not.

268. The Opioid MDL plaintiffs also alleged (and proved) that as a distributor of controlled substances Walmart failed to "control the supply chain, prevent diversion, report suspicious orders, and halt shipments" despite being "in possession of national, regional, state, and local prescriber and patient-level data that allowed them to track prescribing patters over time." As a distributor Walmart also "refused to identify, investigate and report suspicious orders to the DEA when they came aware of the same despite their actual knowledge of drug diversion rings."

269. On August 17, 2022 the MDL Court issued an Abatement Order setting forth Walmart's penalty and mandating Walmart take certain actions to abate the public nuisance the jury found it guilty of. The Abatement Order held that Walmart, CVS, and Walgreens must pay a total of $650.6 million over the course of 15 years

and immediately fund two-years' worth of payments ($86.7 million for Walmart) into an Abatement Fund.[172]

270. In the Abatement Order, the MDL Court held that because "the evidence presented in the Phase I trial ***overwhelmingly*** demonstrated that Defendants' underlying dispensing conduct was both ***knowing and intentional***" joint and several liability was appropriate.[173] Accordingly, Walmart's share of the penalty is $216,866,667.

271. As part of the Abatement Order the MDL Court also entered an Injunction Order directing Walmart (and CVS and Walgreens) to "undertake certain actions to ensure that they are complying fully with the Controlled Substances Act and avoiding further improper dispensing conduct."[174] The Injunction Order requires, among other things, that Walmart implement and maintain a Controlled Substance Compliance Program ("CSCP"), comply with the applicable federal and Ohio state laws regarding dispensing of Controlled Substances, and designate an independent Chief Controlled Substance Compliance Officer who completes an annual compliance certification.[175] The term of the Injunctive Order is 15 years.[176]

---

[172] *See* Abatement Order (Exh. E), p.4, second bullet point.
[173] *Id.* at 62-64.
[174] Abatement Order p. 4, fourth bullet point.
[175] Abatement Order at Ex. A, p. 1-5, 13).
[176] Abatement Order at Ex. A, p. 3.

272. Further, the MDL Court specifically found that Walmart's wrongful conduct was ***ongoing***, stating that "the ongoing, unreasonable interference with public health in this case is complicated and multi-faceted, and consists of both Defendants' ongoing conduct and the resulting nuisance-causing conditions. An order to meaningfully abate the nuisance the jury found will require the Court to carefully craft both: (1) injunctive relief to stop the Defendants' *wrongful* dispensing conduct, so they can no longer cause oversupply of legal prescription opioids that can be diverted, while still allowing *appropriate* dispensing; and (2) an abatement plan to reduce the prevalence of OUD[177] in the Counties, thereby ameliorating the ongoing interference with public health." (emphasis original).[178]

273. Walmart remained defiant and obstinate to the bitter end, ignoring the MDL Court's order to submit its own proposed abatement plan. The MDL Court found that Walmart (and the other Pharmacy Defendants):

> largely ignored the Court's directives to submit their own proposed abatement plan, and not to merely attack and criticize Plaintiffs' proposed abatement plan. Despite the Court's order that the parties each propose a detailed plan for abatement, only the Plaintiffs proposed one. Upon further order compelling them to submit a plan, Defendants eventually submitted three paragraphs suggesting a proper abatement remedy would be comprised of drug takeback programs to facilitate disposal of diverted opioids—and nothing more. But Defendants did not produce any evidence at the Abatement Trial, either through their own witnesses or through cross-examination of Plaintiffs' experts, that would support a finding that drug takeback programs, standing alone,

[177] Opioid Use Disorder.
[178] Abatement Order p. 25.

> would effectively abate the nuisance in the Counties. Defendants, instead, chose to challenge the legal validity, rather than the practical effectiveness, of all or various portions of Plaintiff's plan.[179]

## VIII. SEC Rules and Regulations and Accounting Principles Governing Defendants' Class Period Disclosures

274. SEC rules and regulations govern the content and preparation of disclosures public companies make in SEC filings.

275. GAAP are principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practices at a particular time. Compliance with GAAP is a fundamental obligation of publicly traded companies. As set forth in SEC Rule 4-01(a) of SEC Regulation S-X, "[f]inancial statements filed with the [SEC] which are not prepared in accordance with [GAAP] will be presumed to be misleading or inaccurate." 17 C.F.R. § 210.4-01(a)(1).

### A. Item 103

276. Item 103 of Regulation S-K, 17. C.F.R. §229.103 ("Item 103") specifically required Walmart's 10-K's and 10-Q's to disclose "any [material legal] proceedings known to be contemplated by governmental authorities.

[179] Abatement Order p. 9.

277. Specifically, Item 103 requires companies to disclose any material pending legal proceedings other than ordinary routine litigation incidental to the business, including "***any such proceedings known to be contemplated by governmental authorities.***" Such disclosure must include: (i) the name of the court or agency in which the proceedings are pending, (ii) the date instituted, (iii) the principal parties thereto and (iv) a description of the factual basis alleged to underlie the proceedings and the relief sought. Similar information for contemplated proceedings must be disclosed. 17. C.F.R. §229.103(a).

278. Item 103 provides a disclosure threshold for pending and contemplated proceedings that involve primarily a claim for damages for which the amount of damages involved, exclusive of interests and costs, does not exceed 10% of the company's current assets. Companies must aggregate *similar legal proceedings* (i.e. proceedings that "present in large degree the same [legal and factual] issues"). The 10% disclosure threshold applies to both pending legal proceedings and legal proceedings ***known to be contemplated*****, when applying the 10% disclosure threshold.** 17. C.F.R. §229.103(a)(2)(b)(2).

279. Because EDTX DOJ was intending to file criminal charges, the DOJ's claims did not "primarily involve a claim for damages." Indeed, Walmart itself recognized in the 2014 PSW detailing the need to have a functioning SOM system that the risks of failing to comply with the 2011 MOA "include potential DEA

enforcement which, could include fines, penalties and license forfeiture, as well as failure to secure VAWD reaccreditation."

280. By the beginning of the Class Period Defendants were aware of the Criminal Investigation into the Company for its failure to comply with the CSA and the 2011 MOA. Defendants were also aware of: 1) the existence of the 2011 MOA 2) the 2013 Whistleblower Complaint and 3) Walmart's failure to comply with the 2011 MOA and the CSA because, according to the June 2014 PSW: 1. Walmart had failed to comply with the 2011 MOA, 2. Walmart's suspicious order monitoring system was an "existing risk" for which the Company had "no processes in place" which was "likely" to result in "severe financial and reputational" harm to the Company, and 3. Walmart's suspicious order monitoring program required substantial enhancements in order "to help Walmart avoid DEA enforcement as a result of non-compliance with [the CSA]."

281. In violation of Item 103, Walmart's Class Period quarterly and annual reports filed with the SEC failed to disclose the Criminal Investigation (and later the parallel Civil Investigation). Item 103 required Defendants to disclose the Criminal Investigation because it threatened a criminal indictment which is not an action for damages and is clearly material to the Company. Further, Item 103 required Defendants to disclose the Civil Investigation as a "similar legal proceeding[ ]" to the Opioid MDL. Defendants violated Item 103 by disclosing the

Opioid MDL but failing to aggregate those claims with the DOJ's contemplated civil claims. Had Walmart aggregated the two claims as required, then Walmart would have specifically disclosed the Investigations alongside the Opioid MDL in its Class Period 10-K's and 10-Q's. It did not.

**B. ASC 450**

282. GAAP, and specifically Financial Accounting Standards Board ("FASB"), Accounting Standards Codification ("ASC") 450 ("ASC 450"), *Contingencies*, also required disclosure of the Criminal Investigation and Civil Investigation.

283. ASC 450 requires disclosure in the footnotes to a Company's financial statements of material loss contingencies and/or significant risk and uncertainties.[180] Under ASC 450, disclosing a loss contingency[181] is required when there is more than a remote chance that a loss will be incurred. The threshold for disclosure of a loss contingency (as opposed to a higher threshold for the accrual of a loss contingency) is very low – ASC 450 requires disclosure only when the loss is

---

[180] ASC 450 (formerly Statement of Financial Accounting Standards No. 5, Accounting for Contingencies) defines a loss contingency as "[a]n existing condition, situation, or set of circumstances involving uncertainty as to [a] possible loss to an enterprise that will ultimately be resolved when one or more future events occur or fail to occur."

[181] ASC 450 defines a contingent liability or loss contingency as "an existing condition, situation, or set of circumstances involving uncertainty as to possible loss to an entity that will ultimately be resolved when one or more future events occur or fail to occur." ASC 450-20-20.

"[r]easonably possible," which is defined as, "[t]he chance of the future event or events occurring is more than remote but less than likely."[182]

284. Under ASC 450, the disclosure shall indicate the nature of the contingency and an estimate of the possible loss or range of loss or state that such an estimate cannot be made.[183]

285. ASC 450 specifically addresses the disclosure of "pending or threatened litigation," stating that when "determining whether accrual and/or disclosure is required with respect to pending or threatened litigation," companies must consider: (i) "[t]he period in which the underlying cause (i.e., the cause for action) of the pending or threatened litigation or of the actual or possible claim or assessment occurred"; (ii) "[t]he degree of probability of an unfavorable outcome"; and (iii) "[t]he ability to make a reasonable estimate of the amount of loss."[184] ASC 450 adds that:

> With respect to ***unasserted claims*** and assessments, an enterprise must determine the degree of probability that a suit may be filed or a claim or assessment may be asserted and the possibility of an unfavorable outcome. . . . ***[A]n investigation of an enterprise by a governmental agency, if enforcement proceedings have been or are likely to be instituted, is often followed by private claims for redress, and the probability of their assertion and the possibility of loss should be considered in each case.***[185]

[182] ASC 450-20-20; ASC 450-20-50-3; ASC 450-20-50-4.
[183] ASC 450-20-50-6.
[184] ASC 450-20-55-10.
[185] ASC 450-55-14b.

286. Actual or possible claims and assessments and pending or threatened litigation are sources of significant potential liability for a public company. ASC 450 requires disclosure of a contingency involving an ***unasserted*** claim or assessment when there is a manifestation by a potential claimant of awareness of a possible claim or assessment. Even when where there is **no** manifestation by a potential claimant of awareness of a possible claim or assessment, disclosure is nevertheless required if it is **probable** that a claim will be asserted and there is a **reasonable possibility** that the outcome will be unfavorable.[186]

287. Finally, the SEC considers the disclosure of loss contingencies of such importance to an informed investment decision that it issued Article 10-01 of Regulation S-X, 17 C.F.R. § 210.10-01, which provides that disclosures in interim period financial statements may be abbreviated and need not duplicate the disclosure contained in the most recent audited financial statements, *except that* "where material contingencies exist, disclosure of such matters shall be provided even though a significant change since year end may not have occurred."

288. By the beginning of the Class Period Defendants were aware of: (i) the Criminal Investigation; (ii) the 2011 MOA; (iii) that Walmart had violated the 2011 MOA by failing to comply with its terms and (iv) the Company's CSA violations. Defendants were required to disclose the DOJ Investigation and provide an estimate

[186] ASC 450-20-50-6a-b.

of the potential liability pursuant to ASC 450 in Walmart's 2017 10-K, and in all of the Company's Class Period quarterly and annual reports thereafter because: (i) the DOJ had manifested an awareness of a potential material criminal action against the Company and (ii) Defendants were aware that it was at least reasonably possible that the outcome would be unfavorable, given: (a) the Company's CSA violations and (b) the Company's failure to comply with the 2011 MOA.

## IX. Defendants' Class Period False and Misleading Statements and Omissions of Facts that the Company Was Required to Disclose

### A. Defendants' False and Misleading Statements Concerning Disclosure of All Reasonably Possible Liabilities that "May" Be Material

289. The Class Period begins on March 31, 2017, when Walmart filed its 2016 10-K for the fiscal year ended January 31, 2017 ("2016 10-K"). In the 2016 10-K Defendants affirmatively misrepresented that they had disclosed all legal proceedings where a liability is "reasonably possible" and "*may* be material."

290. Walmart's 2016 10-K financial statements, note 10 titled "Contingencies" states:

> ***Legal Proceedings***
>
> The Company is involved in a number of legal proceedings. The Company has made accruals with respect to these matters, where appropriate, which are reflected in the Company's Consolidated Financial Statements. For some matters, a liability is not probable or the amount cannot be reasonably estimated and therefore an accrual has

not been made. ***However, where a liability is reasonably possible and may be material, such matters have been disclosed.***

291. By the time Walmart filed the 2016 10-K on March 31, 2017, Defendants had learned of the Criminal Investigation and had received an email search warrant from the Assistant US Attorney in EDTX. Defendants' statement purporting to disclose all reasonably possible legal proceedings that "may" be material was false and materially misleading and omitted material facts necessary to make it not misleading because Defendants omitted to disclose the Criminal Investigation. Defendants were aware that a material liability stemming from the Criminal Investigation was at least reasonably possible given Defendants' awareness of: (1) the 2011 MOA which essentially placed Walmart on "probation" for its CSA violations; (2) Walmart's failure to comply with the 2011 MOA and CSA as evidenced by, *inter alia* the 2014 PSW which stated that the potential for reputational and financial harm stemming from the 2011 MOA and Walmart's failure to comply with the CSA was greater than material, it was ***severe.***

292. Further, by specifically disclosing certain legal proceedings and investigations while omitting to disclose the Criminal Investigation, Defendants essentially denied its existence.

293. Defendants repeated the statement in ¶290 above in Walmart's June 2, 2017 quarterly report for the first quarter of 2017 ended April 30, 2017 ("1Q 2017

10-Q"); Walmart's August 31 2017, quarterly report for the second quarter ended July 31, 2017 ("2Q 2017 10-Q"); and Walmart's December 1, 2017 10-Q for the third quarter ended October 31, 2017 ("3Q 2017 10-Q") which were false and misleading for the reasons stated in ¶¶291-92 above.

294. On December 1, 2017 the Company filed its 10-Q for the third quarter ended October 31, 2017 ("3Q 2017 10-Q"). By the time Walmart filed the 3Q 2017 10-Q Defendants were aware that EDTX DOJ was conducting a parallel civil investigation in addition to the Criminal Investigation. In Walmart's 3Q 2017 10-Q Defendants repeated the statement concerning disclosure of legal proceedings set forth in ¶290 above. Defendants' statement was false and materially misleading and omitted material facts necessary to make it not misleading for the reasons set forth in ¶¶291-92 above and for the additional reason that Defendants omitted to disclose the DOJ's parallel Civil Investigation which began in November 2017.

295. On March 30, 2018, the Company filed its annual report on Form 10-K with the SEC for the fiscal year ended January 31, 2018 ("2017 10-K"). By now Defendants were aware of the EDTX DOJ's intent to indict Walmart.

296. The 2017 10-K states the following under Note 10. "Contingencies:"

> ***Legal Proceedings***
>
> The Company is involved in a number of legal proceedings. The Company has made accruals with respect to these matters, where

appropriate, which are reflected in the Company's Consolidated Financial Statements. For some matters, a liability is not probable or the amount cannot be reasonably estimated and therefore an accrual has not been made. ***However, where a liability is reasonably possible and may be material, such matters have been disclosed***. The Company may enter into discussions regarding settlement of these matters, and may enter into settlement agreements, if it believes settlement is in the best interest of the Company and its shareholders.

***Unless stated otherwise, the matters discussed below, if decided adversely to or settled by the Company, individually or in the aggregate, may result in a liability material to the Company's financial condition or results of operations.***

297. In addition to other legal proceedings and investigations the 10-K disclosed the MDL:

***National Prescription Opiate Litigation***

In December 2017, the United States Judicial Panel on Multidistrict Litigation ordered consolidated numerous lawsuits filed against a wide array of defendants by various plaintiffs, including counties, cities, healthcare providers, Native American tribes, individuals, and third-party payors, asserting claims generally concerning the impacts of widespread opioid abuse. The consolidated multidistrict litigation is entitled *In re National Prescription Opiate Litigation (MDL No. 2804)*, and is pending in the U.S. District Court for the Northern District of Ohio. The Company is named as a defendant in some of the cases included in this multidistrict litigation, including cases filed by several counties in West Virginia; by healthcare providers in Mississippi, Alabama, Texas, and Florida; and by the St. Croix Chippewa Indians of Wisconsin. Similar cases that name the Company have been filed in state courts by various counties and municipalities; by health care providers; and by various Native American Tribes. The Company cannot predict the number of such claims that may be filed, and cannot reasonably estimate any loss or range of loss that may arise from such claims. The Company believes it has substantial factual and legal defenses to these claims, and intends to defend the claims vigorously.

298. The foregoing statements purporting to disclose all reasonably possible legal proceedings that may be material was false and materially misleadingly and omitted to disclose material information necessary to make it not misleading because Defendants failed to disclose the Criminal Investigation and parallel Civil Investigation. Defendants were aware that a material liability stemming from the Investigations was at least reasonably possible given Defendants' awareness of the foregoing facts: (i) On March 28, 2018 Assistant U.S. Attorney Rattan notified Walmart that she intended to indict the Company, (ii) the EDTX DOJ had now expanded its criminal investigation into Walmart and had sent Walmart a broadened information request in June 2017 and five DEA Administrative Subpoenas between June 2017 to July 2018; (iii) Walmart violated the 2011 MOA and recognized that the potential for reputational and financial harm stemming from the 2011 MOA and Walmart's failure to comply with the CSA was greater than material, it was ***severe.***

299. On June 4, 2018 the Company filed its 10-Q for the first quarter 2018 ending April 30, 2018 ("1Q 2018 10-Q"). The 1Q 2018 stated the following under Note 9. "Contingencies:"

> ***Legal Proceedings***
> The Company is involved in a number of legal proceedings. The Company has made accruals with respect to these matters, where appropriate, which are reflected in the Company's Consolidated Financial Statements. For some matters, a liability is not probable or the amount cannot be reasonably estimated and therefore an accrual has not been made. ***However, where a liability is reasonably possible and***

***may be material, such matters have been disclosed***. The Company may enter into discussions regarding settlement of these matters, and may enter into settlement agreements, if it believes settlement is in the best interest of the Company and its shareholders.

***Unless stated otherwise, the matters discussed below, if decided adversely to or settled by the Company, individually or in the aggregate, may result in a liability material to the Company's financial condition or results of operations***.

…

***National Prescription Opiate Litigation and Related Matters***

In December 2017, the United States Judicial Panel on Multidistrict Litigation ordered numerous lawsuits filed against a wide array of defendants by various plaintiffs be consolidated, including counties, cities, healthcare providers, Native American tribes, and third-party payors, asserting claims generally concerning the impacts of widespread opioid abuse. The consolidated multidistrict litigation is entitled In re National Prescription Opiate Litigation (MDL No. 2804), and is pending in the U.S. District Court for the Northern District of Ohio. The Company is named as a defendant in some of the cases included in this multidistrict litigation. Similar cases that name the Company have been filed in state courts by various counties and municipalities; by health care providers; and by various Native American Tribes. The relief sought by various plaintiffs is compensatory and punitive damages, as well as injunctive relief including abatement. The Company cannot predict the number of such claims that may be filed, and cannot reasonably estimate any loss or range of loss that may arise from such claims. The Company believes it has substantial factual and legal defenses to these claims, and intends to defend the claims vigorously. ***The Company has also been responding to subpoenas, information requests and investigations from governmental entities related to nationwide controlled substance dispensing practices involving the sale of opioids. The Company can provide no assurance as to the scope and outcome of these matters and no assurance as to whether its business, financial condition or results of operations will not be materially adversely affected.***

300. By the time Walmart filed its 1Q 2018 10-Q on June 4, 2018 Defendants were aware that in May 2018 U.S. Attorney for the Eastern District of Texas told Walmart that it would ***imminently*** indict the Company and it should pay a billion dollars to resolve the matter civilly ,and subsequently acknowledged that an indictment would have a "***profound***" negative impact on shareholders, including "***the loss of billions of dollars in the value of Walmart shares***." The foregoing statements purporting to disclose all "reasonably possible" material liabilities and vague reference to "subpoenas, information requests and investigations from governmental entities" were false and materially misleading and omitted material information necessary to make them not misleading because Defendants did not specifically disclose the Investigations and concealed from investors the nature and scope of the Investigations.

301. After improperly exploiting its access to high-level DOJ officials, on August 31, 2018 the DOJ informed Walmart it would decline, at that time, to criminally prosecute the Company. Nevertheless, in September 2018 AUSA Rattan told Walmart the Criminal Investigation remained ongoing and that Walmart should continue to comply with the DEA's subpoenas. Further, the Civil Investigation remained ongoing.

302. Defendants repeated the statements in statements in ¶299 above in Walmart's September 6, 2018 quarterly report on Form 10-Q the quarter 2018 ended July 31, 2018 ("2Q 2018 10-Q).

303. The statements in Walmart's 2Q 2018 10-Q were false and materially misleading when made and omitted to disclose material facts necessary to make them not misleading because Defendants did not specifically disclose Civil Investigation and concealed from investors the nature and scope of the Investigation.

304. Defendants repeated the statements in ¶299 above in Walmart's November 30, 2018 quarterly report for the quarter ended October 31, 2018 ("3Q 2018 10-Q").

305. By the time Walmart filed its 3Q 2018 10-Q on November 30, 2018 Defendants were aware that the DOJ had formed a Working Group consisting of 15 separate U.S. Attorneys' Offices and three litigating components of the DOJ to continue investigating Walmart for civil violations of the CSA. Accordingly, Defendants were aware that a material liability stemming from the Civil Investigation was at least reasonably possible for this additional reason, which demonstrated to Defendants that the DOJ had expanded and intensified its Investigation. The statements in Walmart's 3Q 2018 10-Q were false and materially

misleading when made and omitted to disclose material facts necessary to make them not misleading because Defendants did not specifically disclose the Civil Investigation and concealed from investors the nature and scope of the Investigation.

306. Defendants repeated the statements in ¶299 above in Walmart's March 30, 2019 annual report on Form 10-K with the SEC for the fiscal year ended January 31, 2019 ("2018 10-K") and Walmart's June 7, 2019 quarterly report on Form 10-Q for the period ended April 30, 2019 ("1Q 2019 10-Q").

307. By the time Walmart filed its 2018 10-K on March 31, 2019 Defendants were aware that the Working Group conducting the Civil Investigation issued an Omnibus Subpoena to Walmart seeking evidence across 36 broad categories relating to dispensing and distribution of controlled substances, including records of all prescriptions filled in the Working Group's 15 districts over a five year period; prescription records for all prescribers who have been corporately blocked by Walmart, alone with 329 additional prescribers over a five-year period; and all witness statements, transcripts, pleading and discovery materials Walmart produced in the Opioid MDL. Accordingly, Defendants were aware that a material liability stemming from the Civil Investigation was at least reasonably possible for this additional reason, which demonstrated to Defendants that the DOJ had further expanded and intensified its Investigation. The statements in Walmart's 2018 10-K

and 1Q 2019 were false and materially misleading when made and omitted to disclose material facts necessary to make them not misleading because Defendants did not specifically disclose the Civil Investigation and concealed from investors the nature and scope of the Investigation.

308. Defendants repeated the statements in ¶299 above in Walmart's September 6, 2019 quarterly report on Form 10-Q for the period ended July 31, 2019 ("2Q 2019 10-Q"); Walmart's December 4, 2019 quarterly report on Form 10-Q for the period ended October 31, 2019 ("3Q 2019 10-Q"); and Walmart's March 20, 2020 Form 10-K for the fiscal year ended January 31, 2020 ("2019 10-K").

309. By the time Walmart filed its 2Q 2019 10-Q on September 6, 2019 Defendants were aware that federal prosecutors were preparing to indict former Walmart Compliance Director Brad Nelson (whom EDTX had planned to indict alongside Walmart as a co-conspirator prior to the declination) and was concerned about the impact of Nelson's indictment on Walmart.[187] Accordingly, Defendants were aware that a material liability stemming from the Civil Investigation was at least reasonably possible for this additional reason. The statements in Walmart's 2Q 2019 10-Q, 3Q 2019 10-Q and 2019 10-K were false and materially misleading when made and omitted to disclose material facts necessary to make them not

[187] September 2019 Hewitt Letter, p. 3-4.

misleading because Defendants did not specifically disclose Civil Investigation and concealed from investors the nature and scope of the Investigation.

310. Defendants' intention to conceal the Investigations from investors is evidenced by their disclosure of "Certain other matters" in Walmart's 2019 10-K:

> **II. CERTAIN OTHER MATTERS:** The Company has received grand jury subpoenas issued by the United States Attorney's Office for the Middle District of Pennsylvania seeking documents regarding the Company's consumer fraud program and anti-money laundering compliance related to the Company's money transfer services, where Walmart is an agent. The most recent subpoena was issued in January 2020. The Company has been responding to these subpoenas. The Company has also been responding to civil investigative demands from the United States Federal Trade Commission related to money transfers and the Company's anti-fraud program. Due to the investigative stage of these matters, the Company is unable to predict the outcome of the investigations by the governmental entities. While the Company does not currently believe that the outcome of these matters will have a material adverse effect on its business, financial condition, results of operations or cash flows, the Company can provide no assurance as to the scope and outcome of these matters and whether its business, financial position, results of operations or cash flows will not be materially adversely affected.

311. Unlike the disclosure above, in which Defendants provided detailed information setting forth the nature and subject matter of the investigation, the governmental entity conducting the investigation and the date a subpoena was issued, Defendants' vague disclosure of "subpoenas, information requests and investigations from governmental entities subpoenas and information" (in Walmart's 1Q 2018 10-Q and each of Walmart's Class Period 10-Q's and 10-K's

thereafter) misled investors and deprived them of material information necessary to made Defendants' existing statements not misleading.

**B. Defendants' Violations of ASC 450**

312. ASC 450 requires a company to disclose a loss contingency if there is more than a remote chance that a loss will occur. Such as disclosure must indicate the nature of the liability and provide an estimate or estimate a range of the amount of the liability. ASC 450 requires a company to accrue a charge on its financial statements or "account" for a contingent liability where the liability is probable.

313. Defendants did not disclose the Criminal Investigation or the Civil Investigation in any of Walmart's Class Period 10-K's and 10-Q's, in violation of ASC 450. Because Defendants knowingly failed to disclose a loss contingency in Walmart's financial statements, including the nature of the possible loss, the financial statements contained in Walmart's Class Period 10-K's and 10-Q's were materially false and misleading.

By the beginning of the Class Period (March 31, 2017) Defendants were aware of the Criminal Investigation which began after the DEA raided a Walmart store. Accordingly, Defendants were required to disclose the Criminal Investigation in Walmart's 2016 10-K pursuant to ASC 450 because: (i) Defendants were aware that the DOJ manifested an awareness of a potential material claim against Walmart when it commenced the Criminal Investigation into the Company's alleged CSA

violation on December 7, 2016 and (ii) it was at least reasonably possible that the Criminal Investigation would result in Walmart incurring a material liability. Because Defendants knowingly failed to disclose a loss contingency in Walmart's financial statements, including the nature of the possible loss, the financial statements contained in Walmart's 2016 10-K were false and misleading.

314. By the time Walmart filed its 1Q 2017 10-Q on June 2, 2017 EDTX DOJ had now expanded the Criminal Investigation into Walmart and had sent Walmart a broadened information request, increasing the likelihood that Walmart would incur a material liability as a result of the Criminal Investigation. ASC 450 required Defendants to disclose the Criminal Investigation for this additional reason.

315. By the time Walmart filed its 3Q 2017 10-Q on December 1, 2017 Defendants were now aware that AUSA Russ had commenced a parallel civil investigation and Walmart was responding to broad information requests in connection therewith. Accordingly, ASC 450 required Defendants to disclose the Civil Investigation as well as the Criminal Investigation.

316. By the time Walmart filed its 2017 10-K on March 30, 2018 Defendants were aware of the EDTX DOJ's intention to indict Walmart. Accordingly, ASC 450 required Defendants to disclose the Criminal Investigation

for the additional reason that on March 28, 2018 the AUSA informed Walmart it intended to indict the Company.

317. By the time Walmart filed its 1Q 2018 10-Q on June 4, 2018 Defendants were aware that U.S. Attorney for EDTX told Walmart that it would ***imminently*** indict the Company and stated that Walmart should pay a billion dollars to resolve the matter civilly. Walmart's top lawyer acknowledged that an indictment would have a "***profound***" negative impact on shareholders, including "***the loss of billions of dollars in the value of Walmart shares***." Accordingly, ASC 450 required Defendants to disclose the Criminal Investigation and the Civil Investigation for these additional reasons.

318. After improperly exploiting its access to high-level DOJ officials on August 31, 2018 the DOJ informed Walmart it would decline to criminally prosecute the Company at that time. Nevertheless, in September 2018 AUSA Rattan told Walmart the Criminal Investigation remained ongoing and that Walmart should continue to comply with the DEA's subpoenas. Further, the Civil Investigation remained ongoing. Accordingly, even after the declination ASC 450 required Defendants to disclose the Civil Investigation in Walmart's 2Q 2018 10-Q, 3Q-2018 10-Q, 2018 10-K, 1Q 2019 10-Q, 2Q 2019 10-Q, 3Q 2019 10-Q and 2019 10-K.

### C. Defendants Violations of the Affirmative Disclosure Obligations Imposed by Item 103.

319. Item 103 requires companies to disclose any material pending legal proceedings other than ordinary routine litigation incidental to the business, including "any such proceedings known to be contemplated by governmental authorities."

320. Defendants violated the affirmative disclosure obligations Item 103 imposes by failing to disclose the Investigations in Walmart's Class Period SEC filings because the Investigations were material legal proceedings known to be contemplated by a governmental authority. Further, Item 103 requires, in the case of "any proceedings known to be contemplated by governmental authorities," Defendants to disclose: (i) the name of the court or agency in which the proceedings are pending, (ii) the date instituted, the principal parties thereto and (iii) a description of the factual basis alleged to underlie the proceeding and the relief sought. Despite Defendants' awareness that: (i) the U.S. Attorney's Office for the Eastern District of Texas was contemplating indicting the Company, (ii) the contemplated indictment stemmed from the Criminal Investigation which the EDTX DOJ began on December 7, 2016; (iii) the claims in the Criminal Investigation were based on Walmart's decade long violations of the CSA and related laws (iv) Walmart began responding to broad information requests in

connection with a parallel Civil Investigation which Walmart learned of in November 2017l and (v) the DOJ was seeking criminal relief and a billion dollars to resolve the matter civilly, Defendants failed to disclose any of this required information.

### D. Defendants' False and Misleading Portrayal of Walmart as a "Steward" in the Opioid Crisis

321. On October 26, 2017 Walmart issued a Press Release titled "Walmart Supports State of Emergency Declaration on Opioids- Company pledges to continue measures in addressing the nation's prescription drug abuse crisis" ("October 26, 2017 Press Release"). The October 26, 2017 Press Release stated, in relevant part:

> Walmart, including its 5,300 Walmart and Sam's Club pharmacies, expressed support for the administration's declaration of a public health emergency on opioids and reinforced the company's commitment to be part of the solution to the epidemic.
>
> '***At Walmart, the health and safety of our patients is a critical priority***, and we welcome the administration's actions to bring attention and resources to the nation's opioid issue- one that has devastated so many families and communities across America,' said Greg Foran, president and chief executive officer, Walmart U.S. '***We stand ready to work with our nation's leaders on a solution to combat prescription drug addiction and misuse.***'
>
> ***As a company, Walmart has taken steps to help address the prescription drug abuse problem, including***:
>
> ***The Company has comprehensive policies and training to help support its pharmacists in filling prescriptions only for legitimate medical purposes.***
>
> …

322. The foregoing statements in the October 26, 2017 Press Release were false and materially misleading when made and/or omitted to state material facts necessary to make the statements not misleading because the Company's policies were specifically designed to ***prevent*** pharmacists from refusing to fill illegitimate prescriptions because, for example: Walmart chose not to disseminate compiled "red flag" information to its pharmacists, Walmart pressured pharmacists to fill prescriptions as quickly as possible, Walmart refused to allow pharmacists to refuse to fill, as a blanket matter, all prescriptions issued by "pill-mill" prescribers, and Walmart failed to adequately train pharmacists concerning red-flag identification. Additionally, at Walmart, the "health and safety of our patients" was ***not*** a "critical priority." Instead, "driving sales" and filling prescriptions as quickly as possible- despite dangers to patient health and safety- so that customers would continue to shop at Walmart and Sam's Club was Walmart's "critical priority." Further, Walmart did not comprehensively train its pharmacists. Instead, as the DOJ Complaint alleges, Walmart pharmacists "received little training before 2018 on how to handle prescriptions raising red flags" and "Walmart provided its staff with no training program, training materials, or written policies, procedures, or criteria specific to suspicious order monitoring."[188]

---

[188] DOJ Complaint, ¶¶ 357.

323. Further, Defendants' issuance of the October 2017 Press Release at a time when other pharmaceutical companies and distributors were coming under fire for playing a role in the opioid crisis, was a conscious attempt to distance Walmart from the crisis and any illegal conduct and mislead investors.

324. In short, the October 2017 Press Release was a false exculpatory statement indicating Walmart's scienter as to its unlawful role in causing and exacerbating the opioid crisis in the United States.

### E. Defendants' False and Misleading Risk Disclosures

325. Item 105 of Regulation S-K, 17. C.F.R. §229.105 ("Item 105") (as amended November 9, 2020) requires a company to provide a discussion of the material factors that make an investment in the registrant speculative or risky. The SEC also requires that a registrant's Form 10-Q set forth any material changes from risk factors as previously disclosed in the registrant's last Form 10-K.

326. Walmart's 2016 10-K filed on March 31 2017set forth "numerous" risk factors related to Walmart's retail pharmacy operations under "Item 1A Risk Factors":

> **Changes in the results of our retail pharmacy business could adversely affect our overall results of operations, cash flows and liquidity.**

The retail pharmacy operations in our Walmart U.S. and Sam's Club segments generate substantial net sales, a large majority of which are generated by filling prescriptions for which we receive payment established through contractual relationship with third-party payers and payment administrators, such as private insurers, governmental agencies and pharmacy benefit managers ("PBMs").

***Our retail pharmacy operations are subject to numerous risks,*** including: reductions in the third-party reimbursement rates for drugs; changes in our payer mix (i.e., shifts in the relative distribution of our pharmacy customers across drug insurance plans and programs toward plans and programs with less favorable reimbursement terms); changes in third party payer drug formularies (i.e., the schedule of prescription drugs approved for reimbursement or which otherwise receive preferential coverage treatment); growth in, and our participation in or exclusion from, exclusive and preferred pharmacy network arrangements operated by PBMs and/or any insurance plan or program; increases in the prices we pay for brand name and generic prescription drugs we sell; increases in the administrative burden associated with seeking third-party reimbursement; changes in the frequency with which new brand name pharmaceuticals become available to consumers; introduction of lower cost generic drugs as substitutes for existing brand name drugs for which there was no prior generic drug competition; changes in drug mix (i.e., the relative distribution of drugs customers purchase at our pharmacies between brands and generics); changes in the health insurance market generally; changes in the scope of or the elimination of Medicare Part D or Medicaid drug programs; increased competition from other retail pharmacy operations; further consolidation among third party payers, PBMs or purchasers of drugs; overall economic conditions and the ability of our pharmacy customers to pay for drugs prescribed for them to the extent the costs are not reimbursed by a third party; failure to meet any performance or incentive thresholds to which our level of third party reimbursement may be subject; and changes in the regulatory environment for the retail pharmacy industry and the pharmaceutical industry, including as a result of restrictions on the further implementation of or the repeal of the Patient Protection and Affordable Care Act or the enactment and implementation of a law replacing such act, and other changes in laws, rules and regulations that affect our retail pharmacy business.

> If the supply of certain pharmaceuticals provided by one or more of vendors were to be disrupted for any reason, our pharmacy operations could be severely affected until at least such time as we could obtain a new supplier for such pharmaceuticals. Any such disruption could cause reputational damage and result in a significant number of our pharmacy customers transferring their prescriptions to other pharmacies.
>
> One or a combination of such factors may adversely affect the volumes of brand name and generic pharmaceuticals we sell, our cost of sales associated with our retail pharmacy operations, and the net sales and gross margin of those operations, result in the loss of cross-store or -club selling opportunities and, in turn, adversely affect our overall net sales, other results of operations, cash flows and liquidity.

327. Defendants repeated and/or incorporated by reference substantially the same risk disclosures in Walmart's 1Q 2017 10-Q, 2Q 2017 10-Q and Walmart's 3Q 2017 10-Q.

328. Defendants' statements regarding the "numerous risks" Walmart's retail pharmacy business faced were false and materially misleading when made and omitted to state material facts necessary to make the statements not misleading because while disclosing the above risks Defendants concealed the much larger risks that the DOJ would criminally and/or civilly prosecute Walmart and that Walmart would be subject to billions of dollars in fines and penalties and severe reputational harm, among other things, as a result of failing to comply with the CSA.

329. Walmart's 2017 10-K filed on March 31, 2018 purported to set forth the following "risk factors" related to Walmart's pharmacy business. The 2017 10-

K states the following under the heading "Legal, Tax, Regulatory, Compliance, Reputational and other Risks:"

> We operate in complex regulated environments in the United States and in the other countries in which we operate and could be adversely affected by changes to existing legal requirements including the related interpretations and enforcement practices, new legal requirements and/or any failure to comply with applicable regulations. ***Our pharmacy operations in the United States are subject to numerous federal, state and local regulations including licensing and other requirements for pharmacies and reimbursement arrangements. The regulations to which we are subject include, but are not limited to: federal and state registration and regulation of pharmacies; dispensing and sale of controlled substances and products containing pseudoephedrine***; applicable governmental payer regulations including Medicare and Medicaid; data privacy and security laws and regulations including the Health Insurance Portability and Accountability Act, the Affordable Care Act or any successor thereto; laws and regulations relating to the protection of the environment and health and safety matters, including those governing exposure to, and the management and disposal of, hazardous substances; regulations regarding food and drug safety including those of the U.S. Food and Drug Administration (the "FDA") and the Drug Enforcement Administration (the "DEA"), trade regulations including those of the U.S. Federal Trade Commission, and consumer protection and safety regulations including those of the Consumer Product Safety Commission, as well as state regulatory authorities, governing the availability, sale, advertisement and promotion of products we sell and the financial services we offer; anti-kickback laws; false claims laws; and federal and state laws governing health care fraud and abuse and the practice of the professions of pharmacy, optical care and nurse practitioner services.
>
> ***For example, in the United States the DEA and various other regulatory authorities regulate the distribution and dispensing of pharmaceuticals and controlled substances. We are required to hold valid DEA and state-level licenses, meet various security and operating standards and comply with the federal and various state controlled substance acts and related regulations governing the sale,***

***dispensing, disposal, holding and distribution of controlled substances. The DEA, FDA and state regulatory authorities have broad enforcement powers, including the ability to seize or recall products and impose significant criminal, civil and administrative sanctions for violations of these laws and regulations.*** We are also governed by foreign, national and state laws of general applicability, including laws regulating matters of working conditions, health and safety and equal employment opportunity and other labor and employment matters, as well as employee benefit, competition, anti-money laundering, antitrust matters and health and wellness related regulations for our pharmacy operations outside of the United States. Changes in laws, regulations and policies and the related interpretations and enforcement practices may alter the landscape in which we do business and may significantly affect our cost of doing business.

***The impact of new laws, regulations and policies and the related interpretations and enforcement practices generally cannot be predicted, and changes in applicable laws, regulations and policies and the related interpretations and enforcement practices may require extensive system and operational changes, be difficult to implement, increase our operating costs and require significant capital expenditures. Untimely compliance or noncompliance with applicable laws and regulations could result in the imposition of civil and criminal penalties that could adversely affect the continued operation of our businesses,*** including: suspension of payments from government programs; loss of required government certifications; loss of authorizations to participate in or exclusion from government programs, including the Medicare and Medicaid programs in the United States; loss of licenses; and significant fines or monetary damages and/or penalties***. Any failure to comply with applicable regulatory requirements in the United States or in any of the countries in which we operate could result in significant legal and financial exposure, damage our reputation, and have a material adverse effect on our business operations, financial condition and results of operations.***

330. Walmart repeated and/or incorporated by reference substantially the same risk factors in the Company's 1Q 2018 10-Q, 2Q 2018 10-Q, 3Q 2018 10-Q, 2018 10-K, 1Q 2019 10-Q, 2Q 2019 10-Q, 3Q 2019 10-Q, and 2019 10-K.

331. The foregoing statements were false and materially misleading when made and omitted to state material facts necessary to make the statements not misleading because the statements represented as hypothetical, risks that had already transpired, namely that because of the Company's decade long failure to comply the CSA and related laws the Company was subject to a targeted DOJ criminal investigation as well as a DOJ civil investigation.

### F. McMillon's and Biggs's False and Misleading Sarbanes-Oxley Certifications

332. Defendants McMillon and Biggs each signed certifications attached at Exhibits to Walmart's 2016 10-K, 2017 10-K, 2018 10-K and 2019 10-K as well as each Class Period 10-Q pursuant to Sections 302 and 906 of the Sarbanes Oxley Act ("SOX Certifications").

333. McMillon's and Biggs' SOX 302 certifications state:

I have reviewed this Annual Report on Form 10-K of Wal-Mart Stores, Inc. (the "registrant");

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a) designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b) designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c) evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report, based on such evaluations; and

d) disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting.

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the Audit Committee of registrant's Board of Directors:

a) all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b) any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting

334. McMillion's and Biggs SOX 906 certification states:

1. The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended; and

2. The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company as of the dates and for the periods expressed in the Report.

335. McMillon's and Biggs's SOX certifications in each of Walmart's Class Period 10-K's and 10-Q's were false and misleading because: a) McMillon and Biggs were aware of the fraud involving Walmart's longstanding CSA violations which subjected the Company to criminal and civil liability and reputational damage and had not disclosed it to Walmart's outside auditors; b) McMillon and Biggs were aware that the financial statements did not fairly present in all material respects the financial condition of the Company because the Company did not disclose a material loss contingency related to the Government Investigations as ASC 450 required; (c) failed to disclose contemplated and pending material legal proceedings related to Walmart's illegal distribution and sale of opioids; and (d) the Class Period 10-K's and 10-Q's contained untrue facts/omitted material facts concerning the risks and uncertainties the Company faced as a result of its CSA violations.

**THE TRUTH BEGINS TO EMERGE**

336. On March 25, 2020, before the market opened, the journalism outlet *ProPublica* published an article disclosing for the first time that the Department of Justice had been criminally investigating Walmart for violating the CSA and related laws sales since 2016. The *ProPublica* article was based on hundreds of internal Walmart documents and investigative documents, correspondence Walmart exchanged with the DOJ, and nine people "familiar with the investigation." The article attached correspondence from Walmart's top lawyer at Jones Day evidencing that in March 2018 Defendants became aware that the DOJ intended to indict the Company and remained the subject of an ongoing DOJ civil investigation. The article also revealed that Walmart entered a secret settlement with the DEA in 2011 (the 2011 MOA) in which it agreed to implement measures to comply with the CSA, and that Walmart had received more than 50 "Letters of Admonition" from the DEA from 2000 to 2018 for its opioid prescribing practices. The article further revealed that Walmart did not comply with the 2011 MOA, prompting the DOJ to pursue criminal charges against the Company.

337. On this news shares of Walmart fell nearly 5%, or $5.63 per share from its closing price of $115.03 on March 24, 2020 to its close at $109.40 on March 25, 2020.

338. *ProPublica*'s expose shocked not only investors but members of Congress. On April 2, 2020, Senator Dianne Feinstein sent a letter to Attorney

General William Barr questioning why high-ranking DOJ officials prevented federal prosecutors from bringing criminal charges against Walmart. Senator Feinstein's letter states, in part:

> This letter requests additional information regarding the Department of Justice's efforts to ensure that pharmacies are not helping fuel the opioid epidemic by filling prescriptions under suspicious circumstances.
>
> **
>
> ***In 2011*, a DEA investigation found that a Walmart pharmacy in California had repeatedly filled opioid prescriptions from unlicensed doctors. *In response, Walmart signed a Memorandum of Agreement with the DEA in which it pledged to implement procedures to guard against improper opioid dispensing*.** [ProPublica, March 25, 2019; DEA-Walmart Memorandum of Agreement March 17, 2011]
>
> ***New reporting indicates that despite this agreement, officials at Walmart's corporate headquarters refused to let the company's pharmacists block prescriptions from doctors believed to be operating "pill mills,"* including prescriptions that led to drug overdose deaths of customers in Texas. *Rather than empowering its pharmacists to cut off prescriptions from problematic doctors, the company reportedly decided that "driving sales and patient awareness is a far better use of our Market Directors and Market manager's time*.**" [ProPublica, March 25, 2019]
>
> ***After a two-year investigation, federal prosecutors in the U.S. Attorney's Office for the Eastern District of Texas informed Walmart that they planned to indict the company for violating the Controlled Substances Act*. They were reportedly overruled, however, after Walmart appealed to high-ranking Justice Department political appointees**. [ProPublica, March 25, 2019]
>
> ***It is important to understand why the U.S. Attorney's Office was overruled in this case, particularly because the acting DEA director supported bringing charges***. Notably, it appears that the Justice Department decided not to pursue charges despite the fact that it had

> established a Prescription Interdiction & Litigation Task Force designed to "use all criminal and civil tools at its disposal to hold distributors such as pharmacies, pain management clinics, drug testing facilities, and individual physicians accountable for unlawful actions." [DOJ Press Release, Feb. 27, 2018]

339. On December 22, 2020, while the market was open, the DOJ announced in a press release that it had filed a lawsuit against Walmart for its alleged violations of the Controlled Substances Act and the Company's role in the opioid epidemic. The DOJ press release stated, in pertinent part:

> In a civil complaint filed today, the Department of Justice has alleged that Walmart Inc. unlawfully dispensed controlled substances from pharmacies it operated across the country and unlawfully distributed controlled substances to those pharmacies throughout the height of the prescription opioid crisis.
>
> The complaint alleges that this unlawful conduct resulted in hundreds of thousands of violations of the Controlled Substances Act (CSA). ***The Justice Department seeks civil penalties, which could total in the billions of dollars, and injunctive relief.***
>
> "It has been a priority of this administration to hold accountable those responsible for the prescription opioid crisis. As one of the largest pharmacy chains and wholesale drug distributors in the country, Walmart had the responsibility and the means to help prevent the diversion of prescription opioids," said Jeffrey Bossert Clark, Acting Assistant Attorney General of the Civil Division. ***"Instead, for years, it did the opposite — filling thousands of invalid prescriptions at its pharmacies and failing to report suspicious orders of opioids and other drugs placed by those pharmacies. This unlawful conduct contributed to the epidemic of opioid abuse throughout the United States. Today's filing represents an important step in the effort to hold Walmart accountable for such conduct."***
>
> "We entrust distributors and dispensers with the responsibility to ensure controlled substances do not fall into the wrong hands," said Drug Enforcement Administration (DEA) Acting Administrator Timothy Shea. "When processes to safeguard against drug diversion are

violated or ignored, or when pharmacies routinely fill illegitimate prescriptions, we will hold accountable anyone responsible, including Walmart. Too many lives have been lost because of oversight failures and those entrusted with responsibility turning a blind eye."

The result of a multi-year investigation by the department's Prescription Interdiction & Litigation (PIL) Task Force, the complaint filed in the U.S. District Court for the District of Delaware alleges that Walmart violated the CSA in multiple ways as the operator of its pharmacies and wholesale drug distribution centers. ***The complaint alleges that, as the operator of its pharmacies, Walmart knowingly filled thousands of controlled substance prescriptions that were not issued for legitimate medical purposes or in the usual course of medical practice, and that it filled prescriptions outside the ordinary course of pharmacy practice. The complaint also alleges that, as the operator of its distribution centers, which ceased distributing controlled substances in 2018, Walmart received hundreds of thousands of suspicious orders that it failed to report as required to by the DEA. Together, the complaint alleges, these actions helped to fuel the prescription opioid crisis.***

If Walmart is found liable for violating the CSA, it could face civil penalties of up to $67,627 for each unlawful prescription filled and $15,691 for each suspicious order not reported. The court also may award injunctive relief to prevent Walmart from committing further CSA violations.

"For years, Walmart failed to meet its obligations in distributing and dispensing dangerous opioids and other drugs," said Deputy Assistant Attorney General Daniel J. Feith of the Civil Division's Consumer Protection Branch. "We look forward to advancing this case with our DOJ partners."

"The opioid crisis has exacted a catastrophic human toll upon the residents of our district and upon our country," said U.S. Attorney for the Middle District of Florida Maria Chapa Lopez. "National pharmacy chains must meet their legal obligations when dispensing and distributing these powerful medications. The filing of this complaint in collaboration with the Department of Justice and other United States Attorneys' Offices demonstrates our firm commitment to enforcing these critical legal requirements."

> ***"As a pharmacy that fills prescriptions for controlled substances, Walmart has an obligation to fill only those prescriptions that are legitimate***," said Acting U.S. Attorney for the Eastern District of New York Seth D. DuCharme. "As a wholesale drug distributor, Walmart also had an obligation to notify DEA of suspicious orders of controlled substances. ***Walmart failed to comply with both of its obligations, and thereby failed in its responsibility to prevent the diversion of controlled substances."***
>
> ***"Today's complaint is the culmination of a painstaking investigation by my office and our Department of Justice colleagues that uncovered years of unlawful conduct that did untold damage to communities around the country, including here in Colorado," said U.S. Attorney for the District of Colorado Jason R. Dunn. "We look forward to pursuing justice and holding the company accountable for its conduct."***
>
> (Emphasis added.)

340. The DOJ Complaint revealed to investors that despite the Investigations, and despite Walmart's awareness of its CSA violations, Walmart's non-compliance with the CSA continued until *at least* December 22, 2020. The DOJ Complaint further revealed the breadth and scope of Walmart's CSA violations and the enormous liability it faced in connection with the suit.

341. On this news, Walmart's stock price fell $2.75 per share, or 1.88%, over the next two trading days to close at $144.20 per share on December 23, 2020.

## ADDITIONAL SCIENTER ALLEGATIONS

342. The facts set forth above, when viewed holistically and together with the other allegations in this Complaint support a strong inference that each of the Defendants knew or were severely reckless in not knowing that each of the

misrepresentations and omissions alleged herein were materially false and misleading at the time they were made.

343. At all relevant times, each of the Defendants knew of the existence of the Government Investigations. In addition, it is inconceivable that each of the Defendants did not know of the 2011 MOA given that it was a settlement that was national in scope and bound the entire company, was signed by Walmart senior leadership and would have had to be approved by Walmart's senior leadership. Further, by at least June 2014, according to the June 2014 PSW, each of the Defendants knew that Walmart lacked a nationwide suspicious order monitoring program, as required by the CSA and 2011 MOA- which was an "existing risk," and that the "events or conditions underlying the Risk [i.e. the absence of a SOM program] will occur," leading to a "severe" risk of "financial or reputational impact to the Company[,], which included "fraudulent activities" and "reputational risk." Accordingly, each of the Defendants knew or recklessly disregarded that the Investigations were material to investors because they would invariably uncover Walmart's CSA violations. Each of the Defendants therefore knew or recklessly disregarded that their statements and omissions concerning Walmart's potential material liabilities, material loss contingencies, opioid stewardship program and the risks to Walmart's pharmacy business were false and materially misleading to

investors at the time they were made. In addition to the facts discussed above, the following facts further support a strong inference of the Defendants' scienter.

### A. The Complaint Pleads a Strong Inference of Scienter as to Defendant McMillon

344. As the MDL Court found, Defendant McMillon has personal knowledge of Walmart's opioid policies and the Criminal Investigation into Walmart. In October 2016 McMillon asked his friend, who had lost a son to opioids what Walmart could to help his mission of combatting opioid abuse. McMillon emphasized that he was serious and emailed Walmart executives his friend's suggestions. Defendant McMillon was therefore highly attuned to the opioid crisis and was personally focused Walmart's opioid compliance policies.

345. Defendant McMillon provided input into and was required to approve the Company's July 26, 2018 presentation to the DOJ in the face of Walmart's anticipated indictment, demonstrating his knowledge of and involvement in the Criminal Investigation, as well as the gravity of the Investigation.

346. Defendant McMillon was a member of Walmart's Ethics, Compliance and Risk Committee which oversees Walmart's ethics and compliance matters and makes recommendations about identifying, monitoring and mitigating compliance risks. As a member of Walmart's Ethics, Compliance and Risk Committee Defendant McMillon would have received the documents from Walmart's

compliance department referenced in the DOJ Complaint detailing Walmart's CSA violations.

347. In February 2018 Walmart hired Rachel Brand, who left the DOJ, as its Chief Ethics and Compliance Officer. Brand reported directly to Defendant McMillon. A July 29, 2018 e-mail produced in the Opioid MDL (*infra* ¶347) states Rachel Brand was in charge of a project to make red-flag information accessible to all pharmacists- something that Walmart should have done years prior in order to comply with the CSA. Defendant McMillon would have been made aware of this- had he not been already- through Brand.

348. Defendant McMillon also signed each of Walmart's quarterly and annual reports filed with the SEC during the Class Period and signed SOX certifications attesting to the accuracy of the information, *inter alia*, in Walmart's quarterly and annual reports. Each misstatement in this case (with the exception of one) was contained in an SEC filing signed by Defendant McMillon stating that it did not contain any untrue statement of material fact. Given McMillon's knowledge of any easy access to information showing the falsity of the statements alleged herein, McMillon was, at a minimum, reckless in signing them.

**B. The Complaint Pleads a Strong Inference of Scienter as to Defendant Biggs**

349. Defendant Biggs was a member of Walmart's Ethics, Compliance and Risk Committee which oversees Walmart's ethics and compliance matters and makes recommendations about identifying, monitoring and mitigating compliance risks. As a member of Walmart's Ethics, Compliance and Risk Committee Defendants Biggs would have received the documents from Walmart's compliance documents referenced in the DOJ Complaint detailing Walmart's CSA violations.

350. As Walmart's CFO, Defendant Biggs signed each Walmart 10-K and 10-Q and SOX certification during the Class Period. As CFO it was Defendant Biggs's job to review and assess the accuracy of the Company's statements concerning disclosure of material liabilities and loss contingencies because they were part of Walmart's financial statements. It is inconceivable that Defendant Biggs was unaware of the Investigations. Defendant Biggs also received the June 2014 PSW, and any minimal level of due diligence would have uncovered Walmart's CSA violations and therefore the fact that the Investigations posed a material liability to Walmart and were required to be disclosed to investors. Accordingly, Defendant Biggs was, as minimum, reckless when he signed the filings containing the misstatements and material omissions and the SOX certifications accompanying them.

### C. MDL Court's Summary Judgment Opinion, the Jury Verdict, and the Abatement Order Supports Scienter

351. On January 27, 2020 the MDL Court denied Walmart's motion for summary judgment stating that "the record evidence suggests obvious deficiencies [in Walmart's opioid suspicious order monitoring] that a layperson could plainly recognize." The MDL Court's recognition of the obviousness of Walmart's failure to comply with the CSA's requirement to have a functioning SOM program supports an inference of scienter.

352. After a six-week trial, on November 23, 2021 the jury in the first bellwether trial in the Opioid MDL found Walmart guilty of creating a public nuisance in connection with the dispensing and distribution of opioids. Following the guilty verdict Walmart engaged in failed attempts to have the jury verdict overturned and/or have the case retried. After extensive briefing on F.R.C.P. 59 and 60 motions, the MDL Court concluded that: (1) the verdict was supported by the weight of the evidence (2) defendants were not entitled to a new trial. The core facts the Opioid MDL plaintiffs alleged and proved are the same core facts that formed the basis for the Government's case against Walmart, and dated all the way back to the 2011 MOA.

353. In the Abatement Order the MDL Court held that because "the evidence presented in the Phase I trial ***overwhelmingly*** demonstrated that

Defendants' underlying dispensing conduct was both ***knowing and intentional.***" Walmart's share of the penalty is $216,866,667. Further, the MDL Court specifically found that Walmart's wrongful conduct was ***ongoing***, stating that "the ongoing, unreasonable interference with public health in this case is complicated and multi-faceted, and consists of both Defendants' ongoing conduct and the resulting nuisance-causing conditions. The MDL Court issued an injunction requiring, among other things, Walmart to have a Chief Controlled Substance Compliance Officer for a period of 15 years.

354. The egregiousness of Walmart's CSA violations and the fact that they went on for over a decade and are ongoing demonstrates that Defendants must have been aware of them and, correspondingly, aware of the risks the Investigations posed to the Company.

### D. Walmart's Efforts to Withhold Evidence and Improperly Interfere with the Investigations Supports Scienter

355. Walmart's attempt to withhold evidence concerning Defendants' knowledge of the DOJ Investigation supports an inference of scienter. The MDL Court sanctioned Walmart for failing to produce the PowerPoint slides Walmart presented to the DOJ as well as documents related to alleged corporate mismanagement. The MDL Court found that: "Walmart's excuses for not timely producing this discovery require convoluted or illogical understandings of the

Court's clear and repeated messages to the parties. ***It is vexatious for Walmart to reach and pretend to see exceptions where none exist, and then use these phantom exceptions as a means to delay or avoid complying with clear Court Orders***. The MDL Court further noted Walmart's repeated attempts to cabin discovery stating: "Defendants' obligation has been set forth with clear language for three years, and ***the Court has rejected each attempt since by Defendants to suggest the obligation should be constrained***. That Walmart is willing to engage in sanctionable discovery misconduct rather than produce relevant evidence pursuant to a clear court order demonstrates its continued desire to conceal its illegal acts.

356. Walmart also withheld evidence from government prosecutors in connection with the DOJ Investigation. As *ProPublica* reported, according to prosecutors Walmart did not cooperate with the investigation. Notably, Walmart refused to produce emails between the Company's senior management and compliance officials.

357. Walmart's improper interference with the Investigations additionally supports an inference of scienter. Walmart successfully delayed federal prosecutor's case against it by improperly appealing to high-level officials in the DOJ. Joshua Russ resigned on October 25, 2019 in disgust and protest of Walmart's improper interference. Russ stated in his resignation letter that Walmart "abused the

Department's fairness, largely ignored our subpoena, and scoffed at our larger work on behalf of all Americans."

358. The day Russ resigned he filed a confidential whistleblower complaint with the DOJ's inspector general alleging interference by the DOJ's political leaders, stating that they blocked prosecutors' efforts to obtain key evidence and provided special treatment to Walmart.

**E. Walmart's Inconsistent Representations Concerning the Status of the DOJ's Criminal Investigation Supports Scienter**

359. According to Walmart's own representations to at least one court, the DOJ's criminal investigation into Walmart remained opened through at least October 2020. According to Walmart's October 2020 representations to the Circuit Court of Kanawha County, West Virginia in *In re Opioid Litigation*, Civil Action No. 19-C-9000, the DOJ's criminal investigation into Walmart continued even after the declination. In an October 20, 2020 order compelling Walmart to produce documents related to government investigations the West Virginia court chastised Walmart for its inconsistent positions concerning the status of the DOJ's criminal investigation. The court stated: "Plaintiffs point out that although ***Walmart represents to this Court that the DOJ's criminal investigation into it is ongoing***, Walmart has represented to at least one court that the investigation finished without an indictment issuing. Walmart's inconsistent representations to this Court and

others concerning the status to the DOJ's criminal investigation into it is concerning, to say the least."

### F. Defendants' Motive Supports Scienter

360. Opioids were a major driver of customer traffic to Walmart stores. Walmart operated its pharmacies to draw customers in to buy other non-pharmacy goods and specifically offered drastic discounts on opioids to drive customer traffic to its stores. Walmart's fiscal year 2017 annual report states that risks to its pharmacy business could "result in the loss of cross-store or club selling opportunities, and in turn, adversely affect our overall net sales, other results of operations, cash flows and liquidity."

361. To attract pharmacy customers to its stores, Walmart collaborated with McKesson to make trial offers, savings cards, and e-coupons to promote discount opioids. Walmart also agreed to partner on direct mail campaigns to sell Butrans on behalf of Purdue Pharma, using Walmart's prescription data to reach prior buyers of these products to encourage them to seek more prescriptions.

362. Walmart's pharmacy incentive plan provided bonus payments to pharmacists based on the number of prescriptions filled regardless of whether the prescriptions were for controlled substances.

363. Defendants' motive to drive sales by attracting customers to Walmart who filled prescriptions for opioids and could do so without question supports an

inference of scienter. Indeed, the DOJ stated in its complaint that Walmart intentionally failed to comply with the law in order to avoid the burden and expense of compliance and also to drive customer traffic to it stores to increase sales of non-pharmacy products. In short, the DOJ alleged ***"Walmart substantially benefitted[ itself* while increasing the risk of undetected unlawful conduct and serious widespread harm to Americans in the midst of a nationwide prescription drug abuse epidemic.***

**G. Walmart's Actions in Connection with its Membership in the National Association of Chain Drug Stores Supports Scienter**

364. The Opioid MDL Plaintiffs alleged that the "Distributor Defendants" (consisting of companies that distributed opioids) were members of the Healthcare Distribution Alliance ("HDA") and that the "Pharmacy Defendants" (which includes Walmart) the Distributor Defendants were members of the National Association of Chain Drug Stores ("NACDS").

365. The Opioid MDL Plaintiffs alleged that Walmart and other members used the HDA and NACDS to protect the supply chain of opioids through various means, including: (1) Drafting a "best practices" model for dealing with "suspicious orders," better known as the Industry Compliance Guidelines ("ICGs"), as a ruse to avoid regulatory enforcement; (2) Coordinating to invalidate enforcement actions; (3) Coordinating to fight the stricter controls for hydrocodone combination products

and (4) Circumventing the DEA through the creation of a coalition on controlled substances that aimed to limit the scope of DEA restrictions on their continued distribution of controlled substances.

366. In denying Walmart and the other MDL Defendants' summary judgment motions on plaintiffs' civil conspiracy claims Judge Polster held that the evidence showed that the Pharmacy Defendants: (i) used their membership and leadership positions in NACDS and their relationship with Distributor Defendants to "grow and protect the Opioid Supply Chain," (ii) coordinated with Distributor Defendants to form a "coalition" on controlled substances to limit the scope of DEA regulations on the distribution of controlled substances, and (iii) worked "in partnership" with the HDA to develop "solutions to the DEA enforcement issues" and "strategies" concerning "ongoing problems that NACDS members are having with DEA enforcement actions."

### H. Walmart's Hiring of a Former Top-Ranking DOJ Official During the Height of the DOJ Investigation Supports Scienter

367. On February 9, 2018 Walmart hired Rachel Brand at the Company's chief ethics and compliance officer ("CECO"). According to Walmart's press release announcing her appointment, Brand was "responsible for the organization's Legal [and] Global Ethics and Compliance and Global Investigation, Security." Brand reported directly to Defendant McMillon. Prior to joining Walmart Brand

was the third ranking top official at the DOJ. Brand resigned from the DOJ specifically to take a job at Walmart. According to news reports, Brand's departure from the DOJ caught top DOJ members by surprise. Walmart's hiring of a former top ranking DOJ official during the pendency of the Government Investigations DOJ's criminal investigation demonstrates Defendants' desire to influence the investigation so that they could continue to conceal the Investigations from investors and attempt to quash the Investigations through improper means. Walmart's hiring of Brand supports an inference of scienter.

## LOSS CAUSATION/ECONOMIC LOSS

368. As a result of Defendants' materially false or misleading statements, Walmart's stock was artificially inflated throughout the Class Period. Like other members of the Class who purchased at artificially inflated prices during the Class Period, Investors suffered an economic loss, i.e., damages, when the trading price of Walmart's common stock declined upon the disclosures that corrected Defendants' alleged false or misleading statements.

369. The damages suffered by Investors and other members of the Class were a direct result of Defendants' misrepresentations, which artificially inflated the price of Walmart's common stock, and the subsequent significant declines in the value of Walmart's stock once the truth regarding the Government Investigations and Walmart's CSA violations were revealed to the market in a series

to two partial corrective disclosures, correcting the misrepresentations and/or the economic impact thereof.

370. On March 25, 2020 before the market opened, the investigative journalism news source *ProPublica* published an article disclosing, for the first time, material information previously unknown to the public, including:

> -Walmart had received more than 50 "Letters of Admonition" from the DEA for its prescribing practices from 2000-2018;
>
> -Walmart entered into a "secret settlement," the 2011 MOA, with the DEA in March 2011;
>
> -Even during the time Walmart was under the 2011 MOA Walmart's compliance department tolerated Walmart's CSA violations. For example, Walmart's internal emails demonstrated that Walmart internally tracked certain doctors, yet Brad Nelson and other members of the compliance department ignored these complaints and demanded that pharmacists and employees focus on increasing sales rather than comply with the CSA;
>
> -the DOJ in EDTX had intended to criminally indict Walmart, but Walmart took steps to quash the indictment by improperly influencing DOJ officials in Washington, D.C.;
>
> -EDTX DOJ had been conducting a civil investigation of Walmart concerning its potential CSA violations.

371. On this news shares of Walmart fell nearly 5%, or $5.63 per share from its closing price of $115.03 on March 24, 2020 to its close at $109.40 on March 25, 2020, damaging investors.

372. On December 22, 2020, while the market was open, the DOJ announced in a press release that it had filed a lawsuit against Walmart for alleged

violations of the Controlled Substances Act and the Company's role in the opioid epidemic. The DOJ Complaint revealed to investors that despite the Investigations, and despite Walmart's awareness of its CSA violations, Walmart's non-compliance with the CSA continued until *at least* December 22, 2020. The DOJ Complaint further revealed the breadth and scope of Walmart's CSA violations and the enormous liability it faced in connection with the suit.

373. On this news, Walmart's stock price fell $2.75 per share, or 1.88%, over the next two trading days to close at $144.20 per share on December 23, 2020, damaging investors.

374. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common shares, Investors and other Class members have suffered significant losses and damages.

## APPLICABILITY OF PRESUMPTION OF RELIANCE:

### Fraud-on-the-Market Doctrine

375. Investors are entitled to rely, and will rely, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

a. Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

b. the omissions and misrepresentations were material;

c. Walmart common stock is traded in an efficient market;

d. the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of Walmart common stock; and

e. Investors and members of the Class purchased, acquired and/or sold Walmart common stock between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

376. At all relevant times, the market for Walmart common stock was an efficient market for the following reasons, among others:

(a) Walmart's common stock 500.com's met the requirements for listing, and were listed and actively traded on the NYSE, a highly efficient and automated market;

(b) According to the Company's 2019 Form 10-K, the Company had more than 2.8 billion shares of common stock outstanding as of March 18, 2020, demonstrating a very active and broad market for Walmart common stock;

(c) As a regulated issuer, Walmart filed periodic reports with the SEC;

(d) Walmart regularly communicated with public investors via established communication mechanisms, including the regular dissemination of press releases on national circuits of major newswire services, the Internet, and other wide-ranging public disclosures;

(e) During the Class Period at least 25 stock market analysts followed Walmart and wrote hundreds of reports on Walmart during the Class Period. Analysts covering Walmart included Citigroup, Deutsche Bank, Morgan Stanley and RBC.

(f) Unexpected material news about Walmart was rapidly reflected and incorporated into the Company's common stock price during the Class Period. For example, when *ProPublica* published its expose revealing the DOJ Investigation, Walmart's common stock price fell a material amount.

377. As a result of the foregoing, the market for Walmart promptly digested current information regarding Walmart from all publicly available sources and reflected such information in Walmart's common stock price. Under these circumstances, all purchasers of Walmart common stock during the Class Period suffered similar injury through their purchase of Walmart common stock at artificially inflated prices, and a presumption of reliance applies

## Affiliated Ute

378. Neither Investors nor the Class need prove reliance – either individually or as a class because under the circumstances of this case, positive proof of reliance is not a prerequisite to recovery, pursuant to ruling of the United States Supreme Court in Affiliated Ute Citizens of Utah v. United States, 406 U.S. 128 (1972). All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered the omitted information important in deciding whether to buy or sell the subject security.

## INVESTORS' CLASS ACTION ALLEGATIONS

379. Investors bring this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all persons who purchased Walmart common stock during the Class Period and who were damaged thereby. Excluded from the Class are Defendants, the officers and directors of the Company at all relevant times, members of their immediate families

and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

380. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Walmart common stock was actively traded on the NYSE. While the exact number of Class members is unknown to Investors at this time and can only be ascertained through appropriate discovery, Investors believe that there are at least thousands of members in the proposed Class. Members of the Class may be identified from records maintained by Walmart or its transfer agent and may be notified of the pendency of this action by mail, using a form of notice customarily used in securities class actions.

381. Investors' claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

382. Investors will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

383. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b) whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Walmart;

(c) whether the Individual Defendants caused Walmart to issue false and misleading statements during the Class Period;

(d) to what extent the members of the Class have sustained damages and the proper measure of damages.

384. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to redress individually the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## NO SAFE HARBOR

385. The false and misleading statements alleged herein were not forward-looking. To the extent any of the alleged false and misleading statements were forward-looking, the federal statutory safe harbor for forward-looking statements under certain circumstances does not apply. Many of the specific statements alleged were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary

statements accompanying them. To be meaningful, cautionary statements must identify important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Such cautions were absent from Walmart's Class Period filings and oral disclaimers.

386. Alternatively, to the extent that the statutory safe harbor could apply to any forward-looking statements pleaded herein, Defendants are liable for those false and misleading forward-looking statements because, at the time each of those forward-looking statements were made, the speaker knew that the particular forward-looking statement was false or misleading and the forward-looking statement was authorized and approved by an executive officer of Walmart who knew that those statements were false or misleading when made. Moreover, to the extent that Defendants issued any disclosures designed to warn or caution investors of certain risks, those disclosures were also false and misleading.

## COUNT I

### Violations of Section 10(b) And Rule 10b-5 Promulgated Thereunder Against All Defendants

387. Investors repeat and reallege each and every allegation contained above as if fully set forth herein.

388. This Count is asserted against Defendants is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

389. During the Class Period, Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

390. Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

- employed devices, schemes and artifices to defraud;
- made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or
- engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Walmart securities during the Class Period.

391. Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of Walmart were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of Walmart, their control over, and/or receipt and/or modification of Walmart's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning Walmart, participated in the fraudulent scheme alleged herein.

392. Individual Defendants, who are the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other Walmart personnel to members of the investing public, including Investors and the Class.

393. As a result of the foregoing, the market price of Walmart securities was artificially inflated during the Class Period. In ignorance of the falsity of

Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of Walmart securities during the Class Period in purchasing Walmart securities at prices that were artificially inflated as a result of Defendants' false and misleading statements.

394. Had Plaintiff and the other members of the Class been aware that the market price of Walmart securities had been artificially and falsely inflated by Defendants' misleading statements and by the material adverse information which Defendants did not disclose, they would not have purchased Walmart securities at the artificially inflated prices that they did, or at all.

395. As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

396. By reason of the foregoing, Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchase of Walmart securities during the Class Period.

## COUNT II

### Violations of Section 20(a) of the Exchange Act Against the Individual Defendants

397. Investors repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

398. During the Class Period, the Individual Defendants participated in the operation and management of Walmart, and conducted and participated, directly and indirectly, in the conduct of Walmart's business affairs. Because of their senior positions, they knew the adverse non-public information about Walmart's misstatement of revenue and profit and false financial statements.

399. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Walmart's financial condition and results of operations, and to correct promptly any public statements issued by Walmart which had become materially false or misleading.

400. Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Walmart disseminated in the marketplace during the Class Period concerning Walmart's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Walmart to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of Walmart within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Walmart securities.

401. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Walmart.

## PRAYER FOR RELIEF

**WHEREFORE**, Investors, on behalf of themselves and the Class, prays for judgment and relief as follows:

(a) declaring this action to be a proper class action, designating certifying Investors as a class representative under Rule 23 of the Federal Rules of Civil Procedure and designating Investors' counsel as Lead Counsel;

(b) awarding damages in favor of Investors and the other Class members against all defendants, jointly and severally, together with interest thereon;

(c) awarding Investors and the Class reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d) awarding Investors and other members of the Class such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Investors hereby demand a trial by jury.

Dated: October 14, 2022

Respectfully submitted,

**FARNAN LLP**

/s/ Michael J. Farnan
Brian E. Farnan (Bar No. 4089)
Michael J. Farnan (Bar No. 5165)
919 N. Market St., 12th Floor
Wilmington, DE 19801
Telephone: (302) 777-0300
Facsimile: (302) 777-0301
Email: bfarnan@farnanlaw.com
mfarnan@farnanlaw.com

*Liaison Counsel for Plaintiffs*

**THE ROSEN LAW FIRM, P.A.**
Laurence Rosen
Phillip Kim
Sara Fuks
275 Madison Avenue, 40th Floor
New York, NY 10016
Telephone: (212) 686-1060
Facsimile: (212) 202-3827
Email: lrosen@rosenlegal.com
pkim@rosenlegal.com

*Lead Counsel for Plaintiffs*