IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

IN RE: WALMART INC.                    Civil Action No. 21-55-CFC
SECURITIES LITIGATION                  CLASS ACTION

Brian E. Farnan, Michael J. Farnan, FARNAN LLP, Wilmington, Delaware; Sara
Fuks, THE ROSEN LAW FIRM, P.A., New York, New York

       *Counsel for Plaintiffs*

Robert W. Whetzel, Raymond J. DiCamillo, John M. O'Toole, RICHARDS,
LAYTON & FINGER, P.A., Wilmington, Delaware; Sean M. Berkowitz, Nicholas
J. Siciliano, LATHAM & WATKINS LLP, Chicago, Illinois

       *Counsel for Defendants*

## **MEMORANDUM OPINION**

April 8, 2024
Wilmington, Delaware

COLM F. CONNOLLY
CHIEF JUDGE

Lead Plaintiff Kim Kengle, as trustee of the Kim K. Kengle 2000 Trust, along with named plaintiff Roseanne Lacy, filed this Class Action against Defendants Walmart Inc., Douglas McMillon, and M. Brett Biggs. A corrected version of the operative Second Amended Complaint (SAC) was filed on May 2, 2023. D.I. 75.

The SAC has two counts. In Count I, Plaintiffs allege that all three defendants violated Section 10(b) of the Securities Exchange Act of 1934 (the Exchange Act), 15 U.S.C. § 78j(b), and Securities Exchange Commission (SEC) Rule 10b-5, 17 CFR § 240.10b-5. D.I. 75 ¶¶ 392–401. In Count II, Plaintiffs allege that McMillon and Biggs violated Section 20(a) of the Exchange Act. D.I. 75 ¶¶ 402–06. Plaintiffs allege that during the Class Period (March 31, 2017– December 22, 2020) Defendants violated these securities laws by failing to timely and completely disclose to investors in thirteen different forms filed with the Securities and Exchange Commission (SEC) that Walmart was the subject of parallel criminal and civil investigations (the Investigations) conducted by the Eastern District of Texas (EDTX) United States Attorney's Office. *See* D.I. 75 ¶¶ 1–7; D.I. 72 at 14. D.I. 68.

Defendants have moved pursuant to Federal Rule of Civil Procedure 12(b)(6) to dismiss the SAC.

## I.    BACKGROUND

The following background is based on the allegations in the SAC and the documents incorporated by reference in the SAC, all of which I must accept as true in deciding the pending motion. *See Umland v. Planco Fin.*, 542 F.3d 59, 64 (3d Cir. 2008).

### A.    The Controlled Substances Act

Although this is a securities class action, much of Plaintiffs' SAC focuses on whether Walmart complied with the Controlled Substance Act (the CSA), 21 U.S.C. §§ 801 *et seq*.

The CSA was enacted to "provide meaningful regulation over legitimate sources of drugs to prevent diversion into illegal channels." D.I. 75 ¶ 58. The Act created a category of drugs—controlled substances—that are strictly monitored because of their high abuse potential. D.I. 75 ¶ 59. Opioid painkillers are categorized as controlled substances, and anyone who "manufactures, distributes, or dispenses" opioid painkillers is required by the CSA to register with the Drug Enforcement Agency (DEA). D.I. 75 ¶ 62.

Distributors and pharmacists are subject to numerous CSA requirements. Distributors must for example identify and report to the DEA suspicious controlled

substance orders that are unusual in size, pattern, or frequency.  D.I. 75 ¶¶ 63, 64.

Pharmacists, before filling controlled substance prescriptions, must look for "red

flags": prescriptions that call for drug combinations that pharmacists know are

dangerous and susceptible to abuse.  If a pharmacist cannot resolve all relevant red

flags, she must refuse to fill the prescription.  D.I. 75 ¶ 69.

The CSA imposes civil penalties for failing to report suspicious orders to the

DEA and for violating the dispensing rules.  D.I. 75 ¶¶ 71, 74.

**B.    The Government's Investigation into Walmart's Opioid Sales and Walmart's Corporate Financial Disclosure Statements**

In addition to selling retail products, Walmart operates approximately 5,000

pharmacies.  D.I. 75 ¶ 8.  Customers can use these pharmacies to fill prescriptions

for controlled substances, including prescription opioids.  D.I. 75 ¶ 9.  Until 2018,

Walmart "self-distributed" these controlled substances to its pharmacies.  D.I. 75

¶ 9.  Thus, Walmart both employed pharmacists and was a controlled substance

distributor.  D.I. 75 ¶ 48.

On December 27, 2007, the DEA sent letters to every registered controlled

substance distributor, including Walmart.  D.I. 75 ¶ 141.  The letters warned

distributors about the dangers of prescription drug abuse.  D.I. 75 ¶ 142.

In 2009, the DEA threatened to revoke a California Walmart pharmacy's

controlled substance registration.  D.I. 75 ¶ 188.  As a result, in March 2011,

Walmart and the DEA entered a "nationwide memorandum of agreement" (the

3

2011 MOA).  D.I.  5 ¶ 189.  The 2011 MOA required Walmart to adopt a program to ensure that it complied with the CSA when Walmart's pharmacists filled controlled substance prescriptions.  D.I. 29 ¶¶ 189, 191.  Although the 2011 MOA was created because of concerns relating to a specific California pharmacy, it applied to every Walmart pharmacy.  D.I. 75 ¶ 192.  The MOA expired in March 2015.  D.I. 75 ¶ 190.

In October 2013, Walmart created a document titled "Controlled Substance Risk Assessment: Executive Summary" (CSRA).  D.I. 75 ¶ 145.  That document "stated that Walmart had not '[d]esigne[d] & operate[d] a system [sic] to detect suspicious orders and report them to the DEA when discovered.'"  D.I. 75 ¶ 145 (quoting CSRA) (alterations in the original).  Although the CSRA "recognized that it was necessary to create and operate such a system to 'meet obligations of [the 2011] MOA,'" the CSRA "did not contain an expected date for such a system." D.I. 75 ¶ 145 (quoting CSRA).

In June 2014, Walmart's Health and Wellness Department created a "Portfolio Scoring Worksheet, Suspicious Order Monitoring" (2014 PSW).  D.I. 75 ¶ 149.  The 2014 PSW was designed to assess the effectiveness of Walmart's suspicious monitoring program.  D.I. 75 ¶ 150.  According to the 2014 PSW, because of Walmart's insufficient suspicious order monitoring systems, Walmart faced a "severe" risk of "potential financial or reputational impact."  D.I. 75 ¶ 150.

The 2014 PSW also stated that Walmart's suspicious order monitoring was "related to a settlement [or] agreement with a Government Agency" and was "Board informed."  D.I. 75 ¶ 150 (alteration in the original).

In 2015, Walmart's U.S. Compliance Department submitted a proposal to "design and operate a system to identify 'Suspicious Orders' of controlled substances."  D.I. 75 ¶ 152.  That proposal "acknowledged that the Company's suspicious order monitoring program still required immediate and substantial enhancements in order to help Walmart avoid DEA enforcement as a result of non-compliance with the CSA."  D.I. 75 ¶ 152 (alterations and emphasis omitted).  The Compliance Department "requested that a project be performed to modify Walmart's suspicious order monitoring system to allow program enhancements to help Walmart to avoid DEA enforcement as a result of noncompliance with 21 CFR 1301.74(b)[,]" and it noted "that the 'benefits' to be achieved from 'completing this initiative' are 'Compliance with federal law and VAWD accreditation standards.'"  D.I. 75 ¶ 152.

In the summer of 2016, the DEA began investigating two Texas doctors who were prescribing opioids.  D.I. 75 ¶ 202.  On December 7, 2016, the DEA raided a Walmart store and "obtain[ed] records" relating to the Texas doctors.  D.I. 75 ¶ 203.  "Walmart has acknowledged that on December 7, 2016 it learned that the

EDTX DOJ was criminally investigating [Walmart] following the DEA's raid."
D.I. 75 ¶ 204.

In October 2016, Individual Defendant Douglas McMillon spoke with a
friend whose adult son had ended his life after becoming addicted to prescription
opioids. D.I. 75 ¶ 206. McMillon has been Walmart's President and CEO since
2014 and a Walmart director since 2013. D.I. 75 ¶ 38. During the October 2016
conversation, McMillon asked his friend what Walmart could do to help combat
the opioid epidemic. D.I. 75 ¶ 206. McMillon's friend emailed suggestions, and
McMillon forwarded them to other "Walmart executives." D.I. 75 ¶ 207. He also
told his friend that Walmart would begin "throwing technology" at the opioid
epidemic to "monitor prescriptions" and further stated: "if we detect over-
prescribing, we are going to cut them off." D.I. 75 ¶ 207.

In March 2017, an Assistant United States Attorney (AUSA) in the EDTX
U.S. Attorney's Office obtained and served on Walmart a warrant to search
Walmart emails for documents related to certain pharmacists in Texas. D.I. 75
¶ 210.

On March 31, 2017—the first day of the class period—Walmart filed its
2016 10-K statement. D.I. 75 ¶ 293. In that statement, Walmart made the
following representation:

6

> ### *Legal Proceedings*
>
> The Company is involved in a number of legal proceedings.  The Company has made accruals with respect to these matters, where appropriate, which are reflected in the Company's Consolidated Financial Statements.  For some matters, a liability is not probable or the amount cannot be reasonably estimated and therefore an accrual has not been made.  ***However, where a liability is reasonably possible and may be material, such matters have been disclosed.***

D.I. 75 ¶ 294 (emphasis in the original).  Walmart repeated this statement in its 1Q, 2Q, and 3Q 2017 10-Q statements.  D.I. 75 ¶¶ 297–98.  It did not disclose in these filings any information about the 2011 MOA; nor did it say that the EDTX U.S. Attorney's Office was criminally investigating Walmart's CSA practices.  D.I. 75 ¶¶ 294–98.

"Between June 2017 and July 2018, EDTX issued five DEA Administrative subpoenas in connection with its criminal investigation of Walmart."  D.I. 75 ¶ 212.  A second EDTX AUSA later informed Walmart that he was conducting a parallel civil investigation into Walmart's controlled substance dispensing practices.  D.I. 75 ¶ 213.

On December 1, 2017, Walmart filed its 3Q 2017 10-Q.  D.I. 75 ¶ 298.  That filing included Walmart's representation that "where a liability is reasonably possible and may be material, such matters have been disclosed."  Plaintiffs allege

that by this point, Walmart knew that EDTX had launched a parallel civil investigation and was issuing administrative subpoenas.  D.I. 75 ¶ 298.

On March 28, 2018, an EDTX AUSA "informed Walmart of her intention to indict the Company."  D.I. 75 ¶ 215.  Walmart responded by requesting a meeting with federal prosecutors to "resolve any criminal or civil proceedings in one shot[.]"  D.I. 75 ¶ 216.  Walmart requested that EDTX AUSA in charge of the civil investigation attend the meeting.  D.I. 75 ¶ 216.

Two days after the EDTX AUSA informed Walmart of her intent to indict it, on March 30, 2018, Walmart filed its annual 2017 10-K.  D.I. 75 ¶ 299.  Walmart again represented that "where a liability is reasonably possible and may be material, such matters have been disclosed."  D.I. 75 ¶ 300.  Plaintiff alleges that Walmart also added the following statement:

> Unless stated otherwise, the matters discussed below, if decided adversely to or settled by the Company, individually or in the aggregate, may result in a liability material to the Company's financial condition or results of operations.

D.I. 75 ¶ 300 (emphasis omitted).  In addition to other unrelated legal proceedings and investigations, Walmart disclosed multidistrict litigation (MDL) pending in the Northern District of Ohio:

> ### *National Prescription Opiate Litigation*
>
> In December 2017, the United States Judicial Panel on Multidistrict Litigation ordered consolidated numerous

> lawsuits filed against a wide array of defendants by
> various plaintiffs, including counties, cities, healthcare
> providers, Native American tribes, individuals, and third-
> party payors, asserting claims generally concerning the
> impacts of widespread opioid abuse. The consolidated
> multidistrict litigation is entitled *In re National
> Prescription Opiate Litigation (MDL No. 2804)*, and is
> pending in the U.S. District Court for the Northern
> District of Ohio. The Company is named as a defendant
> in some of the cases included in this multidistrict
> litigation, including cases filed by several counties in
> West Virginia; by healthcare providers in Mississippi,
> Alabama, Texas, and Florida; and by the St. Croix
> Chippewa Indians of Wisconsin. Similar cases that name
> the Company have been filed in state courts by various
> counties and municipalities; by health care providers; and
> by various Native American Tribes. The Company
> cannot predict the number of such claims that may be
> filed, and cannot reasonably estimate any loss or range of
> loss that may arise from such claims. The Company
> believes it has substantial factual and legal defenses to
> these claims, and intends to defend the claims vigorously.

D.I 75 ¶ 301 (emphasis omitted). As in its prior statements, Walmart did not

disclose in its 2017 10-K the EDTX AUSA's stated intent to indict Walmart, the

existence of the EDTX investigations, or the 2011 MOA. D.I. 75 ¶ 302.

On May 3 and 4, 2018, EDTX prosecutors, including the EDTX United

States Attorney, met with senior Walmart attorneys. D.I. 75 ¶ 219. During the

meetings, prosecutors said that they would "imminently" indict Walmart, and

Walmart had to pay "$1 billion to resolve the matter civilly." D.I. 75 ¶ 220.

On June 4, 2018, Walmart filed its 1Q 2018 10-Q statement. D.I. 75 ¶ 303.

Once again, Walmart stated that it had disclosed "where a liability is reasonably

possible and may be material," and it also referred to the pending Northern District

of Ohio MDL.  D.I. 75 ¶ 303.  This time, Walmart also included the following

statement:

> The Company has also been responding to subpoenas,
> information requests and investigations from
> governmental entities related to nationwide controlled
> substance dispensing practices involving the sale of
> opioids.  The Company can provide no assurance as to
> the scope and outcome of these matters and no assurance
> as to whether its business, financial condition or results
> of operations will not be materially adversely affected.

D.I. 75 ¶ 303 (emphasis omitted).  Walmart did not disclose in its 1Q 2018 10-Q

the 2011 MOA or the EDTX prosecutors' statement that they would "imminently"

indict Walmart.

Walmart met with Department of Justice (DOJ) officials throughout the

summer of 2018.  D.I. 75 ¶¶ 221–33.  Plaintiffs allege that Individual Defendant

Robert McMillon personally knew about PowerPoint presentations that Walmart

made to DOJ officials during a July 26, 2018 meeting.  D.I. 75 ¶ 227.  Plaintiffs

further allege that McMillon was consulted during the formulation and approval of

Walmart's response to the DOJ investigation.  D.I. 75 ¶ 227.

Despite the EDTX attorneys' earlier statements, on August 31, 2018, the

DOJ informed Walmart that it was declining to criminally prosecute Walmart.

D.I. 75 ¶ 234.  At the same time, the DOJ formed Walmart that it had formed a

working group to investigate Walmart for civil CSA violations, D.I. 75 ¶ 240, and

determine whether criminal charges should be brought against individual Walmart employees, D.I. 75 ¶ 239.

Walmart filed its 2Q 2018 10-Q on September 6, 2018, D.I. 75 ¶ 306; 3Q 2018 10-Q on November 30, 2018, D.I. 75 ¶ 308; 2018 10-K on March 31, 2019, D.I. 75 ¶ 311; 1Q 2019 10-Q on June 7, 2019, D.I. 75 ¶ 310; 2Q 2019 10-Q on September 6, 2019, D.I.75 ¶ 312; and 3Q 2019 10-Q on December 4, 2019, D.I. 75 ¶ 312.  All these filings contained the same relevant disclosures made in Walmart's 1Q 2018 10-Q.  D.I 75 ¶¶ 306, 308, 310, 312.

On March 20, 2020, Walmart filed its 2019 10-K, which repeated the same relevant disclosures as Walmart's 1Q 2018 10-Q.  D.I. 75 ¶ 312.  Walmart also disclosed that it had received grand jury subpoenas from the U.S. Attorney's Office for the Middle District of Pennsylvania for documents relating to Walmart's consumer fraud program and anti-money laundering compliance.  D.I. 75 ¶ 314. Walmart did not disclose any additional information about the civil investigation into Walmart's CSA compliance practices or the new DOJ working group.  D.I. 75 ¶ 315.

Five days later, on March 25, 2020, the journalism outlet *ProPublica* published an article that revealed the civil and criminal investigations into Walmart for potential CSA violations.  D.I 75 ¶ 341.  That "article was based on hundreds of internal Walmart documents and investigative documents, correspondence

Walmart exchanged with the DOJ, and nine people 'familiar with the investigation.'" D.I. 75 ¶ 341.  The same day that the *ProPublica* article was published, Walmart's stock dropped nearly five percent.  D.I. 75 ¶ 342.

On December 22, 2020, the DOJ announced in a press release that it had filed a civil lawsuit against Walmart for alleged CSA violations.  D.I. 75 ¶ 344.  By December 23, 2020, Walmart's stock had fallen by 1.88%.  D.I. 75 ¶ 346.

## II.   LEGAL STANDARDS

### A.   Sections 10(b) and 20(a) of the Securities Exchange Act

Section 10(b) prohibits the "use or employ[ment] in connection with the purchase or sale of any security . . . [of] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe."  15 U.S.C. § 78j(b).  Rule 10b-5—the SEC's corresponding regulation—makes it unlawful:

> (a) To employ any device, scheme, or artifice to defraud,
>
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

To state a claim for securities fraud under Rule 10b-5, a plaintiff "must plead (1) a material misrepresentation or omission, (2) scienter, (3) a connection between the misrepresentation or omission and the purchase or sale of a security, (4) reliance upon the misrepresentation or omission, (5) economic loss, and (6) loss causation." *In re Hertz Glob. Holdings Inc.*, 905 F.3d 106, 114 (3d Cir. 2018); *see also Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341–42 (2005). An individual's liability for fraudulent misrepresentations made in violation of Rule 10b-5 can be imputed to the company that employs the individual. *See Institutional Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242, 251–52 (3d Cir. 2009) ("[L]iability for [employees'] statements, if they were fraudulent, can also be imputed to [their employing company] because 'a corporation is liable for statements by employees who have apparent authority to make them'" (citation and alteration omitted)).

Section 20(a) of the Exchange Act allows a plaintiff to assert a derivative cause of action against individuals who exercise control over a "controlled person," including a corporation, that has violated § 10(b). 15 U.S.C. § 78t(a); *Avaya*, 564 F.3d at 252. To establish a § 20(a) violation, the plaintiff must prove that a third party under the defendant's control violated the Exchange Act and that the defendant was a "culpable participant" in the unlawful conduct. *Belmont v. MB Inv. Partners, Inc.*, 708 F.3d 470, 484 (3d Cir. 2013).

## B.   Rule 12(b)(6) and the Private Securities Litigation Reform Act

When considering a Rule 12(b)(6) motion to dismiss, the court must accept as true all factual allegations in the complaint and view them in the light most favorable to the plaintiffs. *Umland*, 542 F.3d at 64. The court may consider only the allegations in the complaint and the documents incorporated into the complaint by reference and matters of which the court may take judicial notice. *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007).

To state a claim upon which relief can be granted, a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The complaint must include more than mere "labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citation omitted). It must set forth enough facts, accepted as true, to "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). Deciding whether a claim is plausible is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679 (citation omitted).

14

Plaintiffs alleging a securities fraud claim also must satisfy the heightened

pleading standards imposed by the Private Securities Litigation Reform Act

(PSLRA).  15 U.S.C. § 78u-4(b); *see also Avaya*, 564 F.3d at 252–53.  As the

Third Circuit explained in *Avaya*:

> The PSLRA provides two distinct pleading requirements, both of which must be met in order for a complaint to survive a motion to dismiss.  First, under 15 U.S.C. § 78u–4(b)(1), the complaint must "specify each allegedly misleading statement, why the statement was misleading, and, if an allegation is made on information and belief, all facts supporting that belief with particularity."  Second, the complaint must, "with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2).
>
> Significantly, both provisions require facts to be pleaded "with particularity."  As we have explained, this particularity language echoes precisely Rule 9(b). Indeed, although the PSLRA replaced Rule 9(b) as the pleading standard governing private securities class actions, Rule 9(b)'s particularity requirement is comparable to and effectively subsumed by the requirements of § 78u–4(b)(1) of the PSLRA.  This standard requires plaintiffs to plead the who, what, when, where, and how: the first paragraph of any newspaper story.  Section 78u–4(b)(1) adds an additional requirement where "an allegation regarding a defendant's statement or omission is made on information and belief." 15 U.S.C. § 78u–4(b)(1).  In those circumstances, plaintiffs must also state with particularity all facts on which that belief is formed.  That is, when allegations are made on information and belief, the complaint must not only state the allegations with factual particularity, but must also describe the sources of information with

15

> particularity, providing the who, what, when, where and
> how of the sources, as well as the who, what, when,
> where, and how of the information those sources convey.
>
> The PSLRA's requirement for pleading scienter, on the
> other hand, marks a sharp break with Rule 9(b).  Under
> § 78u–4(b)(2), a plaintiff can no longer plead the
> requisite scienter element generally, as he previously
> could under Rule 9(b).  Instead, under the PSLRA's
> "exacting" pleading standard for scienter, any private
> securities complaint alleging that the defendant made a
> false or misleading statement must state with particularity
> facts giving rise to a strong inference that the defendant
> acted with the required state of mind.

564 F.3d at 252–53 (internal quotation marks, citations, footnotes, and alterations

omitted).  A "strong inference" of scienter exists "only if a reasonable person

would deem the inference of scienter cogent and at least as compelling as any

opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S.

at 324.

## III.   DISCUSSION

Defendants argue that the SAC should be dismissed for three reasons.  First,

they say that Defendants' statements in the SEC filings challenged by Plaintiffs

were not false or misleading.  D.I. 69 at 9.  Second, they argue that Plaintiffs have

failed to plead particularized facts that support an inference of scienter.  D.I. 69

at 24.  And third, they say that Plaintiffs did not properly plead loss causation.  D.I.

69 at 32.  I agree with Defendants that the SAC does not allege actionable false or

misleading statements in the challenged SEC filings.  Accordingly, I will grant

16

Defendants' motion and dismiss the SAC. I need not and do not address

Defendants' arguments regarding scienter and loss causation.

Plaintiffs argue that Defendants "were required to disclose the [EDTX U.S.

Attorney's Office criminal and civil] investigations [in the thirteen challenged SEC

filings] to make their existing statements [in those filings] not misleading." D.I. 72

at 15 (some capitalization removed). In Plaintiffs' words:

> Nondisclosure of the Investigations is actionable
> under the securities laws for three separate and
> independent reasons. <u>First</u>, Walmart's Class Period
> quarterly and annual reports spoke on the subject of
> "reasonably possible legal proceedings" that "may be
> material" but failed to disclose the Investigations.
> <u>Second</u>, [Accounting Stands Codification] ASC-450
> required disclosure of the Investigations because: (i) the
> Investigations raised potential material claims and (ii) it
> was reasonably possible the Investigations would result
> in Walmart incurring a material liability. <u>Third</u>, Item 103
> required disclosure of the Investigations because
> Defendants knew that "governmental authorities" were
> contemplating a material legal proceeding by the start of
> the Class Period.

D.I. 72 at 14. I address these arguments in turn.[1]

---

[1] Plaintiffs also argue vaguely and in passing that "Walmart's risk disclosures, that
'any failure to comply with applicable regulatory requirements . . . could result in
significant legal and financial exposure . . .' ([SAC] ¶329) represented as
hypothetical risks that had already transpired." D.I. 72 at 25–26. Plaintiffs appear
to be saying that this risk disclosure (made under [SEC Regulation S-K] Item 105)
was false because "[w]hen Defendants made this statement Walmart already faced
significant legal and financial exposure in connection with the Investigations."
D.I. 72 at 26. Plaintiffs, however, do not dispute Defendants' contentions that Item
105 does not require disclosure of legal proceedings or regulatory enforcement

### 1. Reasonably Possible Liability that Might be Material

Although Plaintiffs state in their briefing that the challenged "quarterly and annual reports spoke on the subject of 'reasonably possible legal *proceedings*,'" D.I. 72 at 14 (emphasis added), in point of fact, Defendants stated in the challenged filings that "where *a liability* is reasonably possible and may be material, such matters have been disclosed," D.I. 69 at 10. (emphasis added). Liability and legal proceedings are, of course, two very different things.

Elsewhere in their briefing, Plaintiffs argue that "Defendants were required to disclose the existence of [the] Investigations to make their existing statements affirming disclosure of all liabilities that may be material not misleading." D.I. 72 at16. But Plaintiffs cite no legal authority for the proposition that being the subject or target of an investigation constitutes "a liability." I therefore agree with Defendants that the nondisclosure of the Investigations in the challenged SEC filings made before the EDTX prosecutors told Walmart it would be indicted did not make the representation "where a liability is reasonably possible and may be material, such matters have been disclosed" false or misleading.

---

actions and does not provide an independent cause of action. *Compare* D.I. 69 at 20 *with* D.I. 72. Accordingly, to the extent Plaintiffs are arguing that Defendants' risk disclosures were false and misleading by not complying with Item 105, I reject that argument.

Defendants do not dispute that Plaintiffs have sufficiently alleged that Defendants were made aware of potential material liabilities when EDTX prosecutors told Walmart in April 2018 that it would be indicted.  D.I. 69 at 11. But Defendants say that Walmart "promptly disclosed the Investigation" in its 1Q 2018 10-Q in June 2018, and that because of that disclosure, Walmart's representation that "where a liability is reasonably possible and may be material, such matters have been disclosed" was neither false nor misleading.  D.I. 69 at 11. I agree.  Defendants made clear in the disclosure that Walmart had "been responding to subpoenas, information requests and investigations from governmental entities related to nationwide controlled substance dispensing practices involving the sale of opioids" and that Walmart could "provide no assurance as to the scope and outcome of these matters and no assurance as to whether its business, financial condition or results of operations will not be materially adversely affected."  D.I. 75 ¶ 303 (emphasis omitted).  Plaintiffs' criticisms of this disclosure for being "vague" and "downplay[ing] the serious problems the Investigations concerned" ignore the fact that the Investigations were ongoing and that the conclusions of the EDTX prosecutors were challenged by Walmart's lawyers and subject to review by DOJ officials who had yet to weigh in and hear from Walmart's lawyers.  D.I. 72 at 21.  Walmart did not downplay the investigations; rather it informed investors that it did not know whether the

investigations of it would have a material effect on its performance and operations. "[A]n investor reads each statement within such a document, whether of fact or of opinion, in light of all its surrounding text, including hedges, disclaimers, and apparently conflicting information." *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 190 (2015).[2] From this disclosure, a reasonable investor would understand that Walmart was responding to investigations and that these investigations could possibly have a material adverse effect on Walmart.

At bottom, no investor could read Walmart's disclosures regarding the Investigations without understanding what was true—namely, that Walmart potentially faced losses if the Investigation resulted in criminal charges or civil claims and that the scope of any such losses was indeterminate. Accordingly, Plaintiffs have not plausibly alleged that nondisclosures by Defendants with respect to the Investigations rendered Walmart's statement that "where a liability is reasonably possible and may be material, such matters have been disclosed" false or misleading.

---

[2] The Third Circuit recently held that "*Omnicare*'s framework for evaluating opinion falsity applies to claims under § 10(b) for violations of Rule 10b-5." *City of Warren Police & Fire Ret. Sys. v. Prudential Fin., Inc.*, 70 F.4th 668, 685 (3d Cir. 2023).

## 2. ASC-450

The Exchange Act gives the SEC the authority to prescribe rules for reporting earnings statements and balance sheets. 15 U.S.C. § 78m(b)(1). The 2002 Sarbanes-Oxley Act permits the SEC to "recognize, as 'generally accepted' for purposes of the securities laws, any accounting principles established by a standard setting body" that meet certain criteria. 15 U.S.C. § 77s(b)(1); Commission Guidance Regarding the Financial Accounting Standards Board's Accounting Standards Codification, 74 Fed. Reg. 42,772-01, 42,772 (Aug. 25, 2009). The SEC in turn recognizes the Financial Accounting Standards Board (FASB) as the entity that establishes and maintains "generally accepted" accounting standards in the United States. Commission Statement of Policy Reaffirming the Status of the FASB as a Designated Private-Sector Standard Setter, 68 Fed. Reg. 23,333-01, 23,333 (May 1, 2003). The FASB establishes and maintains generally accepted accounting principles (GAAP). About the FASB, Fin. Accounting Standards Board. (Accessed May 8, 2024), https://www.fasb.org/about-us/about-the-fasb [https://perma.cc/ZT2Y-NPFF]. GAAP are codified in the Accounting Standards Codification (ASC). Accounting Standards Codification § 105-10-05-1, Fin. Accounting Standards Board (Accessed Apr. 24, 2023), https://fasb.org/page/PageContent?pageId=/reference-library/superseded-standards/summary-of-statement-no-105.html&bcpath=tff

[https://perma.cc/ARK6-YA7J].  SEC Regulation S-X provides that "[f]inancial statements filed with the [SEC] [that] are not prepared in accordance with [GAAP] will be presumed to be misleading or inaccurate . . . unless the [SEC] has otherwise provided."  17 C.F.R. § 210.4-01(a)(1).

One GAAP—ASC 450—governs "contingencies," which are defined as "existing condition[s], situation[s], or set[s] of circumstances involving uncertainty as to possible gain (gain contingency) or loss (loss contingency) that will ultimately be resolved when one or more future events occur or fail to occur." ASC 450-20-20.  A loss contingency can consist of "actual or possible claims" or "pending or threatened litigation."  ASC 450-20-55-10.  ASC 450 requires the disclosure a loss contingency "if there is 'at least a reasonable possibility' that the loss may have been incurred, even if the amount cannot be reasonably estimated." *Sec. & Exch. Comm'n v. RPM Int'l, Inc.*, 282 F. Supp. 3d 1, 19 (D.D.C. 2017) (quoting ASC 450-20-50-3).

In this case, Defendants are correct that under Plaintiffs' own allegations, Walmart could not have known a loss "may have been incurred" until EDTX prosecutors told Walmart at the end of April in 2018 that they intended to indict it. "[S]ecurities laws do not impose an obligation on a company to predict the outcome of investigations."  *In re Lions Gate Ent. Corp. Sec. Litig.*, 165 F. Supp. 3d 1, 12 (S.D.N.Y. 2016).  Until EDTX prosecutors told Walmart of their intent to

indict it, Defendants' opinions about the likelihood of charges or claims resulting

from the investigations would have been purely conjectural.  Defendants therefore

had no obligation under ASC-450 to disclose the existence of the Investigations

before that time.  *See Id.*; *Richman v. Goldman Sachs Grp., Inc.,* 868 F. Supp. 2d

261, 272 (S.D.N.Y. 2012) ("An investigation on its own is not a 'pending legal

proceeding' until it reaches a stage when the agency or prosecutorial authority

makes known that it is contemplating filing suit or bringing charges.").

As noted above, once EDTX prosecutors informed Walmart that they

intended to indict it, Walmart disclosed to its investors that Walmart did not know

whether the investigations would have a material effect on its performance and

operations.  Plaintiffs argue that this disclosure was inadequate because Walmart

failed to say whether the "Investigations were Federal criminal and civil

investigations."  D.I. 72 at 21.  But Plaintiffs do not cite to a single case that states

that a company has an obligation, under ASC 450 or otherwise, to disclose this

level of detail in a corporate disclosure statement.  On the contrary, "[a]ccountants

long have recognized that [GAAP] are far from being a canonical set of rules that

will ensure identical accounting treatment of identical transactions.  [GAAP],

rather, tolerate a range of 'reasonable' treatments, leaving the choice among

alternatives to management."  *Thor Power Tool Co. v. Comm'r*, 439 U.S. 522, 544

(1979) (citation omitted).  That is why "[w]here statements about GAAP

compliance are concerned, courts have deemed them to be opinions. This is so because GAAP standards are often subjective. They involve a range of possible treatments instead of a single objective set of calculations." *In re Hertz Glob. Holdings, Inc. Sec. Litig.*, 2017 WL 1536223, at *11 (D.N.J. Apr. 27, 2017) (citation omitted), *aff'd sub nom. In re Hertz Glob. Holdings Inc*, 905 F.3d 106 (3d Cir. 2018). Opinion statements like ASC 450 are only "actionable under the securities laws if they are not honestly believed and lack a reasonable basis." *City of Edinburgh Council v. Pfizer, Inc.*, 754 F.3d 159, 170 (3d Cir. 2014) (citation omitted). Here, however, Plaintiffs allegations do not suggest that Walmart did not believe that its disclosures were adequate or lacked a reasonable basis.

Accordingly, Plaintiffs have not pleaded with sufficient particularity that Walmart's Class Period disclosure statements violated ASC 450.

### 3. SEC Regulation S-K Item 103

Plaintiffs allege that Walmart "violated the affirmative disclosure obligations [SEC Regulation S-K] Item 103 imposes by failing to disclose the [EDTX] Investigations in Walmart's Class Period SEC filings *because the Investigations were material legal proceedings* known to be contemplated by a governmental authority." D.I. 75 ¶ 325 (emphasis added). Item 103 requires the disclosure in SEC filings of "any material pending legal proceedings, other than ordinary routine litigation incidental to the business," and "any such proceedings

24

known to be contemplated by governmental authorities." 17 C.F.R. § 229.103.

Investigations, however, are not "legal proceedings" under Item 103. *City of*

*Westland Police & Fire Ret. Sys. v. MetLife, Inc.*, 928 F. Supp. 2d 705, 718

(S.D.N.Y. 2013); *see also United States v. Crop Growers Corp.*, 954 F. Supp. 335,

347 (D.D.C. 1997) (holding that Item 103 "does not require the disclosure of

uncharged criminal conduct"). Thus, Defendants had no obligation under Item 103

to disclose the EDTX Investigations in the challenged SEC filings.

I note, finally, that Plaintiffs do not argue that Defendants violated Item 103

by not disclosing the EDTX U.S. Attorney's Office's known contemplation of

district court criminal proceedings following Walmart's indictment or civil

proceedings following the filing of a civil complaint against Walmart by the DOJ.

Under Item 103, "[n]o information need be given under this section for

proceedings . . . [t]hat involve primarily a claim for damages if the amount

involved, exclusive of interest and costs, does not exceed 10 percent of the current

assets of the registrant and its subsidiaries on a consolidated basis." 17 C.F.R.

§ 229.103(b)(2). And, here, there are no allegations in the SAC that the DOJ

would have claimed damages in the EDTX's contemplated criminal and civil

proceedings against Walmart that exceeded ten percent of the assets of Walmart

and its subsidiaries on a consolidated basis.

## IV.    CONCLUSION

Because Plaintiffs have failed to allege with particularity actionable false and misleading statements in the challenged SEC filings, I will grant Defendants' motion to dismiss.